## RECORD NUMBERS: 14-1167 (L), 14-1169, 14-1173

*In the*

# United States Court of Appeals

*for the*

# Fourth Circuit

TIMOTHY B. BOSTIC, et al.,
*Plaintiffs-Appellees,*

and

JOANNE HARRIS, JESSICA DUFF, CHRISTY BERGHOFF
and VICTORIA KIDD, on behalf of themselves and all others similarly situated,
*Intervenors,*

v.

GEORGE E. SCHAEFER, III,
in his official capacity as the Clerk of the Court for Norfolk Circuit Court,
and JANET M. RAINEY,
in her official capacity as State Registrar of Vital Records, et al.,
*Defendants-Appellants,*

and

MICHELE B. McQUIGG,
in her official capacity as Prince William County Clerk of Circuit Court, et al.,
*Intervenor / Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT NORFOLK

## BRIEF OF *AMICUS CURIAE* DR. PAUL McHUGH IN SUPPORT OF DEFENDANTS-APPELLANTS AND REVERSAL

GERARD V. BRADLEY, ESQ.
NOTRE DAME LAW SCHOOL
3156 Eck Hall
Notre Dame, Indiana 46556
(574) 631-8385 Telephone
(574) 631-8078 Facsimile
Email: Gerard.V.Bradley.16@nd.edu

KEVIN T. SNIDER, ESQ.
PACIFIC JUSTICE INSTITUTE
212 9th Street, Suite 208
Oakland, California 94607
(510) 834-7232 Telephone
(510) 834-8784 Facsimile
Email: KSnider@pji.org

*Attorneys for Amicus Curiae Dr. Paul McHugh*



COUNSEL PRESS · (800) 3-APPEAL

PRINTED ON RECYCLED PAPER



# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

INTEREST OF AMICUS CURIAE ......................................................1

SUMMARY OF ARGUMENT ............................................................1

ARGUMENT .....................................................................................3

I.    Sexual Orientation Does Not Define a Discrete and Insular Minority. ..........3

    A.    Threshold Questions Prevent this Court from Defining a Class Based on Sexual Orientation with Sufficient Clarity. ..........................3

    B.    Social Science Experts Raise Serious Doubts About the Definability of Sexual Orientation. ........................................................7

II.   Sexual Orientation is Not an Immutable Characteristic. ...............................14

    A.    Immutability Means Solely an Accident of Birth. ..............................14

    B.    Sexual Orientation Is Not *Solely* an Accident of Birth. .....................15

    C.    Sexual Orientation Can and Often Does Change Over Time. ............20

CONCLUSION .....................................................................................27

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases**

*Ben-Shalom v. Marsh,*
        881 F. 2d 454 (7th Cir. 1989) ..........................................................4

*Burlington N. R.R. Co. v. Ford*,
        504 U.S. 648 (1992) .........................................................................4

*Citizens for Equal Prot. v. Bruning*,
        455 F.3d 859 (8th Cir. 2006) ...........................................................4

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
        473 U.S. 432 (1985) ...................................................................... 5-7

*Equal. Found. of Greater Cincinnati, Inc. v. City of Cincinnati*,
        128 F.3d 289 (6th Cir. 1997) ...........................................................4

*Frontiero v. Richardson,*
        411 U.S. 677 (1973) .......................................................................14

*Gomez v. Perez,*
        409 U.S. 535 (1973) .......................................................................14

*Graham v. Richardson,*
        403 U.S. 365 (1971) .......................................................................14

*Johnson v. Johnson,*
        385 F.3d 503 (5th Cir. 2004) ...........................................................4

*Lawrence v. Texas*,
        539 U.S. 558 (2003) .........................................................................3

*Locke v. Davey,*
        540 U.S. 712 (2004) .........................................................................4

*Lofton v. Sec'y of Dep't of Children & Family Servs.*,
        358 F.3d 804 (11th Cir. 2004) .........................................................4

*Lyng v. Castillo,*
        477 U.S. 635 (1986) ...................................................................5, 14

*Massachusetts Bd. of Ret. v. Murgia*,
    427 U.S. 307 (1976)...................................................................... 2, 4-5,7

*Massachusetts v. Dep't of Health & Human Servs.*,
    682 F.3d 1 (1st Cir. 2012)...............................................................4

*McLaughlin v. Florida*,
    379 U.S. 184 (1964).......................................................................14

*Milligan-Hitt v. Bd. of Trs. of Sheridan Cnty. Sch. Dist. No. 2*,
    523 F. 3d 1219 (10th Cir. 2008) ....................................................4

*Oyama v. California*,
    332 U.S. 633 (1948).......................................................................14

*Parham v. Hughes*,
    441 U.S. 347 (1979).......................................................................14

*Plyler v. Doe*,
    457 U.S. 202 (1982).......................................................................14

*Quiban v. Veterans Administration*,
    928 F.2d 1154 (D.C. Cir. 1991)....................................................15

*Reed v. Reed*,
    404 U.S. 71 (1971).........................................................................14

*Romer v. Evans*,
    517 U.S. 620 (1996).........................................................................3

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
    411 U.S. 1 (1973)..................................................................2, 5-7, 14

*Schweiker v. Wilson*,
    450 U.S. 221 (1981).......................................................................15

*Steffan v. Perry*,
    41 F. 3d 677 (D.C. Cir. 1994)........................................................4

*Thomasson v. Perry*,
    80 F. 3d 915 (4th Cir. 1996) .........................................................4

*United States v. Windsor*,
133 S. Ct. 2675 (2013)...............................................................3-4

*Windsor v. United States*,
699 F.3d 169 (2d Cir. 2012) .................................................4, 6-7

*Witt v. Dep't of Air Force*,
527 F.3d 806 (9th Cir. 2008) ........................................................4

*Woodward v. United States*,
871 F. 2d 1068 (Fed. Cir. 1989) ...................................................4

**Rules**

Fed. R. App. P. 29(a) ....................................................................1

**Other Authorities**

Am. Psychiatric Ass'n, *LGBT-Sexual Orientation*,
http://www.psychiatry.org/mental-health/people/lgbt-sexual-
orientation (last visited Dec. 5, 2013) .......................................19

Am. Psychol. Ass'n, *Sexual Orientation and Homosexuality: Answers to
Your Questions for a Better Understanding, What Is Sexual
Orientation?*, http://www.apa.org/topics/sexuality/orientation.aspx
?item=2  (last visited Dec. 5, 2013)..............................................9

M.V. Lee Badgett, *Money, Myths, & Change: The Economic Lives of
Lesbians & Gay Men* 4 (2001) .....................................................8

M.V. Lee Badgett, *Sexual Orientation Discrimination: An International
Perspective* 23 (2007) .................................................................18

Peter S. Bearman & Hannah Bruckner, *Opposite-Sex Twins and Adolescent
Same-Sex Attraction*, 107 Am. J. Soc. 1179 (2002) ..........................15-16, 19

Gail S. Bernstein, *Defining Sexual Orientation,* Selfhelp Magazine,
(Sept. 18, 2012) http://www.selfhelpmagazine.com/articles/sexual_
orientation .....................................................................................8

Karen L. Bridges & James M. Croteau, *Once-Married Lesbians: Facilitating Changing Life Patterns*, 73 J. Counseling & Dev. 134 (1994) .....................26

Sean Cahill et al., *Family Policy: Issues Affecting Gay, Lesbian, Bisexual and Transgender Families*, The National Gay and Lesbian Task Force Policy Institute, at 59 (2002) ........................................................................23

C. Charbonneau & P.S. Lander, *Redefining Sexuality: Women Becoming Lesbian in Mid-Life*, *in Lesbians at Mid-Life* 35 (B. Sang, et al. eds., 1991)............................................................................26

Committee on Lesbian Health Research Priorities, Inst. of Med., *Lesbian Health* 25-26 (Andrea L. Solarz ed., 1999) ......................................12

Laura Dean et al., *Lesbian, Gay, Bisexual, and Transgender Health: Findings and Concerns*, J. Gay & Lesbian Med. Ass'n, Sept. 2000, Vol. 4, at 135 ....................................................................................8,11

John P. DeCecco, *Gay Personality and Sexual Labeling* 16 (1985) .......................13

Lisa M. Diamond, *Female Bisexuality from Adolescence to Adulthood: Results from a 10-Year Longitudinal Study*, 44 Dev. Psychol. 5 (2008) ....................................................................21, 24

Lisa M. Diamond, *New Paradigms for Research on Heterosexual and Sexual Minority Dev.*, 32 (4) J. Clinical Child & Adolescent Psychol. 492 (2003). ...................................................................... 7-8

Lisa M. Diamond, *Sexual Fluidity: Understanding Women's Love and Desire* (2008) ..........................................................................21

Lisa M. Diamond, *Sexual Identity, Attractions, and Behavior Among Young Sexual-Minority Women Over a 2-Year Period*, 36 Dev. Psychol. 241 (2000) ....................................................................21

Lisa M. Diamond & Ritch C. Savin-Williams, *Explaining Diversity in the Development of Same-Sex Sexuality Among Young Women*, 56 J. Soc. Issues 297 (2000) .................................................................20, 26

Lisa M. Diamond & Ritch C. Savin-Williams, *Gender & Sexual Identity*, *in Handbook Applied Dev. Sci.* 101 (Richard M. Lerner et al. eds., 2003)... 9-10

Nigel Dickson et al., *Same Sex Attraction in a Birth Cohort: Prevalence and Persistence in Early Adulthood*, 56 Soc. Sci. & Med. 1607 (2003) ........17, 22

Richard C. Friedman & Jennifer I. Downey, *Sexual Orientation and Psychoanalysis: Sexual Science and Clinical Practice* (2002) ....................19

J.H. Gagnon, *The Explicit and Implicit Use of the Scripting Perspective in Sex Research*, 1 Ann. Rev. Sex Research, at 1-43 (1990) .................. 17-18

Linda D. Garnets & Letitia Anne Peplau, *A New Look at Women's Sexuality & Sexual Orientation*, CSW Update, Dec. 2006, at 5 (2006) .................18,21

Gary J. Gates, *How Many People Are Lesbian, Gay, Bisexual, and Transgender?*, Williams Institute 1 (2011) ...........................................25

Gary J. Gates et al., *Marriage, Registration and Dissolution by Same-Sex Couples in the U.S.*, Williams Institute 2 (2008)...........................................23

John C. Gonsiorek et al., *Definition and Measurement of Sexual Orientation*, in Suicide and Life-Threatening Behavior (1995)...................................11-13

John C. Gonsiorek & James D. Weinrich, *The Definition and Scope of Sexual Orientation*, in Homosexuality: Research Implications for Public Policy (John C. Gonsiorek & James D. Weinrich eds., 1991)...........10

G.M. Herek, *Homosexuality*, in 4 Encyclopedia Psychol. 149 (A.E. Kazdin ed., 2000) ...............................................................................17

Herek et al., *Internalized Stigma Among Sexual Minority Adults*, 56 J. Counseling Psychol. 32 (2009) ...........................................................24

A.F. Jorm et al., *Cohort Difference in Sexual Orientation: Results from a Large Age-Stratified Population Sample*, 49 Gerontology 392 (2003) ........17

Michael R. Kauth & Seth C. Kalichman, *Sexual Orientation and Development: An Interactive Approach*, in The Psychology of Sexual Orientation, Behavior, and Identity: A Handbook 82 (Louis Diamant & Richard D. McAnulty eds., 1995) ............................. 26-27

Kenneth S. Kendler et al., *Sexual Orientation in a U.S. National Sample of Twin and Nontwin Sibling Pairs*, 157 Am. J. Psychiatry 1843 (2000) .........16

Ian Kerner, *Understanding females' sexual fluidity*, CNNHealth,
(Feb. 9, 2012) http://thechart.blogs.cnn.com/2012/02/09/
understanding-females-sexual-fluidity/........................................................22

Michael King & Elizabeth McDonald, *Homosexuals Who Are Twins*,
160 Brit. J. Psychiatry 407 (1992)...................................................16

Alfred C. Kinsey et al., *Sexual Behavior in the Human Male* 639 (1948)..............12

Fritz Klein et al., *Sexual Orientation: A Multi-Variable Dynamic Process*,
J. Homosexuality, 11 (1), at 35-49 (1985).......................................11

Niklas Langstrom et al., *Genetic and Environmental Effects on Same-sex
Sexual Behavior: A Population Study of Twins in Sweden*,
Arch. Sexual Behavior 77-78 (2010)....................................................... 15-16

*'Late-Life Lesbians' Reveal Fluidity Of Sexuality*, NPR, (Aug. 7, 2010)
http://www.npr.org/templates/story/story.php?storyId=129050832.............22

Edward O. Laumann et al., *The Social Organization of Sexuality:
Sexual Practices in the United States* 299 (1994) ............................11, 17, 23

A.E. Moses & R.O. Hawkins, Jr., *Counseling Lesbian Women
and Gay Men:  A Life Issues Approach* 43 (1982) .........................................9

Timothy F. Murphy, *Gay Science: The Ethics of Sexual Orientation
Research* 15-24 (1997) .....................................................................................12

Letitia Ann Peplau, *Rethinking Women's Sexual Orientation:
An Interdisciplinary, Relationship-Focused Approach*,
Pers. Relationships 8 (2001).........................................................................23

Letitia Anne Peplau & Linda D. Garnets, *A New Paradigm for
Understanding Women's Sexuality and Sexual Orientation*,
56 J. Soc. Issues 329 (2000) ...................................................................15, 21

Letitia Ann Peplau et al., *The Development of Sexual Orientation in Women*,
10 Ann. Rev. Sex Research, at 70 (1999).........................................10, 19, 21

Todd A. Salzman & Michael G. Lawler, *The Sexual Person: Toward
a Renewed Catholic Anthropology* (2008)e doc ......................................8, 13

Joseph P. Stokes et al, *Predictors of Movement Toward Homosexuality:*
 *A Longitudinal Study of Bisexual Men*, 43 J. Sex Res. 304 (1997)...............22

Ann E. Tweedy, *Polyamory as a Sexual Orientation*,
 79 U. Cin. L. Rev. 1461 (2011) ....................................................................13

Zhana Vrangalova & Ritch C. Savin-Williams, *Mostly Heterosexual and*
 *Mostly Gay/Lesbian: Evidence of New Sexual Orientation Identities*,
 Archives Sexual Behav., Feb. 2012, at 85...............................................12, 25

Williams Institute, http://williamsinstitute.law.ucla.edu/mission
 (last visited Dec. 5, 2013) ..............................................................................11

Williams Institute: Sexual Minority Assessment Research Team, *Best*
 *Practices for Asking Questions about Sexual Orientation on Surveys*,
 6-7 (Nov. 2009), http://williamsinstitute.law.ucla.edu/wp-content/
 uploads/SMART-FINAL-Nov-2009.pdf...............................................10, 11

## INTEREST OF AMICUS CURIAE[1][2]

*Amicus* Dr. Paul McHugh, M.D. is the University Distinguished Service Professor of Psychiatry at the Johns Hopkins University School of Medicine. From 1975 until 2001, Dr. McHugh was the Henry Phipps Professor of Psychiatry and the Director of the Department of Psychiatry and Behavioral Science at Johns Hopkins. At the same time, he was psychiatrist-in-chief at the Johns Hopkins Hospital. His scholarship and expertise include issues of gender identity and sexual orientation. Dr. McHugh appears as an *amicus* to address whether sexual orientation, like race and gender, is a clearly definable (discrete) category or a fixed and immutable characteristic—factors that are highly relevant to whether sexual orientation is a suspect classification. He concludes based on the current state of scientific knowledge that sexual orientation is neither.

## SUMMARY OF ARGUMENT

Compelling reasons counsel against acceding to demand that this Court declare sexual orientation as a suspect classification. Even ignoring the substantial and growing political power of the LGBT-rights movement, which alone should be sufficient to reject the demand for heightened scrutiny, sexual orientation is neither

---

[1] No party's counsel authored the brief in whole or in part, and no one other than *amicus* or his counsel contributed money that was intended to fund preparing or submitting the brief.

[2] This brief is filed with all parties' consent, and as a result, no motion for leave to file is required. *See* Fed. R. App. P. 29(a).

a "discrete" nor "immutable" characteristic in the legal sense of those terms. Under the Supreme Court's longstanding jurisprudence, therefore, sexual orientation should not be granted the "extraordinary protection from the majoritarian political process" entailed by suspect-class status. *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 313 (1976) (citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973)).

Numerous decisions express the Supreme Court's understanding that heightened scrutiny is improper for classifications that are insufficiently discrete. Discreteness requires, at least, that a group or trait be clearly defined. Sexual orientation fails that test. A review of scientific studies demonstrates that there is no scholarly consensus on how to define sexual orientation, and that the various definitions proposed by experts produce substantially different classes. In contrast with race and sex, which are well-defined and understood, and despite popular beliefs to the contrary, sexual orientation remains a contested and indeterminate classification.

The Supreme Court's jurisprudence teaches that immutability is a necessary characteristic for heightened-scrutiny protection, and that the class-defining trait must be determined solely by accident of birth. Unlike the traits of race and sex, and again despite popular beliefs to the contrary, no replicated scientific study supports the view that sexual orientation is determined at birth. Studies conclude,

instead, that sexual orientation is influenced by complex and unpredictable factors. Even if, contrary to past Supreme Court decisions, this Court were to expand the concept of immutability from a trait determined by accident of birth to a personal trait that cannot change—and there are surely many of those—scientific research offers substantial evidence that sexual orientation is far more fluid than commonly assumed.

This brief takes no position on sexual orientation's proper definition or cause. Those are matters for ongoing scholarly inquiry and debate. *Amicus*'s more modest point is that scholars do not know enough about what sexual orientation is, what causes it, and why and how it sometimes changes for this Court to recognize it as the defining feature of a new suspect class.

## ARGUMENT

## I. Sexual Orientation Does Not Define a Discrete and Insular Minority.

### A. Threshold Questions Prevent this Court from Defining a Class Based on Sexual Orientation with Sufficient Clarity.

The Supreme Court has never suggested that sexual orientation is a suspect class entitled to heightened scrutiny under the Equal Protection Clause,[3] and no fewer than 10 federal circuits, including this Court, have considered and rejected

---

[3] The leading cases on sexual orientation are *Romer v. Evans*, 517 U.S. 620 (1996), decided using "conventional" rational-basis review, *Lawrence v. Texas*, 539 U.S. 558 (2003), decided under the Due Process Clause and not as a matter of equal protection, and *United States v. Windsor*, 133 S. Ct. 2675 (2013), decided without applying heightened scrutiny.

that claim.[4] Only the Second Circuit has held that "homosexuals compose a class that is subject to heightened scrutiny." *Windsor v. United States*, 699 F.3d 169, 185 (2d Cir. 2012), *reviewed by United States v. Windsor*, 133 S. Ct. 2675 (2013) (not creating a new suspect classification based on sexual orientation).

Adding sexual orientation to the catalog of suspect classes is a significant legal step that established equal protection jurisprudence does not support. Heightened scrutiny applies to certain classifications, such as race, alienage, national origin, and gender, to protect "discrete and insular group[s], in need of extraordinary protection from the majoritarian political process." *Murgia*, 427 U.S. at 313 (quotation marks omitted).[5]  But the Supreme Court has repeatedly

---

[4] *See Massachusetts v. Dep't of Health & Human Servs.*, 682 F.3d 1, 9-10 (1st Cir. 2012); *Thomasson v. Perry*, 80 F. 3d 915 (4th Cir. 1996); *Johnson v. Johnson*, 385 F.3d 503, 532 (5th Cir. 2004); *Equal. Found. of Greater Cincinnati, Inc. v. City of Cincinnati*, 128 F.3d 289 (6th Cir. 1997); *Ben-Shalom v. Marsh*, 881 F. 2d 454, 464 (7th Cir. 1989); *Citizens for Equal Prot. v. Bruning*, 455 F.3d 859, 866 (8th Cir. 2006); *Witt v. Dep't of Air Force*, 527 F.3d 806, 821 (9th Cir. 2008); *Milligan-Hitt v. Bd. of Trs. of Sheridan Cnty. Sch. Dist. No. 2*, 523 F. 3d 1219, 1233 (10th Cir. 2008); *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 818 & n.16 (11th Cir. 2004); *Steffan v. Perry*, 41 F. 3d 677 (D.C. Cir. 1994) (*en banc*); *Woodward v. United States*, 871 F. 2d 1068 (Fed. Cir. 1989).

[5] Although religion is often listed as a suspect class for equal protection purposes, *see, e.g.*, *Burlington N. R.R. Co. v. Ford*, 504 U.S. 648, 651 (1992), heightened scrutiny for religious discrimination arises directly from the First Amendment rather than from factors like immutability and political powerlessness that justify suspect-class status under the Equal Protection Clause of the Fourteenth Amendment.  Hence, once the requirements of the Free Exercise and Establishment Clauses have been satisfied, any further religious discrimination claims under the Equal Protection Clause are subject only to rational basis review. *See Locke v. Davey*, 540 U.S. 712, 720 n.3 (2004).

declined to apply heightened scrutiny where discreteness or insularity is lacking. *Id.* at 313-314 ("old age does not define a 'discrete and insular' group" (quoting *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152-53 n.4 (1938)); *Rodriguez*, 411 U.S. at 25-28 (1973) (explaining that the law in question did not discriminate against any "definable category of 'poor' people," but rather against a "large, diverse, and amorphous class"); *Lyng v. Castillo*, 477 U.S. 635, 638 (1986) (noting that close relatives are not a suspect class because they "do not exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group"); *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 445 (1985) (denying protected status to the mentally disabled in part because they are a "large and amorphous" class). These decisions teach that "where individuals in the group affected by a law have distinguishing characteristics relevant to interests the State has the authority to implement, the courts have been very reluctant, as they should be in our federal system and with our respect for the separation of powers, to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued." *City of Cleburne*, 473 U.S. at 441-42.

The Supreme Court's reluctance to create new suspect classes is particularly appropriate here because sexual orientation is a less discrete characteristic than age or poverty—two categories that the Court has already refused to accord suspect-class status. In *Rodriguez*, for instance, the Court rejected the claim that the Texas

statutory regime for allocating funds to public schools violated the Equal Protection Clause by discriminating against the poor. 411 U.S. at 54-55. The Court sharply criticized lower courts for "virtually assum[ing] their findings of a suspect classification through a simplistic process of analysis: since, under the traditional systems of financing public schools, some poorer people receive less expensive educations than other more affluent people, these systems discriminate on the basis of wealth." *Id.* at 19. The Court warned that "[t]his approach largely ignores the hard threshold questions, including whether it makes a difference for purposes of consideration under the Constitution that the class of disadvantaged 'poor' cannot be identified or defined in customary equal protection terms." *Id.* Such "hard threshold questions" determine whether a class ought to be accorded special treatment under the Fourteenth Amendment—questions that begin with whether the equal protection claim is clothed with a "definitive description of the classifying facts or delineation of the disfavored class." *Id; accord City of Cleburne*, 473 U.S. at 442 & n.9 (rejecting the mentally disabled as a suspect class).

In the face of overwhelming consensus among the circuits (including this one) that heightened scrutiny does not apply, proponents of same-sex marriage rely on the Second Circuit's opinion in *Windsor*—the one circuit opinion that has held to the contrary. In *Windsor*, however, the Second Circuit "ignore[d] the hard

threshold questions," by reasoning that a class is sufficiently discrete to qualify for heightened scrutiny if its identifying "characteristic invites discrimination when it is manifest." *Windsor*, 699 F.3d at 184. A test so indeterminate conflicts with *Murgia*, *Rodriguez*, and *City of Cleburne*, because age, poverty, and mental disability can "invite[] discrimination when [they are] manifest." *Id.* Certain types of sexual orientation may invite discrimination in particular circumstances, but it does not follow that sexual orientation is the characteristic of a discrete class. To be sure, sexual orientation characterizes the difference between heterosexuals, gay men, lesbians, and bisexuals. But for reasons *amicus* explains below, sexual orientation also may characterize points along a continuum of sexual attraction, sexual behavior, and sexual identity where individual categories are anything but distinct. For that reason alone, sexual orientation should be rejected as the basis for heightened scrutiny because it "cannot be identified or defined in customary equal protection terms." *Rodriguez*, 411 U.S. at 19.

## B. Social Science Experts Raise Serious Doubts About the Definability of Sexual Orientation.

Deep conceptual and empirical difficulties prevent sexual orientation from being used to define a discrete class of persons. Sexual orientation is a complex and amorphous phenomenon that often defies consistent and uniform definition. "There is currently no scientific or popular consensus . . . that definitively 'qualify' an individual as lesbian, gay, or bisexual." Lisa M. Diamond, *New Paradigms for*

*Research on Heterosexual and Sexual Minority Dev.*, 32 (4) J. Clinical Child & Adolescent Psychol. 492 (2003). "Much of the confusion about sexual orientation occurs because there is no single agreed upon definition of the term. . . . There is no one universally accepted definition of sexual orientation, nor of who is bisexual, lesbian, or gay." Gail S. Bernstein, *Defining Sexual Orientation,* Selfhelp Magazine, (Sept. 18, 2012) http://www.selfhelpmagazine.com/articles/ sexual_orientation. *See also* Todd A. Salzman & Michael G. Lawler, *The Sexual Person: Toward a Renewed Catholic Anthropology* 65 (2008) ("The meaning of the phrase 'sexual orientation' is complex and not universally agreed upon.").

Scientific literature often mentions three different ways to define homosexuality: "someone who engages in same-sex sexual behavior," "[s]omeone who fantasizes about such acts," or "[s]omeone who will identify himself or herself as gay or lesbian[.]" M.V. Lee Badgett, *Money, Myths, & Change: The Economic Lives of Lesbians & Gay Men* 4 (2001). Most definitions of sexual orientation "include[] components of at least one of three" of the dimensions of behavior, attraction, and identity. Laura Dean et al., *Lesbian, Gay, Bisexual, and Transgender Health: Findings and Concerns*, J. Gay & Lesbian Med. Ass'n, Sept. 2000, Vol. 4, at 135. Some definitions include all three and, additionally, membership in a community defined by sexual orientation. The APA's definition holds that "[s]exual orientation refers to an enduring pattern of emotional,

romantic, and/or sexual *attractions* to men, women, or both sexes. Sexual orientation also refers to a person's sense of *identity* based on those attractions, related *behaviors*, and *membership in a community* of others who share those attractions." Am. Psychol. Ass'n, *Sexual Orientation and Homosexuality: Answers to Your Questions for a Better Understanding, What Is Sexual Orientation?*, http://www.apa.org/topics/sexuality/orientation.aspx?item=2 (last visited Dec. 5, 2013) (emphasis added).

One of the problems with sexual orientation, so defined, is that many people are not consistent across all three dimensions. "There is a physical orientation, an affectional orientation, and a fantasy orientation, with each of those three further divided into a past (historical) component and a present component. A person's behavior may be totally at variance with all aspects of orientation, and the various parts of orientation may not all agree." A.E. Moses & R.O. Hawkins, Jr., *Counseling Lesbian Women and Gay Men: A Life Issues Approach* 43 (1982). "The more carefully researchers map these constellations, differentiating, for example, between gender identity and sexual identity, desire and behavior, sexual versus affectionate feelings, early-appearing versus late-appearing attractions and fantasies, or social identifications and sexual profiles, the more complicated the picture becomes because few individuals report uniform intercorrelations among these domains." Lisa M. Diamond & Ritch C. Savin-Williams, *Gender & Sexual*

*Identity*, *in Handbook Applied Dev. Sci.* 101, 102 (Richard M. Lerner et al. eds., 2003). Many other researchers also acknowledge discordance between components of sexual orientation. *See* John C. Gonsiorek & James D. Weinrich, *The Definition and Scope of Sexual Orientation*, *in Homosexuality: Research Implications for Public Policy* 8 (John C. Gonsiorek & James D. Weinrich eds., 1991) ("It can be safely assumed that there is no necessary relationship between a person's sexual behavior and self-identity unless both are individually assessed."); Letitia Ann Peplau et al., *The Development of Sexual Orientation in Women*, 10 Ann. Rev. Sex Research, at 70 (1999) ("[T]here is ample documentation that same-sex attractions and behaviors are not inevitably or inherently linked to one's identity.").

Practical consequences follow from these definitional uncertainties. Different definitions produce substantially different estimates of the size of the homosexual population. "Sizable numbers of people reporting only same-sex attraction and/or behavior self-identify as heterosexual or bisexual. Similarly, sizable numbers of those who identify as gay or lesbian report some sexual partners of a different sex and/or some level of attraction to different sex partners." Williams Institute: Sexual Minority Assessment Research Team, *Best Practices for Asking Questions about Sexual Orientation on Surveys*, 6-7 (Nov. 2009), http://williamsinstitute.law.ucla.edu/wp-content/uploads/SMART-FINAL-Nov-

2009.pdf.[6]    The "Chicago Sex Survey," considered one of the most reliable scholarly efforts to determine sexual practices in the United States, reported that from the portion of the population exhibiting at least one of the three components of sexual orientation, only 15% of the women and 24% of the men exhibited all three.    *See* Edward O. Laumann et al., *The Social Organization of Sexuality: Sexual Practices in the United States* 299 (1994).    This and other national studies led one group of researchers to conclude that "[d]epending upon how [the class] is defined and measured, 1-21% of the population could be classified as lesbian or gay to some degree, with the remainder classified as bisexual or heterosexual to some degree."    Dean et al., *supra*, at 135.

Even more problematic, the definitional complexity is not limited to the familiar categories of straight, homosexual, bisexual, and their variations.    Some researchers believe that "sexual orientation cannot be reduced to a bipolar or even a tripolar process, but must be recognized within a dynamic and multi-variate framework." Fritz Klein et al., *Sexual Orientation: A Multi-Variable Dynamic Process*, J. Homosexuality, 11 (1), at 35-49 (1985).    Others recommend the use of a 17-question, multiple-subpart test to measure sexual orientation.    John C. Gonsiorek et al., *Definition and Measurement of Sexual Orientation*, *in Suicide*

---

[6] The Williams Institute is an LGBT-rights think tank at UCLA Law.    *See* Williams Institute, http://williamsinstitute.law.ucla.edu/mission (last visited Dec. 5, 2013).

*and Life-Threatening Behavior* 40 (1995). Still other researchers say that sexual orientation must be analyzed on a continuum. *See* Zhana Vrangalova & Ritch C. Savin-Williams, *Mostly Heterosexual and Mostly Gay/Lesbian: Evidence of New Sexual Orientation Identities*, Archives Sexual Behav., Feb. 2012, at 85, 96 ("Taken together, these data suggest that sexual orientation is a continuously distributed characteristic and decisions to categorize it into discrete units, regardless of how many, may be useful for particular research questions but are ultimately external impositions that are not consistent with reports of individuals."); Committee on Lesbian Health Research Priorities, Inst. of Med., *Lesbian Health* 25-26 (Andrea L. Solarz ed., 1999) ("In general, sexual orientation is most often described as including behavioral, affective (i.e., desire or attraction), and cognitive (i.e., identity) dimensions that occur along continua."). And others, with the caveat that "the concept of sexual orientation is a product of contemporary Western thought," apply a distinct definition for a specific research purpose. Timothy F. Murphy, *Gay Science: The Ethics of Sexual Orientation Research* 15-24 (1997); Alfred C. Kinsey et al., *Sexual Behavior in the Human Male* 639 (1948) ("Males do not represent two discrete populations, heterosexual and homosexual.").

Given the complexities of defining sexual orientation, it should not be surprising that some experts openly admit that "the categories of homosexual, gay,

and lesbian do not signify a common, universal experience." Salzman & Lawler, *supra*, at 2. Because there is no common experience, one can anticipate arguments for an ever-broadening definition of exactly who belongs in a judicially protected class founded on sexual orientation. "It will be useful to expand our notions of sexual orientation to include more than just bisexuality, heterosexuality and homosexuality. . . . With respect to various components of sexual orientation, an individual may be heterosexual, homosexual, bisexual, as well as fetishistic, transvestitic, zoophiliac, and so on. It is important to note that these are not mutually exclusive categories." John P. DeCecco, *Gay Personality and Sexual Labeling* 16 (1985). Even polyamory, "a preference for having multiple romantic relationships simultaneously," has been defended as "a type of sexual orientation for purposes of anti-discrimination law." Ann E. Tweedy, *Polyamory as a Sexual Orientation*, 79 U. Cin. L. Rev. 1461, 1462 (2011). And "asexuality"—the absence of any sexual attraction—is being discussed as a possible sexual orientation. *Id.* at 1463 n.4. Its very capaciousness might lead one reasonably to "conclude there is serious doubt whether sexual orientation is a valid concept at all. Social constructionism suggests that there is nothing 'real' about sexual orientation except a society's construction of it." Gonsiorek et al., *supra*, at 4.

In sum, then, because scientific experts cannot agree on how to define it with substantial certainty, this Court should reject the category of sexual orientation as

incapable of being "identified or defined in customary equal protection terms." *Rodriguez*, 411 U.S. at 19.

## II. Sexual Orientation is Not an Immutable Characteristic.

### A. Immutability Means Solely an Accident of Birth.

Sexual orientation also fails the ordinary standards for heightened scrutiny because it is not immutable. Every class to which the Supreme Court has applied heightened scrutiny is defined by an immutable characteristic. *Parham v. Hughes*, 441 U.S. 347, 351 (1979) (citing *McLaughlin v. Florida*, 379 U.S. 184 (1964) (race); *Oyama v. California*, 332 U.S. 633 (1948) (national origin); *Graham v. Richardson*, 403 U.S. 365 (1971) (alienage); *Gomez v. Perez*, 409 U.S. 535 (1973) (illegitimacy); *Reed v. Reed*, 404 U.S. 71 (1971) (gender)). Moreover, the Supreme Court has refused to apply heightened scrutiny to classes that are not marked by an immutable characteristic. *E.g.*, *Plyler v. Doe*, 457 U.S. 202, 220 (1982) (undocumented aliens); *Lyng v. Castillo*, 477 U.S. 635, 639 (1986) (close relatives). The Court's jurisprudence makes clear that immutability is a necessary condition for recognizing a new protected class.

The Supreme Court's precedents teach that immutability denotes a characteristic "determined solely by the accident of birth." *Frontiero*, 411 U.S. at 686. As then-Judge Ginsburg explained, "the 'immutable characteristic' notion . . . does not mean, broadly, something done that cannot be undone. Instead, it is a trait

'determined *solely* by accident of birth.'"  *Quiban v. Veterans Administration*, 928 F.2d 1154, 1160 n.13 (D.C. Cir. 1991) (quoting *Schweiker v. Wilson*, 450 U.S. 221, 229 n.11 (1981)).

### B.    Sexual Orientation Is Not *Solely* an Accident of Birth.

Sexual orientation, unlike race or gender, is not determined solely or even primarily at birth—indeed, there is no convincing evidence that biology is decisive. On the contrary, some researchers have concluded that biological and genetic factors play little to no role in sexual orientation.  *E.g.,* Letitia Anne Peplau & Linda D. Garnets, *A New Paradigm for Understanding Women's Sexuality and Sexual Orientation*, 56 J. Soc. Issues 329, 332 (2000) ("Although additional research will fill in gaps in our knowledge, there is no reason to expect that biological factors play anything other than a minor and probably indirect role in women's sexual orientation.").  Rather, there is "substantial indirect evidence in support of a socialization model at the individual level."  Peter S. Bearman & Hannah Bruckner, *Opposite-Sex Twins and Adolescent Same-Sex Attraction*, 107 Am. J. Soc. 1179, 1180 (2002) (finding "no support for genetic influences on same-sex preference net of social structural constraints.").

Studies of identical twins have confirmed that same-sex attraction is not solely determined by heredity or other biological factors.  *See id.* at 1196-97 (finding concordance rates of 6.7% for identical twins); Niklas Langstrom et al.,

*Genetic and Environmental Effects on Same-sex Sexual Behavior: A Population Study of Twins in Sweden*, Arch. Sexual Behavior 77-78 (2010) (finding concordance rates of 18% for male identical twins and 22% for female identical twins); Kenneth S. Kendler et al., *Sexual Orientation in a U.S. National Sample of Twin and Nontwin Sibling Pairs*, 157 Am. J. Psychiatry 1843, 1845 (2000) (finding concordance rates of 31.6% for identical twins). Because there is not 100% concordance among identical twins, genetic factors are not the sole cause of sexual orientation. *See* Michael King & Elizabeth McDonald, *Homosexuals Who Are Twins*, 160 Brit. J. Psychiatry 407, 409 (1992) (concluding that "genetic factors are insufficient explanation of the development of sexual orientation" because "[t]he co-twins of men and women who identify themselves as homosexual appear to have a potential for a range of sexual expression").

Other studies have found strong correlations between sexual orientation and external factors, such as family setting, environment, and social conditions, which are difficult—if not impossible—to explain under exclusively biological theories. Professors at Columbia University reported, for instance, that "[a]mong male [opposite-sex] twins, the proportion reporting a same-sex romantic attraction is twice as high among those without older brothers (18.7%) than among those with older brothers (8.8%)." Bearman & Bruckner, *supra*, at 1196-97. Researchers in Australia discovered "a major cohort effect in same-gender sexual behavior" and

noted that this had "implications for purely biological theories of sexual orientation, because there must be historical changes in environmental factors that account for such an effect." A.F. Jorm et al., *Cohort Difference in Sexual Orientation: Results from a Large Age-Stratified Population Sample*, 49 Gerontology 392, 393 (2003). The Chicago Sex Survey found that men were twice as likely, and women nine times as likely, to identify as gay or bisexual if they had completed college. Laumann et al., *supra*, at 305. Researchers in New Zealand noted a correlation between sexual orientation and certain social conditions: "The overall higher rate of same-sex attraction and contact for women in New Zealand in relation to other comparable countries, almost certainly represents a recent increase in prevalence. As such it argues strongly against a purely genetic explanation and suggests the environment can have a significant influence. It might be related to social changes which have happened with particular intensity and rapidity in this country." Nigel Dickson et al., *Same Sex Attraction in a Birth Cohort: Prevalence and Persistence in Early Adulthood*, 56 Soc. Sci. & Med. 1607, 1613 (2003).

Studies like these have led scientists to conclude that sexual orientation is influenced by a variety of factors beyond genetics or biology alone. *See*, *e.g.*, G.M. Herek, *Homosexuality*, *in* 4 *Encyclopedia Psychol.* 149, 150 (A.E. Kazdin ed., 2000) (political or aesthetic values); J.H. Gagnon, *The Explicit and Implicit*

17

*Use of the Scripting Perspective in Sex Research*, 1 Ann. Rev. Sex Research, at 1-43 (1990) (visible gay and lesbian communities); M.V. Lee Badgett, *Sexual Orientation Discrimination: An International Perspective* 23 (2007) (socioeconomic outcomes); Linda D. Garnets & Letitia Anne Peplau, *A New Look at Women's Sexuality & Sexual Orientation*, CSW Update, Dec. 2006, at 5 (2006) (sexual orientation is shaped by "cultural beliefs about gender and sexuality, by kinship systems, by economic opportunities, by social status and power, by attitudes about women's roles, by whether or not sexual identities are recognized in a given culture, and by attitudes of acceptance versus rejection toward sexual minorities.").[7]

    In brief, available evidence casts serious doubt on the simplistic, popular notion that sexual orientation is biologically determined. There is simply no firm evidence, only unproven theories, to support that conclusion. As the American

---

[7] It is sometimes suggested that sexual orientation is genetically based, and that its development and expression owe, to some limited extent, to very early life experiences. In this view, sexual orientation is like left-handedness, which appears to be both inherited and a product of early childhood developmental. There is, however, little social scientific evidence to support this hypothesis. Indeed, if this hypothesis were sound, one would expect that sexual orientation, like left-handedness, would be randomly and uniformly distributed throughout the population. But it is not so distributed. Laumann and collaborators have shown, for example, that there is a remarkable difference in male homosexual behavior rates in America, depending upon whether the subject lived through adolescence in a rural or an urban area. Whereas only 1.2% of males with rural adolescence had a male sexual partner in the year of survey, those with metropolitan adolescence had nearly four times (4.4%) that rate of male sexual partners. Laumann, et al, *supra*, at 303-04.

Psychiatric Association's latest statement on the issue summarizes: "Currently there is a renewed interest in searching for biological etiologies for homosexuality. *However, to date there are no replicated scientific studies supporting any specific biological etiology for homosexuality*." *See* Am. Psychiatric Ass'n, *LGBT-Sexual Orientation*, http://www.psychiatry.org/mental-health/people/lgbt-sexual-orientation (last visited Dec. 5, 2013) (emphasis added); *see also* Peplau et al., *Development of Sexual Orientation*, *supra*, at 81 ("To recap, more than 50 years of research has failed to demonstrate that biological factors are a major influence in the development of women's sexual orientation. . . . Contrary to popular belief, scientists have not convincingly demonstrated that biology determines women's sexual orientation."). And some research suggests that biology does not even play an important role in determining sexual orientation. *See* Bearman & Bruckner, *supra*, at 1180. Therefore, "the assertion that homosexuality is genetic is so reductionistic that it must be dismissed out of hand as a general principle of psychology." Richard C. Friedman & Jennifer I. Downey, *Sexual Orientation and Psychoanalysis: Sexual Science and Clinical Practice* 39 (2002).

The best available evidence thus concludes that sexual orientation is not a trait determined *solely* by accident of birth, and thus that it is not an immutable characteristic for purposes of constitutional equal protection analysis.

## C.    Sexual Orientation Can and Often Does Change Over Time.

Even if the concept of immutability were expanded from a trait determined by accident of birth to a trait that is firmly resistant to change, there is significant evidence that sexual orientation is more plastic than commonly supposed.[8] Changes in sexual orientation are difficult to measure because of the definitional ambiguities described above, but researchers have found that all three of the most frequently mentioned dimensions of sexual orientation—attraction, behavior, and identity—are subject to change over time.  Moreover, the presence of a large bisexual population is evidence that sexual orientation is, for some people and to some extent, fluid.

Research suggests that a person's sexual orientation is not entirely fixed and may be influenced by individual preference or choice.  *See* Lisa M. Diamond & Ritch C. Savin-Williams, *Explaining Diversity in the Development of Same-Sex Sexuality Among Young Women*, 56 J. Soc. Issues 297, 301 (2000) ("Contrary to the notion that most sexual minorities undergo a one-time discovery of their true identities, 50% of [a study's] respondents had changed their identity label more than once since first relinquishing their heterosexual identity.").  Sexual orientation

---

[8] The Supreme Court has never suggested such an expansive approach, which could potentially lead to dozens of new suspect classes based on personal traits or conditions that are nearly impossible to change, such as certain mental illnesses or physical disabilities.  The point is that even under a more liberal approach, sexual orientation would not qualify as immutable.

appears to be especially plastic for women. *See* Peplau et al., *Development of Sexual Orientation*, *supra*, at 93 (noting the "astonishing sexual plasticity of the human female"). "Female sexual development is a potentially continuous, lifelong process in which multiple changes in sexual orientation are possible . . . . Women who have had exclusively heterosexual experiences may develop an attraction to other women, and vice versa." Garnets & Peplau, *A New Look*, *supra*, at 5. Researchers have found that "both women's identification as lesbian, bisexual, or heterosexual and women's actual behavior can vary over time." Peplau & Garnets, *A New Paradigm*, *supra*, at 333; *see also* Lisa M. Diamond, *Sexual Identity, Attractions, and Behavior Among Young Sexual-Minority Women Over a 2-Year Period*, 36 Dev. Psychol. 241, 247 (2000) ("Half of the young women . . . relinquished the first sexual-minority identity they adopted."). Indeed, a 10-year study of 79 non-heterosexual women reported that 67% changed their identity at least once, and 36% changed their identity more than once. Lisa M. Diamond, *Female Bisexuality from Adolescence to Adulthood: Results from a 10-Year Longitudinal Study*, 44 Dev. Psychol. 5, 9 (2008).[9]

---

[9] Professor Diamond's seminal research on the fluidity of female sexuality was summarized in a widely praised book published by Harvard University Press. *See* Lisa M. Diamond, *Sexual Fluidity: Understanding Women's Love and Desire* 3 (2008) ("[O]ne of the fundamental, defining features of female sexuality is its *fluidity*. We are now on the brink of a revolutionary new understanding of female sexuality that has profound scientific and social implications."). Her work on the fluidity of female sexuality has been repeatedly profiled in the mainstream media.

Research also shows changes over time in the intensity of same-sex attraction. When asked to rate their attraction to members of the same sex, many individuals vary in their own estimation over time, with some becoming more "gay" and others becoming less "gay." A study of the same-sex attraction of bisexual men reported that "homosexuality is not some monolithic construct one moves toward or from in a linear way; movement toward homosexuality fails to capture the fluid and contextual nature of sexuality. We also acknowledge that changes in sexual feelings and orientation over time occur in all possible directions." Joseph P. Stokes et al, *Predictors of Movement Toward Homosexuality: A Longitudinal Study of Bisexual Men*, 43 J. Sex Res. 304, 305 (1997) (finding that 34% of respondents moved toward homosexuality, 17% moved away, and 49% did not change). A study of same-sex attraction in a New Zealand birth cohort revealed "a surprising degree of change over time. Ten percent of men, and nearly a quarter of women, reported same-sex attraction at any time, but this nearly halved for current attraction at age 26. The changes were not just in one direction." Dickson et al., *supra*, at 1613.

Extensive studies of the real-world experiences of men and women sharply rebut the notion that sexual orientation is unchanging. The Chicago Sex Survey

---

*See, e.g.*, Ian Kerner, *Understanding females' sexual fluidity*, CNNHealth, (Feb. 9, 2012) http://thechart.blogs.cnn.com/2012/02/09/understanding-females-sexual-fluidity/; *'Late-Life Lesbians' Reveal Fluidity Of Sexuality*, NPR, (Aug. 7, 2010) http://www.npr.org/templates/story/story.php?storyId=129050832**.**

found that of those who had at least one same-sex partner in the last five years, over half of the men and two-thirds of the women also had an opposite-sex partner in the same time period. Laumann et al., *supra*, at 310-11. Scholarly surveys also show that a significant portion of individuals in same-sex relationships had previously been married to someone of the opposite sex. *See*, *e.g.*, Gary J. Gates et al., *Marriage, Registration and Dissolution by Same-Sex Couples in the U.S.*, Williams Institute 2 (2008) (reviewing data from three states and finding that "more than one in five individuals in same-sex couples who marry or register have previously been married to a different-sex partner."); Sean Cahill et al., *Family Policy: Issues Affecting Gay, Lesbian, Bisexual and Transgender Families*, The National Gay and Lesbian Task Force Policy Institute, at 59 (2002) ("According to the 1990 U.S. Census, 31 percent of lesbians and bisexual women in same-sex relationships and 19 percent of gay or bisexual men in same-sex relationships were once married to a person of the other sex."). One researcher captured the overall direction of the scientific research when she noted that "[a]lthough some may think of sexual orientation as determined early in life and relatively unchanging from then on, growing evidence indicates that the nature of a woman's intimate relationships can change throughout her life and differ across social settings." Letitia Ann Peplau, *Rethinking Women's Sexual Orientation: An Interdisciplinary, Relationship-Focused Approach*, Pers. Relationships 8, (2001), at 1 5; *see also*

Herek et al., *Internalized Stigma Among Sexual Minority Adults*, 56 J. Counseling Psychol. 32, at 37, 39 (2009) (study finding that 13% of gay men, 30% of lesbians, 41% of bisexual men, and 55% of bisexual women report "[s]ome," a "fair amount," or "a lot" of choice with respect to their sexual orientation).

One might defend the immutability of sexual orientation by insisting that anyone whose sexual orientation changes over time is bisexual and that bisexuality is a discrete category of sexual orientation. But lumping everyone whose behavior does change into a broad residual category conveniently manipulates theory to blot out the primary evidence that sexuality is often mutable and not a fixed characteristic of human behavior. *See* Diamond, *Female Bisexuality*, *supra*, at 5, 6 ("According to an essentialist perspective, individuals are thought to be endowed with fixed, early developing sexual predispositions that manifest themselves in consistent patterns of same-sex or other-sex desire over the life course. . . . Bisexual attractions pose a quandary for this model because such attractions necessarily create the potential for change over time.").

If human sexual preference were generally fluid rather than fixed, one would expect that some individuals would fall at the tails of the bell curve where behavior, attraction, and identity remain exclusively homosexual or heterosexual, while most individuals would exhibit at least some variation along the sexual orientation continuum with respect to attraction, behavior, and identity. Research

confirms this expectation. A recent report by the Williams Institute averaged the results of five recent population-based surveys, and found that of the 3.5% of the population identifying as LGB, over half (1.8%) identifies as bisexual. Gary J. Gates, *How Many People Are Lesbian, Gay, Bisexual, and Transgender?*, Williams Institute 1 (2011). Above and beyond those self-reporting an LGB identity, 4.7% of the population admits to *some* same-sex sexual experience and 7.5% acknowledges *some* degree of same-sex attraction—numbers that are much higher than the population of self-identified homosexuals. *Id.*

Another recent survey confirmed the plasticity of sexual orientation by including two additional categories—"mostly heterosexual" and "mostly homosexual"—when asking participants to identify their sexual orientation. Vrangalova & Savin-Williams, *supra*, at 85. Of the 1631 participants, 14% of men and 27% of women chose one of the three non-exclusive identities (mostly heterosexual, bisexual, mostly homosexual), while only 5% of men and 2% of women chose an exclusively homosexual identity. *Id.* at 89. Less than half of those adopting an exclusive identity reported exclusive behavior and attraction (48% of men and 39% of women). *Id.* at 94. These results suggest that sexual orientation is a fluid concept, not one that in practice denotes entirely distinct or fixed categories.

The notion that choice powerfully influences some persons' sexual orientation is highly controversial, but some studies conclude that for some women self-identity as a lesbian is experienced as a personal choice rather than an immutable constraint. Diamond & Savin-Williams, *Explaining Diversity*, *supra*, at 298 (noting that "variability in the emergence and expression of female same-sex desire during the life course is normative rather than exceptional"). Researchers Charbonneau and Lander interviewed 30 women who had spent half their lives as heterosexuals, married, had children, and then in midlife became lesbian. Some of these women explained their lesbianism as a process of self-discovery. But a "second group of women . . . regarded their change more as a choice among several options of being lesbian, bisexual, celibate or heterosexual." Karen L. Bridges & James M. Croteau, *Once-Married Lesbians: Facilitating Changing Life Patterns*, 73 J. Counseling & Dev. 134, 135 (1994) (describing C. Charbonneau & P.S. Lander, *Redefining Sexuality: Women Becoming Lesbian in Mid-Life*, *in Lesbians at Mid-Life* 35 (B. Sang, et al. eds., 1991)).

In short, scientific research on sexual identity, attraction, and behavior strongly suggests "that sexual orientation is not static and may vary throughout the course of a lifetime," especially in women. Michael R. Kauth & Seth C. Kalichman, *Sexual Orientation and Development: An Interactive Approach*, *in The Psychology of Sexual Orientation, Behavior, and Identity: A Handbook* 82 (Louis

26

Diamant & Richard D. McAnulty eds., 1995). These studies show that even if the concept of immutability were extended to mean a substantial resistance to change, available evidence tends to show that sexual orientation is more plastic than commonly supposed.

## CONCLUSION

Sexual orientation should not be recognized as a new suspect class. In contrast with other suspect classes, it is neither discrete (clearly definable) nor immutable. There is no scientific consensus on how to define sexual orientation, and the various definitions proposed by experts produce substantially different classes. Nor is there any convincing evidence that sexual orientation is biologically determined; rather, research tends to show that at least for some individuals sexual orientation is mutable (or at least malleable) over time. These are not the characteristics of a proper suspect class.

For the foregoing reasons, the Court should conclude that classifications based on sexual orientation are not subject to heightened scrutiny.

Dated: April 4, 2014                    Respectfully submitted,

                                        s/ Kevin T. Snider
Gerard V. Bradley                        Kevin T. Snider
NOTRE DAME LAW SCHOOL                     PACIFIC JUSTICE INSTITUTE
3156 Eck Hall                            212 9th Street, Suite 208
Notre Dame, IN 46556                     Oakland, California 94607
(574) 631-8385 Telephone                 (510) 834-7232 Telephone

*Counsel for Amicus Curiae Dr. Paul McHugh*

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No. 14-1167    **Caption:** Timothy Bostic v. George Schaefer, III

**CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)**
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[✓] this brief contains ____6,425____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[ ] this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[✓] this brief has been prepared in a proportionally spaced typeface using
Microsoft Word 2010 _____ [*identify word processing program*] in
Times New Roman, 14-point _____ [*identify font size and type style*]; **or**

[ ] this brief has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) Kevin T. Snider _____

Attorney for Amicus Curiae Dr. Paul McHugh

Dated: April 4, 2014 _____

# CERTIFICATE OF SERVICE

I certify that on <u>April 4, 2014</u> the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

s/ Stephen Moore
_____

Signature

April 4, 2014
_____

Date