Case Nos. 14-1167(L), 14-1169, 14-1173

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

TIMOTHY B. BOSTIC, et al., *Plaintiffs-Appellees*,
and
CHRISTY BERGHOFF, JOANNE HARRIS, JESSICA DUFF, AND
VICTORIA KIDD, on behalf of themselves and all others
similarly situated, *Intervenors*,

v.

GEORGE E. SCHAEFER, III, in his official capacity as the Clerk of
Court for Norfolk Circuit Court, *Defendant-Appellant*,
and
JANET M. RAINEY, in her official capacity as
State Registrar of Vital Records, *Defendant-Appellant*,
and
MICHÈLE B. MCQUIGG, in her official capacity as
Prince William County Clerk of Circuit Court,
*Intervenor/Defendant-Appellant*.

On Appeal from the United States District Court for the Eastern
District of Virginia, Norfolk Division

**Brief of *Amici Curiae* United States Conference of Catholic Bishops;
National Association of Evangelicals; The Church of Jesus Christ of
Latter-Day Saints; The Ethics & Religious Liberty Commission of the
Southern Baptist Convention; and Lutheran Church—Missouri Synod
In Support of Defendants-Appellants and Supporting Reversal**

ANTHONY R. PICARELLO, JR.
General Counsel
U.S. CONFERENCE OF CATHOLIC BISHOPS
3211 Fourth Street, N.E.
Washington, D.C. 20017
(202) 541-3300

R. Shawn Gunnarson
KIRTON | MCCONKIE
60 E. South Temple, Suite 1800
Salt Lake City, UT  84111
(801) 328-3600

Attorneys for *Amici Curiae* Religious Organizations

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the undersigned states that none of the religious organizations that join this brief issues stock or has a parent corporation that issues stock.

By: <u>*/s/* Anthony R. Picarello, Jr.</u>
Anthony R. Picarello, Jr.
Attorney for *Amici Curiae*
Religious Organizations

April 4, 2014

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................ i

TABLE OF AUTHORITIES ............................................................. iv

IDENTITY AND INTEREST OF *AMICI* .........................................1

INTRODUCTION .........................................................................2

ARGUMENT .................................................................................5

    I.    Virginia's Marriage Amendment Should Not Be Invalidated or Subjected to Closer Judicial Scrutiny Based on False Accusations of Animus .......................................5

        A.    We Defend Traditional Marriage Out of Fidelity to Religious Beliefs That Include But Transcend Teachings About Human Sexuality, Not Out of Animus ...............................................................7

        B.    We Defend Traditional Marriage to Protect Vital Interests in the Welfare of Children, Families, and Society ...........................................................11

            1.    Procreation and Child-Rearing Ideally Occur Within a Stable Marriage Between a Man and a Woman ...................................12

            2.    Limiting Marriage to Male-Female Couples Furthers Powerful State Interests ........................15

        C.    We Support Laws Protecting Traditional Marriage to Safeguard the Marriage Institution Against Judicial Redefinition .............................................20

II.   Virginia's Laws Reserving Marriage for a Man and a
      Woman Are Not Invalid Expressions of Animus ..................... 21

      A.   Allegations of Animus Are Relevant *Only* If a
           Law Can Be Explained Solely By Animus with No
           Other Possible Rationale .................................................... 21

      B.   Neither *Windsor* Nor *Romer* Justifies This Court
           in Construing Virginia's Marriage Laws As
           Expressions of Impermissible Animus ........................... 22

      C.   This Court Should Reject Arguments Invoking
           Animus as a Justification for Nullifying State
           Marriage Laws ................................................................. 27

III.  Virginia's Marriage Amendment Is Not Invalid Under
      the Establishment Clause Because It Was Informed by
      Religious and Moral Viewpoints ................................................. 30

CONCLUSION ................................................................................. 36

CERTIFICATE OF COMPLIANCE .............................................. 38

CERTIFICATE OF SERVICE ........................................................ 39

ADDENDUM—STATEMENTS OF INTEREST OF THE *AMICI* .......... 40

# TABLE OF AUTHORITIES

## CASES

*Bd. Ed. Westside Cnty. Schs. (Dist. 66) v. Mergens*,
496 U.S. 226 (1990) ..................................................................21, 31, 32

*Bd. Trustees Univ. Ala. v. Garrett*,
531 U.S. 356 (2001) .......................................................................22, 24

*Bond v. United States*,
564 U.S. __, 131 S. Ct. 2355 (2011)......................................................29

*Bostic v. Rainey*,
No. 2:13cv395, 2014 WL 561978 (E.D. Va. Feb. 13, 2014) ..............5, 20

*Brown v. Hartlage*,
456 U.S. 45 (1982) ................................................................................35

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) ..............................................................................32

*Clark v. Jeter*,
486 U.S. 456 (1988) ..............................................................................28

*College Savings Bank v. Florida Prepaid Postsecondary Educ.,
Expense Bd.*, 527 U.S. 666 (1999).........................................................29

*Cook v. Gates*,
528 F.3d 42 (1st Cir. 2008)...................................................................26

*Dandridge v. Williams*,
397 U.S. 471 (1970) ..............................................................................34

*Dep't of Agric. v. Moreno*,
413 U.S. 528 (1973) ..............................................................................27

*Edwards v. Aguillard*,
482 U.S. 578 (1987) ..............................................................................35

iv

*Goodridge v. Dep't of Pub. Health,*
  798 N.E.2d 941 (Mass. 2003) ............................................................... 13

*Griswold v. Connecticut,*
  381 U.S. 479 (1965) .............................................................................. 3

*Harris v. McRae,*
  448 U.S. 297, (1980) ....................................................................... 33, 34

*Heart of Atlanta Motel, Inc. v. United States,*
  379 U.S. 241 (1964) ........................................................................ 33, 34

*Hernandez v. Robles,*
  855 N.E.2d 1 (N.Y. 2006) ................................................................ 7, 14

*Illinois ex rel. McCollum v. Bd. Educ. Sch. Dist.,*
  333 U.S. 203 (1948) ............................................................................ 32

*Larson v. Valente,*
  456 U.S. 228 (1982) ............................................................................ 33

*Lawrence v. Texas,*
  539 U.S. 558 (2003) .............................................................................. 7

*Lofton v. Sec'y of Dep't of Children and Family Servs.,*
  358 F.3d 804 (11th Cir. 2004) ....................................................... 13, 14

*Maynard v. Hill,*
  125 U.S. 190 (1888) .............................................................................. 6

*McDaniel v. Paty,*
  435 U.S. 618 (1978) ........................................................................ 35, 36

*McGowan v. Maryland,*
  366 U.S. 420 (1961) ........................................................................ 33, 34

*Milner v. Apfel,*
  148 F.3d 812 (7th Cir. 1998) .............................................................. 26

*Morrison v. Sadler,*
   821 N.E.2d 15 (Ind. Ct. App. 2005) ...................................................... 12

*Murphy v. Ramsey,*
   114 U.S. 15 (1885) ................................................................................. 4

*New York Times Co. v. Sullivan,*
   376 U.S. 254 (1964) .............................................................................. 36

*Personnel Adm'r of Mass. v. Feeney,*
   442 U.S. 256 (1979) .............................................................................. 22

*Romer v. Evans,*
   517 U.S. 620 (1996) ...................................................................... *passim*

*San Antonio Indep. School Dist. v. Rodriguez,*
   411 U.S. 1 (1973) .......................................................................... 25, 28

*School Dist. of Abington Twp. v. Schempp,*
   374 U.S. 203 (1963) .............................................................................. 30

*Sosna v. Iowa,*
   419 U.S. 393 (1975) .............................................................................. 24

*Turner v. Safley,*
   482 U.S. 78 (1987) ................................................................................. 3

*United States v. O'Brien,*
   391 U.S. 367 (1968) .............................................................................. 21

*United States v. Windsor,*
   570 U.S. ___, 133 S. Ct. 2675 (2013) .......................................... *passim*

*Washington v. Davis,*
   426 U.S. 229 (1976) .............................................................................. 31

*Washington v. Glucksberg,*
   521 U.S. 702 (1997) .............................................................................. 20

*Williams v. North Carolina*,
   317 U.S. 287 (1942) ................................................................. 6

## CONSTITUTIONAL PROVISIONS AND RULES

U.S. CONST. amend. 1 ............................................................ 30

Fed. R. App. P 26.1 ...................................................................i

Fed. R. App. P 29 ............................................................... 1, 38

Fed. R. App. P 32 ................................................................. 38

## OTHER AUTHORITIES

Eric G. Andersen, *Children, Parents, and Nonparents: Protected
   Interests and Legal Standards,* 1998 BYU L. REV. 935 ...................... 14

Brief Amici Curiae of James Q. Wilson et al., Legal and Family Scholars
   In Support of Appellees, *In re Marriage Cases*, 183 P.3d 384 (Cal.
   2008) (No. S147999) ............................................................ 16

CATECHISM OF THE CATHOLIC CHURCH (2d ed. 1994) ........................... 8, 9

ESV STUDY BIBLE (2008) ........................................................ 9

Maggie Gallagher, *(How) Will Gay Marriage Weaken Marriage As a
   Social Institution: A Reply to Andrew Koppelman*,
   2 U. ST. THOMAS L.J. 33 (2004) ............................................. 13

Sherif Girgis, Robert P. George, & Ryan T. Anderson, *What is
   Marriage?*, 34 HARV. J.L. & PUB. POL'Y 245(2011) ........................ 18

MARY ANN GLENDON, ABORTION AND DIVORCE IN WESTERN LAW:
   AMERICAN FAILURES, EUROPEAN CHALLENGES (1987) ...................... 17

Cynthia C. Harper & Sara S. McLanahan, *Father Absence and Youth
   Incarceration*, 14 J. RES. ON ADOLESCENCE 369 (2004) ..................... 15

IDA HUSTED HARPER, LIFE AND WORKS OF SUSAN B. ANTHONY (1908) .... 31

INSTITUTE FOR AMERICAN VALUES, MARRIAGE AND THE LAW:
   A STATEMENT OF PRINCIPLES (2006) .................................................... 18

MARTIN LUTHER KING, I HAVE A DREAM: WRITINGS AND SPEECHES THAT
   CHANGED THE WORLD (James Melvin Washington ed., 1992) ............. 31

WILLIAM LEE MILLER, LINCOLN'S VIRTUES (2002) ................................... 31

KRISTIN ANDERSON MOORE ET AL., CHILD TRENDS, MARRIAGE FROM A
   CHILD'S PERSPECTIVE: HOW DOES FAMILY STRUCTURE AFFECT
   CHILDREN AND WHAT CAN WE DO ABOUT IT? (June 2002)............. 13, 14

Barack Obama, Call to Renewal Keynote Address (June 28, 2006) ...... 34

Matthew B. O'Brien, *Why Liberal Neutrality Prohibits Same-Sex
   Marriage: Rawls, Political Liberalism, and the Family*,
   2012 BRIT. J. AM. LEG. STUD 411 ........................................................ 14

DAVID POPENOE, LIFE WITHOUT FATHER: COMPELLING NEW EVIDENCE
   THAT FATHERHOOD & MARRIAGE ARE INDISPENSABLE FOR THE GOOD OF
   CHILDREN & SOCIETY (1996) ................................................................ 15

CLINTON ROSSITER, SEEDTIME OF THE REPUBLIC: THE ORIGIN OF THE
   AMERICAN TRADITION OF POLITICAL LIBERTY (1953) ............................ 30

The Church of Jesus Christ of Latter-day Saints, Newsroom, *The Divine
   Institution of Marriage* (Aug. 13, 2008).............................................. 10

THE FIRST PRESIDENCY AND COUNCIL OF THE TWELVE APOSTLES OF THE
   CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, THE FAMILY: A
   PROCLAMATION TO THE WORLD (Sept. 23, 1995).................................... 10

THE HOLY BIBLE (RSV) ............................................................................ 7

Ralph Wedgwood, *The Fundamental Argument for Same-Sex Marriage*, 7 J. POL. PHIL. 225 (1999) .................................................................. 18

W. BRADFORD WILCOX ET AL., WHY MARRIAGE MATTERS (2d ed. 2005) ... 15

JOHN WITTE JR., FROM SACRAMENT TO CONTRACT: MARRIAGE, RELIGION, AND LAW IN THE WESTERN TRADITION (2d ed. 2012) ............................ 19

## IDENTITY AND INTEREST OF *AMICI*[1]

The voices of millions of Americans are represented in the broad cross-section of faith communities that join in this brief. Our theological perspectives, though often differing, converge on a critical point: that the traditional, husband-wife definition of marriage is vital to the welfare of children, families, and society. Faith communities like ours are among the essential pillars of this Nation's marriage culture. With our teachings, rituals, traditions, and ministries, we sustain and nourish both individual marriages and a culture that makes enduring marriages possible. We have the deepest interest in strengthening the time-honored institution of husband-wife marriage because of our religious beliefs and also because of the benefits it provides to children, families, and society. Our practical experience in this area is unequaled. In millions of ministry settings each day we see the benefits that married mother-father parenting brings to children. And we deal daily with the devastating effects of out-of-wedlock births, failed

---

[1] No party's counsel authored the brief in whole or in part, and no one other than the amicus curiae, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief. This brief is filed with the consent of all parties. Fed. R. App. P. 29(a).

1

marriages, and the general decline of the venerable husband-wife marriage institution.

We therefore seek to be heard in the democratic and judicial forums where the fate of that foundational institution will be decided. This brief is submitted out of a shared conviction that the United States Constitution does not prohibit the People of Virginia from deciding—directly or through their elected representatives—to preserve the husband-wife definition of marriage. Statements of interest of the *amici* are found in the attached Addendum.

## INTRODUCTION

A common theme has arisen among advocates for redefining marriage to include same-sex couples: that those who oppose them must be irrational or even bigoted—that they are motivated by "anti-gay animus," whether in the form of unthinking ignorance or actual hostility. Such aspersions, which take various forms, are often cast at people and institutions of faith.

The accusation is false and offensive. It is intended to suppress rational dialogue and democratic conversation, to win by insult and intimidation rather than by reason, experience, and fact. In truth, we

support the husband-wife definition of marriage because we believe it is right and good for children, families, and society. Our respective faith traditions teach us that truth. But so do reason, long experience, and social fact.

We are among the "many religions [that] recognize marriage as having spiritual significance," *Turner v. Safley*, 482 U.S. 78, 96 (1987), indeed as being truly "sacred," *Griswold v. Connecticut*, 381 U.S. 479, 486 (1965). Our respective religious doctrines hold that marriage between a man and a woman is sanctioned by God as the right and best setting for bearing and raising children. We believe that children, families, society, and our Nation thrive best when husband-wife marriage is upheld and strengthened as a cherished, primary social institution. The family lives of millions of Americans are ordered around and given deep meaning and stability by these beliefs.

The value we place on traditional, husband-wife marriage is also influenced by rational judgments about human nature and the needs of individuals and society (especially children) and by our collective experience counseling and serving millions of followers over countless years. For these reasons, too, we are convinced that traditional

3

marriage is indispensable to social welfare and our republican form of government.

As our faith communities seek to sustain and transmit the virtues of husband-wife marriage and family life, our teachings and rituals seldom focus on sexual orientation or homosexuality. Our support for the established meaning of marriage arises from an affirmative vision "of the family, as consisting in and springing from the union for life of one man and one woman in the holy estate of matrimony," *Murphy v. Ramsey*, 114 U.S. 15, 44 (1885), and not from animosity toward anyone.

In this brief we demonstrate that Virginia's marriage laws should not be overturned based on the spurious charge that religious organizations support such laws out of animus. Our faith communities bear no ill will toward same-sex couples, but rather have marriage-affirming religious beliefs that merge with both practical experience and sociological fact to convince us that retaining the husband-wife marriage definition is essential. We further demonstrate that under Supreme Court jurisprudence the notion of "animus" holds limited relevance—and none here. Finally, we refute the suggestion that the Establishment Clause limits the fundamental right of persons and

institutions of faith to participate fully in the democratic process. The fact that religious believers support Virginia's marriage laws by no stretch undermines their constitutional validity.

## ARGUMENT

I.  **Virginia's Marriage Amendment Should Not Be Invalidated or Subjected to Closer Judicial Scrutiny Based on False Accusations of Animus.**

The district court declared Virginia's laws defining marriage as the union of a man and a woman unconstitutional, partly based on its judgment that such laws reflect animus toward homosexuals. While declining to apply heightened scrutiny outright, the court reasoned that it would be "unwarranted" to defer to the understanding of marriage approved by a majority of Virginia voters because that understanding reflected "prejudice" and "moral condemnation" directed at homosexuality. *Bostic v. Rainey*, No. 2:13cv395, 2014 WL 561978, at *21-22 (E.D. Va. Feb. 13, 2014). Virginia's marriage laws therefore failed to satisfy the constitutional guarantee of equal protection, the court held, "despite the depth and legitimacy of [their] religious heritage." *Id.* at *22.

But the district court was wrong. We deny that religious support for marriage between a man and a woman is founded on prejudice or moral condemnation. Our faiths teach love and respect for all people. To suggest that our support for traditional marriage is based on hostility is false. That support predates by centuries the controversy over same-sex marriage and has nothing to do with disapproval of any group. Our support for traditional marriage stands on the affirmative belief that husband-wife marriage complements our human natures as male and female, promotes responsible procreation, and provides the best environment for children. These beliefs are echoed in numerous Supreme Court decisions holding that husband-wife marriage—"an institution more basic in our civilization than any other," *Williams v. North Carolina*, 317 U.S. 287, 303 (1942)—is "the most important relation in life" and "ha[s] more to do with the morals and civilization of a people than any other institution." *Maynard v. Hill*, 125 U.S. 190, 205 (1888).

Reducing religious support for traditional marriage to irrational prejudice or bias ignores rational arguments for traditional marriage that have nothing to do with homosexuality. Obviously, "reasons exist

to promote the institution of marriage beyond mere moral disapproval of an excluded group." *Lawrence v. Texas*, 539 U.S. 558, 585 (2003) (O'Connor, J., concurring). We discuss many of these reasons below. They are arguments supported by eons of history, right reason, experience, common sense, and social science. They have been accepted by many courts. *See e.g.*, *Hernandez v. Robles*, 855 N.E.2d 1 (N.Y. 2006).

### A. We Defend Traditional Marriage Out of Fidelity to Religious Beliefs That Include But Transcend Teachings About Human Sexuality, Not Out of Animus.

Let us first dispel the myth that hostility lies at the root of religious support for husband-wife marriage. Jesus expressed no disapproval or hostility when he taught, "Have you not read that he who made them from the beginning made them male and female, and said, 'For this reason a man shall leave his father and mother and be joined to his wife, and the two shall become one flesh?'" *Matthew* 19:4-5 (RSV). Nor were the ancient Jewish scriptural texts that Jesus referenced based on animosity toward anyone. *See Genesis* 1:27, 2:23 (RSV).

Faith communities and religious organizations have a long history of upholding traditional marriage for reasons that have nothing to do with homosexuality. Their support for husband-wife marriage precedes by centuries the very idea of same-sex marriage. Many of this Nation's prominent faith traditions have rich religious narratives that extol the personal, familial, and social virtues of traditional marriage while barely mentioning homosexuality.

*The Catholic Tradition.* With a tradition stretching back two millennia, the Catholic Church recognizes marriage as a permanent, faithful, and fruitful covenant between a man and a woman that is indispensable to the common good.[2] Marriage has its origin, not in the will of any particular people, religion, or state, but rather, in the nature of the human person, created by God as male and female. When joined in marriage, a man and woman uniquely complement one another spiritually, emotionally, psychologically, and physically. This makes it possible for them to unite in a one-flesh union capable of participating in God's creative action through the generation of new human life. Without this unitive complementarity—and the corresponding capacity

---

[2] *See* CATECHISM OF THE CATHOLIC CHURCH ¶ 1601 (2d ed. 1994).

8

for procreation that is unique to such a union—there can be no marriage.[3]   These fundamental Catholic teachings about marriage do not mention and have nothing to do with same-sex attraction.

*The Evangelical Protestant Tradition.*   For five centuries the various denominational voices of Protestantism have taught marriage from a biblical view focused on uniting a man and woman in a divinely sanctioned companionship for the procreation and rearing of children and the benefit of society.   One representative Bible commentary teaches:  "Marriage . . . was established by God at creation, when God created the first human beings as 'male and female' (Gen. 1:27) and then said to them, 'Be fruitful and multiply and fill the earth' (Gen. 1:28). . . . Marriage begins with a commitment before God and other people to be husband and wife for life," with "[s]ome kind of public commitment" being important so that society can "know to treat a couple as married and not as single."[4]   Homosexuality is far from central to Evangelical teachings on marriage.

---

[3] *See id* at ¶¶ 371-72.

[4] ESV STUDY BIBLE 2543-44 (2008).

*The Latter-day Saint (Mormon) Tradition.* Marriage is fundamental to the doctrine of The Church of Jesus Christ of Latter-day Saints. A formal doctrinal proclamation on marriage declares that "[m]arriage between a man and a woman is ordained of God," that "[c]hildren are entitled to birth within the bonds of matrimony, and to be reared by a father and a mother who honor marital vows with complete fidelity," and that "[h]usband and wife have a solemn responsibility to love and care for each other and for their children."[5] Strong families based on husband-wife marriage "serve as the fundamental institution for transmitting to future generations the moral strengths, traditions, and values that sustain civilization."[6] Here again, homosexuality is remote from teachings about marriage and family.

\*      \*      \*

---

[5] THE FIRST PRESIDENCY AND COUNCIL OF THE TWELVE APOSTLES OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, THE FAMILY: A PROCLAMATION TO THE WORLD (Sept. 23, 1995), *available at* http://www.lds.org/topics/family-proclamation.

[6] The Church of Jesus Christ of Latter-day Saints, Newsroom, *The Divine Institution of Marriage* (Aug. 13, 2008), *available at* http://newsroom.lds.org/ldsnewsroom/eng/commentary/the-divine-institution-of-marriage.

10

In sum, our religious understandings of marriage are rooted in beliefs about God's will concerning men, women, children, and society, rather than in the narrower issue of homosexuality.  Religious teachings may indeed address homosexual conduct and other departures from the marriage norm, but such issues are a secondary and small part of religious discourse on marriage.  Indeed, it is only the recent same-sex marriage movement that has made it more common for religious organizations to include discussions of homosexuality in their teachings on marriage.  The suggestion that religious support for husband-wife marriage is rooted in anti-homosexual animus rests on a false portrayal of our beliefs.

### B.    We Defend Traditional Marriage to Protect Vital Interests in the Welfare of Children, Families, and Society.

The social benefits of husband-wife marriages and families with a father and mother are critical for the well-being of society and its children.  Virginia has compelling interests in maintaining traditional marriage.

### 1. Procreation and Child-Rearing Ideally Occur Within a Stable Marriage Between a Man and a Woman.

Every child has a father and a mother. Procreation within a stable male-female marriage gives a child a uniquely full human context that accounts for both the child's biology and the deeper intentions and commitments of the child's parents. The male-female ideal in marriage and parenting provides children security and other irreplaceable benefits.

a. Sex between men and women presents a social challenge. "[A]n orderly society requires some mechanism for coping with the fact that sexual intercourse commonly results in pregnancy and childbirth." *Morrison v. Sadler*, 821 N.E.2d 15, 25-26 (Ind. Ct. App. 2005) (internal quotation marks and citation omitted). Marriage provides "the important legal and normative link between heterosexual intercourse and procreation on the one hand and family responsibilities on the other. The partners in a marriage are expected to engage in exclusive sexual relations, with children the probable result and paternity presumed." *Id.* at 26 (internal quotation marks and citation omitted).

Husband-wife marriage thus "protects child well-being . . . by increasing the likelihood that the child's own mother and father will

12

stay together in a harmonious household."[7]  That is important because "[c]hildren in single-parent families, children born to unmarried mothers, and children in stepfamilies or cohabiting relationships face higher risks of poor outcomes than do children in intact families headed by two biological parents."[8]  As Massachusetts Justice Robert Cordy observed, while nature forges a link between mother and child, there is "no corresponding process for creating a relationship between father and child. . . . The institution of marriage fills this void by formally binding the husband-father to his wife and child, and imposing on him the responsibilities of fatherhood." *Goodridge v. Dep't of Pub. Health*, 798 N.E.2d 941, 996 (Mass. 2003) (Cordy, J., dissenting).

      b.    Both social science and our own experience have taught that children thrive best when cared for by both of their biological parents. *Lofton v. Sec'y of Dep't of Children and Family Servs.*, 358 F.3d 804,

---

[7] Maggie Gallagher, *(How) Will Gay Marriage Weaken Marriage As a Social Institution: A Reply to Andrew Koppelman*, 2 U. St. Thomas L.J. 33, 50-51 (2004).

[8] Kristin Anderson Moore et al., Child Trends, Marriage from a Child's Perspective:  How Does Family Structure Affect Children and What Can We Do About It? 6 (June 2002), http://www.childtrends.org/files/MarriageRB602.pdf.

819 (11th Cir. 2004) ("[C]hildren benefit from the presence of both a father and mother in the home."). Innate differences between men and women mean that they "are not fungible in relation to child rearing."[9] From those natural differences it follows that "a child benefits from having before his or her eyes, every day, living models of what both a man and a woman are like." *Hernandez*, 855 N.E.2d at 7.

Social science confirms the common-sense understanding that "family structure matters for children, and the family structure that helps children the most is a family headed by two biological parents in a low-conflict marriage."[10] Indeed, "[a] family headed by two married parents who are the biological mother and father of their children is the optimal arrangement for maintaining a socially stable fertility rate, rearing children, and inculcating in them the [values] required for politically liberal citizenship."[11]

---

[9] Eric G. Andersen, *Children, Parents, and Nonparents: Protected Interests and Legal Standards,* 1998 BYU L. REV. 935, 998.

[10] MOORE, *supra* note 8, at 1-2.

[11] Matthew B. O'Brien, *Why Liberal Neutrality Prohibits Same-Sex Marriage: Rawls, Political Liberalism, and the Family*, 2012 BRIT. J. AM. LEG. STUD. 411, 414.

The critical role of mothers in child development has never been doubted. But now a large and growing body of research demonstrates that the contributions of fathers are equally critical to children's formation and well-being.[12] "The burden of social science evidence supports the idea that gender-differentiated parenting is important for human development and that the contribution of fathers to childrearing is unique and irreplaceable."[13]

### 2. Limiting Marriage to Male-Female Couples Furthers Powerful State Interests.

a. Alternative child-rearing arrangements pose significant risks. The late James Q. Wilson detailed the overwhelming evidence that single and, in particular, fatherless parenting significantly increases the likelihood that a child will experience poverty, suicide, mental illness, physical illness, infant mortality, lower educational achievement, juvenile delinquency, adult criminality, unwed teen

---

[12] *See, e.g.*, W. BRADFORD WILCOX ET AL., WHY MARRIAGE MATTERS (2d ed. 2005); Cynthia C. Harper & Sara S. McLanahan, *Father Absence and Youth Incarceration*, 14 J. RES. ON ADOLESCENCE 369, 385-86 (2004).

[13] DAVID POPENOE, LIFE WITHOUT FATHER: COMPELLING NEW EVIDENCE THAT FATHERHOOD & MARRIAGE ARE INDISPENSABLE FOR THE GOOD OF CHILDREN & SOCIETY 146 (1996).

parenthood, lower life expectancy, and reduced intimacy with parents. That such social pathologies bear a strong statistical correlation with child-rearing in family structures other than the stable husband-wife marital home with both biological parents is truly sobering.[14]

The figures cited in Professor Wilson's brief are not merely impersonal statistics. Our faith communities are intimately familiar with the personal tragedies associated with unwed parenting and family breakdown. We have seen boys, bereft of their fathers or any proper male role model, acting out in violence, joining gangs, and engaging in other destructive social and sexual behaviors. We have cared for and mourned with victims left in their destructive wake. And we have ministered to those boys in prisons where too many are consigned to live out their ruined lives. We have seen young girls, deprived of the love and affection of a father, engaging in a wide array of self-destructive behaviors. All too often the result is pregnancy and out-of-wedlock birth, thereby cruelly repeating the cycle.

---

[14] *See generally* Brief Amici Curiae of James Q. Wilson et al., Legal and Family Scholars In Support of Appellees at 41-43, *In re Marriage Cases*, 183 P.3d 384 (Cal. 2008) (No. S147999), *available at* http://www.courts.ca.gov/documents/Legal_Family_Scholars_Amicus_ Brief.pdf.

16

The inescapable truth is that only male-female relationships can create children.  Children need their mothers *and* fathers.  And society needs mothers *and* fathers to raise their children.  That, in a nutshell, is why society needs the institution of male-female marriage and why Virginia is right to specially protect and support it.

b.    In this respect, as in so many others, the law plays an important educational function.  "[L]aw is not just an ingenious collection of devices to avoid or adjust disputes and to advance this or that interest, but also a way that society makes sense of things."[15]  By reserving marriage for the relationship between a man and a woman, the law encourages socially optimal behavior through an institution that supports and confirms the People's deep cultural understanding—and the sociological truth—that stable mother-father marital unions are best for children.  "If same-sex partnerships were recognized as marriages, however, that ideal would be abolished from our law: no civil institution would any longer reinforce the notion that children need both a mother and father; that men and women on average bring

_____

[15] MARY ANN GLENDON, ABORTION AND DIVORCE IN WESTERN LAW: AMERICAN FAILURES, EUROPEAN CHALLENGES 7-8 (1987).

different gifts to the parenting enterprise; and that boys and girls need and tend to benefit from fathers and mothers in different ways."[16]

A gender-neutral marriage definition unavoidably changes the message and function of marriage by altering it to serve the interests of adults.[17] That would be a case of those in power (adults) using law to bring about change that is self-serving. "One may see these kinds of social consequences of legal change as good, or as questionable, or as both. But to argue that these kinds of cultural effects of law do not exist, and need not be taken into account when contemplating major changes in family law, is to demonstrate a fundamental lack of intellectual seriousness about the power of law in American society."[18]

---

[16] Sherif Girgis, Robert P. George, & Ryan T. Anderson, *What is Marriage?*, 34 HARV. J.L. & PUB. POL'Y 245, 262-63 (2011).

[17] Supporters of same-sex marriage typically conceive of marriage primarily as a vehicle for advancing the autonomy interests of adults. *See, e.g.*, Ralph Wedgwood, *The Fundamental Argument for Same-Sex Marriage*, 7 J. POL. PHIL. 225, 225 (1999) ("The basic rationale for marriage lies in its serving certain legitimate and important interests of married couples.").

[18] INSTITUTE FOR AMERICAN VALUES, MARRIAGE AND THE LAW: A STATEMENT OF PRINCIPLES 26 (2006).

18

We reject the charge that the long-established understanding of marriage disrespects persons in same-sex relationships. That understanding predates by centuries the current debate over same-sex unions.[19] But we do agree that changing the legal definition of marriage would alter the way society views marriage, making it adult-focused rather than child-focused, just as Plaintiffs suggest. That is, if the meaning of marriage is changed in concept, the cultural significance attached to marriage will also change in practice. Transforming marriage into a relationship primarily directed at adults and their life choices, we judge, will further deepen the devastating effects America has experienced over the last half-century with the devaluing of marriage as a child-centered institution.

For all these reasons, society has the most compelling interest in keeping the focus of marriage where society needs it most: on legally uniting men and women so that the children they bear will feel secure

---

[19] *See, e.g.*, JOHN WITTE JR., FROM SACRAMENT TO CONTRACT: MARRIAGE, RELIGION, AND LAW IN THE WESTERN TRADITION 17 (2d ed. 2012) ("The western tradition inherited from ancient Greece and Rome the idea that marriage is a union of a single man and a single woman who unite for the purposes of mutual love and friendship and mutual procreation and nurture of children.").

and have the best chance of being properly nurtured by both parents. This conclusion reflects not only venerable religious beliefs but reason, long experience, and sociological fact.

### C. We Support Laws Protecting Traditional Marriage to Safeguard the Marriage Institution Against Judicial Redefinition.

In the past two decades, a surge of State-by-State lawmaking—most often through State constitutional amendments—has reaffirmed the traditional definition of marriage.  But marriage amendments like Virginia's cannot be explained as manifestations of animus toward any citizens, but rather as a safeguard against perceived overreach by State judges.  *See Bostic*, 2014 WL 561978 at *5.  Support for new laws reaffirming traditional marriage has been motivated by a desire to reaffirm the societal importance of traditional marriage and preemptively protect it against judicial redefinition.  Like the national groundswell against assisted suicide, traditional marriage, "[t]hough deeply rooted . . . [has] in recent years been reexamined and, generally, reaffirmed." *Washington v. Glucksberg*, 521 U.S. 702, 716 (1997).

II.  **Virginia's Laws Reserving Marriage for a Man and a Woman Are Not Invalid Expressions of Animus.**

We have identified a few of the reasons why we support traditional marriage, none of which is based on hostility or animus. These reasons alone are sufficient to survive this Court's scrutiny. But lest these and other reasons advanced by the States simply be brushed aside based on allegations of animus, we next address the limited role such allegations play in equal-protection analysis.

A.  **Allegations of Animus Are Relevant *Only* If a Law Can Be Explained Solely By Animus with No Other Possible Rationale.**

Judicial inquiry into animus is an exception to the rule that a law will not be declared unconstitutional "on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383 (1968); *see also Bd. Educ. Westside Cnty. Schs. (Dist. 66) v. Mergens*, 496 U.S. 226, 249 (1990) ("[W]hat is relevant is the legislative *purpose* of the statute, not the possibly religious *motives* of the legislators who enacted the law") (emphasis added). Inquiring into animus when adjudicating an equal protection claim serves the limited purpose of "ensur[ing] that classifications are not drawn *for the purpose of* disadvantaging the group burdened by the law." *Romer v. Evans*, 517 U.S. 620, 633 (1996)

21

(emphasis added). The plaintiff must show "that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

That a law challenged under the Equal Protection Clause allegedly suggests "'negative attitudes'" or "'fear'" toward a group is not a sufficient basis to strike it down. *Bd. Trustees Univ. Ala. v. Garrett*, 531 U.S. 356, 367 (2001). "Although such biases may often accompany irrational (and therefore unconstitutional) discrimination, *their presence alone does not a constitutional violation make*." *Id.* (emphasis added). Only naked animus—"unsubstantiated by factors which are properly cognizable"—may render legislation unconstitutional. *Id.* (internal quotation marks omitted).

B.    Neither *Windsor* Nor *Romer* Justifies This Court in Construing Virginia's Marriage Laws As Expressions of Impermissible Animus.

These limits on the animus inquiry characterized the Supreme Court's approach to equal protection analysis in *Windsor* and *Romer*. *Windsor* struck down section 3 of the Defense of Marriage Act

22

("DOMA") as a "'discrimination[ ] of an unusual character'" requiring "careful consideration." *United States v. Windsor*, 570 U.S. ___, 133 S. Ct. 2675, 2693 (2013) (quoting *Romer*, 517 U.S. at 633). Only after concluding that Congress's definition of marriage was "unusual"—a "federal intrusion" on the States' "historic and essential authority to define the marital relation"—did the Court delve into "the design, purpose, and effect of DOMA" to determine whether the law was "motived by an improper animus or purpose." *Id.* at 2692-93. Its purpose, the Court found, was to "impose restrictions and disabilities" on rights granted by those States that, through a deliberative process, had chosen to recognize same-sex marriage. *Id.* at 2692. The Court reasoned:

> DOMA's unusual deviation from *the usual tradition of recognizing and accepting state definitions of marriage* here operates to deprive same-sex couples of the benefits and responsibilities of their marriages. This is strong evidence of a law having the purpose and effect of disapproval of that class.

*Id.* at 2693 (emphasis added).

*Windsor* does not decide this case because the Virginia laws challenged here fundamentally differ from DOMA.

23

State laws reaffirming the historic definition of marriage cannot remotely be described as classifications of an "unusual character," especially when *Windsor* went out of its way to stress that control of the marital relation lies within the "'virtually exclusive province of the States.'" *Id.* at 2691, 2693 (quoting *Sosna v. Iowa*, 419 U.S. 393, 404 (1975)).  Because State laws defining marriage are the norm, there is no warrant for the "careful consideration" applied in *Windsor* or the inquiry into alleged animus.  *Id.* at 2693.

Moreover, unlike DOMA, the Virginia laws challenged here were adopted "[a]fter a statewide deliberative process" that "weigh[ed] arguments for and against same-sex marriage." *Id.* at 2689.  Justice Kennedy has explained that the equal protection guarantee requires a different analysis "when the accusation [of discrimination] is based not on hostility" allegedly reflected in a newly enacted law, "but instead [is based] on the failure to act or the omission to remedy" what is perceived by some to be unjust discrimination.  *Garrett*, 531 U.S. at 375 (Kennedy, J., concurring).  In compelling State courts to adhere to the age-old understanding of marriage, Virginia laws did not create new

legal rights for married couples or impose any new burdens on same-sex couples. They merely preserved the status quo.

Lastly, *Windsor* emphatically did not create a right to same-sex marriage. Instead, it reaffirmed the States' authority to define marriage, invalidating DOMA as a "federal intrusion" on the States' "historic and essential authority to define the marital relation." 133 S. Ct. at 2692. *Windsor* offers the Plaintiffs no authority for this Court to declare the historical definition of marriage unconstitutional, much less hold that the Equal Protection Clause creates a new right to same-sex marriage. The Supreme Court has rejected the idea—holding that "[i]t is not the province of this Court to create substantive constitutional rights in the name of guaranteeing equal protection of the laws." *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 33 (1973). Indeed, the Court has *never* used its limited inquiry into animus to create a new substantive right.

In short, Virginia has always defined marriage as the union of a man and a woman. That definition is anything but a "discrimination[ ] of an unusual character." *Windsor*, 133 S. Ct. at 2693. To the contrary, "until recent years, many citizens had not even considered the

possibility that two persons of the same sex" could get married, "[f]or marriage between a man and a woman no doubt had been thought of by most people as essential to the very definition of that term and to its role and function throughout the history of civilization." *Id.* at 2689. No inquiry into animus is justified because State laws defining marriage are the rule, as *Windsor* itself confirmed, and because "[t]he limitation of lawful marriage to heterosexual couples . . . for centuries had been deemed both necessary and fundamental." *Id.*

*Romer* likewise offers no support for inquiring into allegations of animus behind State laws regulating marriage. Animus fatally undermined the Colorado provision because "'all that the government c[ould] come up with in defense of the law is that the people who are hurt by it happen to be irrationally hated or irrationally feared.'" *Cook v. Gates*, 528 F.3d 42, 61 (1st Cir. 2008) (quoting *Milner v. Apfel*, 148 F.3d 812, 817 (7th Cir. 1998)). The *Romer* Court reasoned that "if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate*

governmental interest.'" *Romer*, 517 U.S. at 635 (quoting *Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)).

Hence, State laws defining marriage as the union of a man and a woman stand apart from the laws struck down in *Windsor* and *Romer*. Such provisions remain the law in most States. There is simply no way to conclude that the *sole* purpose of the traditional definition of marriage was "to harm a politically unpopular group." *Id.*

### C. This Court Should Reject Arguments Invoking Animus as a Justification for Nullifying State Marriage Laws.

Accepting Plaintiffs' allegations that Virginia's laws defining marriage imply animus against same-sex couples triggering heightened scrutiny—a conclusion nowhere authorized by Supreme Court precedent when a challenged classification is not "unusual"—would have serious consequences.

*First*, it would necessarily declare that Virginia voters hold views on marriage that are irrational or bigoted. Maligning their deeply held convictions in this way would "demean[ ]" such voters, with "the resulting injury and indignity" of having their personal convictions condemned by a court and used to overturn laws for which they personally voted. *Windsor*, 133 S. Ct. at 2694, 2692. To say the least,

27

that would be an astounding declaration given the venerable history of man-woman marriage and the fact that the marriage laws the Plaintiffs challenge are substantively indistinguishable from laws in 33 States.

*Second*, it would seriously distort the Supreme Court's well-settled framework for deciding equal protection claims, which assigns "different levels of scrutiny to different types of classifications." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). Because sexual orientation does not characterize a suspect class and marrying a person of the same sex is not a fundamental right, "[a] century of Supreme Court adjudication under the Equal Protection Clause affirmatively supports the application of the traditional standard of review, which requires only that [State laws defining marriage] be shown to bear some rational relationship to legitimate state purposes." *Rodriguez*, 411 U.S. at 40. Finding animus here, when the challenged classifications are demonstrably not "unusual," would distort the Supreme Court's established equal protection framework.

*Third*, it would deny Virginia's marriage laws the presumption of validity they are owed under rational basis review, thereby depriving the people of those States of the benefits of federalism—"the liberties

28

that derive from the diffusion of sovereign power." *Bond v. United States*, 564 U.S. __, 131 S. Ct. 2355, 2364 (2011) (Kennedy, J.) (internal quotation marks omitted).  Perhaps their greatest loss would be the capacity to petition State governments to "respond, through the enactment of positive law, to the initiative of those who seek a voice in shaping the destiny of their own times without having to rely solely upon the political processes that control a remote central power." *Id.*  A mistaken finding of animus would defeat, in short, the efforts of "ordinary citizens seeking to maintain a degree of control, a sense of community, in an increasingly interrelated and complex world." *College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 703 (1999) (Breyer, J., dissenting).

In the marriage context, this disenfranchisement would fall especially hard on faith communities, which by religious mission and tradition shoulder much of the burden of sustaining a vibrant marriage culture and supporting families and individuals when marriages fail. Despite that vital role, their strongly held values would no longer be

reflected in the law—indeed, their values would be declared illegitimate.[20]

## III. Virginia's Marriage Amendment Is Not Invalid Under the Establishment Clause Because It Was Informed by Religious and Moral Viewpoints.

Laws protecting traditional marriage typically receive support from religious organizations and people of faith—a fact that is neither unusual nor constitutionally problematic. Religion has been a key motivating factor for the most formative political movements in our Nation's history, from the founding of our Nation[21] to the abolition of

---

[20] Striking down State marriage laws for animus also would be unjustly one-sided. Laws protecting traditional marriage no more imply animus toward same-sex couples than laws redefining marriage imply animus toward people of faith.

[21] "[T]he Founding Fathers believed devotedly that there was a God and that the unalienable rights of man were rooted in Him." *School Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 212 (1963). Indeed, "[t]he men of 1776 believed that the good state would rise on the rock of private and public morality, that morality was in the case of most men and all states the product of religion, and that the earthly mission of religion was to set men free. It was no mere pose when they justified resistance to oppression as obedience to God and an appeal to heaven." CLINTON ROSSITER, SEEDTIME OF THE REPUBLIC: THE ORIGIN OF THE AMERICAN TRADITION OF POLITICAL LIBERTY 59 (1953). Accordingly, they amended the Constitution to secure religious liberty as America's first freedom. *See* U.S. CONST. amend. 1.

slavery, [22] the fight for women's suffrage, [23] and the civil rights movement.[24]

Yet some suggest that religious support for marriage laws like Virginia's renders them inconsistent with the Establishment Clause. That extreme view disregards the principle that legislation is not judged by the private motivations of its supporters. *Mergens*, 496 U.S. at 249. "A law conscripting clerics should not be invalidated because an atheist voted for it." *Washington v. Davis*, 426 U.S. 229, 253 (1976) (Stevens, J., concurring).

Invalidating Virginia's marriage laws *because* they received support from religious voters gets the Constitution exactly backwards

---

[22] Lincoln's presidential speeches were "suffused with" religious references that inspired and sustained the fight to end slavery. WILLIAM LEE MILLER, LINCOLN'S VIRTUES 50 (2002).

[23] Susan B. Anthony argued that women's suffrage would bring moral and religious issues "into the political arena" because such issues were of special importance to women. Letter from Susan B. Anthony to Dr. George E. Vincent (Aug. 1904), *in* 3 IDA HUSTED HARPER, LIFE AND WORKS OF SUSAN B. ANTHONY, at 1294 (1908).

[24] Martin Luther King's best-known speeches and writings relied on biblical language and imagery. *See, e.g.*, Martin Luther King, I Have a Dream (1963), *in* I HAVE A DREAM: WRITINGS AND SPEECHES THAT CHANGED THE WORLD, at 105-06 (James Melvin Washington ed., 1992).

by "impos[ing] a special disability upon those persons alone." *Romer*, 517 U.S. at 631. That approach amounts to a one-sided religious test that strikes down laws protecting traditional marriage while leaving laws allowing same-sex marriage undisturbed. Such unvarnished hostility toward religion is "at war with our national tradition as embodied in the First Amendment's guaranty of the free exercise of religion." *Illinois ex rel. McCollum v. Bd. Educ. Sch. Dist.*, 333 U.S. 203, 211-12 (1948); *see also Mergens*, 496 U.S. at 248 ("[The Constitution] does not license government to treat religion and those who teach or practice it … as subversive of American ideals and therefore subject to unique disabilities.") (internal quotation marks omitted).

Subjecting Virginia's marriage laws to unusual constitutional scrutiny because they coincide with traditional morality also could be regarded as a "religious gerrymander," indirectly "regulat[ing] … [political participation] because it is undertaken for religious reasons." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993) (citations omitted). Though differing religious groups may align on different sides of the marriage issue, judges cannot pronounce

32

the religious beliefs of one group of voters legitimate and those of another group ignorant or hateful and thus illegitimate. *See Larson v. Valente*, 456 U.S. 228, 244 (1982).

The Constitution protects the right of voters to freely support laws reflecting moral judgments about what is best for society. *See Harris v. McRae*, 448 U.S. 297, 319-20 (1980) ("That the Judaeo-Chrstian religions oppose stealing does not mean that a State or the Federal Government may not, consistent with the Establishment Clause, enact laws prohibiting larceny."); *McGowan v. Maryland*, 366 U.S. 420, 422 (1961) (holding that a Sunday-closing law does not violate the Establishment Clause merely because it "happens to coincide or harmonize with the tenets of some or all religions"). Most State and congressional enactments reflect moral judgments, meaning judgments about what is right and best for society. From criminal laws, to business and labor regulations, environmental legislation, military spending, and universal health care—the law and public policy are constantly based on notions of morality. *See, e.g., Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 257 (1964) (collecting

33

decisions upholding federal laws where "Congress was legislating against moral wrongs").

If all laws reflecting moral choices were struck down under the Establishment Clause, it would be the end of representative government as we know it, for "[c]onflicting claims of morality . . . are raised by opponents and proponents of almost every [legislative] measure." *Dandridge v. Williams*, 397 U.S. 471, 487 (1970). Perhaps this is why President Obama recognized that "to say that men and women should not inject their 'personal morality' into public policy debates is a practical absurdity."[25]

Thus, it is axiomatic that no law transgresses the Equal Protection Clause when it "merely happens to coincide or harmonize with the tenets of some or all religions." *McGowan*, 366 U.S. at 442; *see also Harris*, 448 U.S. at 319. The Civil Rights Act of 1964—whose anniversary we celebrate this year—was no less valid because "Congress was also dealing with what it considered a moral problem." *Heart of Atlanta Motel*, 379 U.S. at 257. And courts "surely would not

---

[25] Barack Obama, Call to Renewal Keynote Address (June 28, 2006), *available at* http://www.nytimes.com/2006/06/28/us/politics/2006obama-speech.html?pagewanted=all&_r=0.

34

strike down a law providing money to feed the hungry or shelter the homeless if it could be demonstrated that, but for the religious beliefs of the legislators, the funds would not have been approved." *Edwards v. Aguillard*, 482 U.S. 578, 615 (1987) (Scalia, J., dissenting).

Nullifying Virginia's marriage laws because they coincide with traditional religious or moral beliefs likewise contradicts the inalienable right of citizens to participate fully in the process of self-government *as believers*. *See Brown v. Hartlage*, 456 U.S. 45, 56 (1982) ("[O]ur tradition of political pluralism is partly predicated on the expectation that voters will pursue their individual good through the political process, and that the summation of these individual pursuits will further the collective welfare."). "[N]o less than members of any other group, [religious Americans must] enjoy the full measure of protection afforded speech, association, and political activity generally." *McDaniel v. Paty*, 435 U.S. 618, 641 (1978) (Brennan, J., concurring in the judgment).[26]

---

[26] Overturning Virginia's marriage laws because they reflect the views of some religious voters would render meaningless the "profound national commitment to the principle that debate on public issues

35

In short, "[t]he Establishment Clause … may not be used as a sword to justify repression of religion or its adherents from any aspect of public life." *McDaniel*, 435 U.S. at 640-41 (Brennan, J., concurring in the judgment) (citations omitted). American citizens are entitled by constitutional right to rely on and to freely express their religious beliefs when debating and making decisions about important matters of public policy like same-sex marriage. And Virginia's marriage laws must be judged on their merits based on settled rules of law—not on a more demanding standard born of suspicion toward religion, religious believers, or their values.

## CONCLUSION

Marriage, understood as the union of one man and one woman, remains a vital and foundational institution of civil society. The government's interests in continuing to encourage and support marriage are not merely legitimate but compelling. No other institution joins together two persons with the natural ability to create children for the purpose of maximizing the welfare of such children. No other

---

should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

institution strives to ensure that children have the opportunity of feeling a sense of security and being raised in a stable household by the mother and father who conceived them. Undermining the husband-wife marital institution by redefining it to include same-sex couples will, in the long term, harm vital child-welfare interests that only the husband-wife definition can secure. The result will be more mothers and fathers concluding that the highest end of marriage is not the welfare of their children but the advancement of their own life choices. We know, from personal experience over numerous decades of ministering to families and children, that more focus on satisfying adult needs will not benefit vulnerable children. The societal ills caused by the deterioration of husband-wife marriage will only be aggravated if the Commonwealth cannot reserve to marriage its historic and socially vital meaning.

DATED this 4th day of April, 2014.

By: *s/* Anthony R. Picarello, Jr.

ANTHONY R. PICARELLO, JR.               R. Shawn Gunnarson
General Counsel                         KIRTON | MCCONKIE
U.S. CONFERENCE OF CATHOLIC BISHOPS      60 E. South Temple, Ste. 1800
3211 Fourth Street, N.E.                Salt Lake City, UT  84111
 Washington, D.C. 20017
Telephone:  (202) 541-3300
e-mail:  APicarello@usccb.org

37

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P 32(a)(7)(B) and 29(b) because it contains 6,992 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P 32(a)(5) and the type style requirements of Fed. R. App. P 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14-Point Century style.

By: */s/* Anthony R. Picarello, Jr.
ANTHONY R. PICARELLO, JR.
General Counsel
U.S. CONFERENCE OF CATHOLIC BISHOPS
3211 Fourth Street, N.E.
Washington, D.C. 20017
(202) 541-3300
e-mail: APicarello@usccb.org

Attorneys for *Amici Curiae*
Religious Organizations

38

### CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system on April 4, 2014.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

By: *s/*Anthony R. Picarello, Jr.
ANTHONY R. PICARELLO, JR.
General Counsel
U.S. CONFERENCE OF CATHOLIC BISHOPS
3211 Fourth Street, N.E.
Washington, D.C. 20017
Telephone: (202) 541-3300
e-mail: APicarello@usccb.org

Attorneys for *Amici Curiae*
Religious Organizations

### ADDENDUM—STATEMENTS OF INTEREST OF THE *AMICI*

*The United States Conference of Catholic Bishops* ("USCCB" or "Conference") is a nonprofit corporation, the members of which are the Catholic Bishops in the United States. The USCCB advocates and promotes the pastoral teaching of the U.S. Catholic Bishops in such diverse areas of the nation's life as the free expression of ideas, fair employment and equal opportunity for the underprivileged, protection of the rights of parents and children, the sanctity of life, and the nature of marriage. Values of particular importance to the Conference include the promotion and defense of marriage, the protection of the First Amendment rights of religious organizations and their adherents, and the proper development of the nation's jurisprudence on these issues.

*The National Association of Evangelicals* ("NAE") is the largest network of evangelical churches, denominations, colleges, and independent ministries in the United States. It serves 41 member denominations, as well as numerous evangelical associations, missions, nonprofits, colleges, seminaries, and independent churches. NAE serves as the collective voice of evangelical churches, as well as other church-related and independent religious ministries.

40

*The Church of Jesus Christ of Latter-day Saints* ("LDS Church") is a Christian denomination with over 14 million members worldwide. Marriage and the family are central to the LDS Church and its members. The LDS Church teaches that marriage between a man and a woman is ordained of God, that the traditional family is the foundation of society, and that marriage and family supply the crucial relationships through which parents and children acquire private and public virtue. Out of support for these fundamental beliefs, the LDS Church appears in this case to defend the traditional, husband-wife definition of marriage.

*The Ethics and Religious Liberty Commission (ERLC)* is the moral concerns and public policy entity of the Southern Baptist Convention (SBC), the nation's largest Protestant denomination, with over 46,000 churches and 16 million members. The ERLC is charged by the SBC with addressing public policy affecting such issues as marriage and family, the sanctity of human life, ethics, and religious liberty. Marriage is a crucial social institution. As such, we seek to strengthen and protect it for the benefit of all.

41

*The Lutheran Church-Missouri Synod* is the second largest Lutheran denomination in North America, with approximately 6,150 member congregations which, in turn, have approximately 2.4 million baptized members.  The Synod believes that marriage is a sacred union of one man and one woman, *Genesis* 2:24-25, and that God gave marriage as a picture of the relationship between Christ and His bride the Church, *Ephesians* 5:32.  As a Christian body in this country, the Synod believes it has the duty and responsibility to speak publicly in support of traditional marriage and to protect marriage as a divinely created relationship between one man and one woman.