Nos. 14-1167(L), 14-1169, 14-1173

# In the United States Court of Appeals for the Fourth Circuit

TIMOTHY B. BOSTIC, ET AL.,
*Plaintiffs-Appellees,*

and

CHRISTY BERGHOFF, JOANNE HARRIS, JESSICA DUFF, and VICTORIA KIDD, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,
*Intervenors,*

v.

GEORGE E. SCHAEFER, III, IN HIS OFFICIAL CAPACITY AS THE CLERK OF COURT FOR NORFOLK CIRCUIT COURT,
*Defendant-Appellant,*

and

JANET M. RAINEY, IN HER OFFICIAL CAPACITY AS STATE REGISTRAR OF VITAL RECORDS, ET AL.,
*Defendants,*

and

MICHÈLE B. MCQUIGG, IN HER OFFICIAL CAPACITY AS PRINCE WILLIAM COUNTY CLERK OF CIRCUIT COURT,
*Intervenor/Defendant-Appellant.*

ON APPEAL FROM THE U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA, NORFOLK DIVISION, NO. 2:13-CV-00395 (HON. ARENDA L. WRIGHT ALLEN)

**BRIEF FOR *AMICUS CURIAE* EAGLE FORUM EDUCATION & LEGAL DEFENSE FUND IN SUPPORT OF APPELLANTS AND REVERSAL**

Lawrence J. Joseph, D.C. Bar #464777
1250 Connecticut Ave, NW, Suite 200
Washington, DC 20036
Tel: 202-355-9452
Fax: 202-318-2254
Email: ljoseph@larryjoseph.com

Counsel for *Amicus Curiae*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __14-1167__        Caption: _Bostic v. Schaefer_____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Eagle Forum Education & Legal Defense Fund ("Eagle Forum")_____
(name of party/amicus)

_____

 who is _____amicus curiae_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.      Does party/amicus have any parent corporations?                              ☐YES ☑NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                          ☐YES ☑NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
       If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
       If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
       If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Lawrence J. Joseph _____    Date: _____4/4/2014_____

Counsel for: Eagle Forum _____

# CERTIFICATE OF SERVICE
**************************
I certify that on _____4/4/2014_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

David A. Robinson
P. O. Box 780
North Haven, CT 06473

/s/ Lawrence J. Joseph _____                    _____4/4/2014_____
         (signature)                                                              (date)

# <u>TABLE OF CONTENTS</u>

Disclosure of Corporate Affiliations Statement..................................................i

Table of Contents................................................................................... iii

Table of Authorities..................................................................................v

Identity, Interest and Authority to File .........................................1

Statement of the Case...............................................................1

Statement of Facts...................................................................4

Summary of Argument................................................................5

Argument.............................................................................6

I.    Virginia's Marriage Laws Satisfy the Rational-Basis
Test ...............................................................................6

    A.    Plaintiffs Are Not Similarly Situated with
Married Opposite-Sex Couples, and Virginia Has
No Discriminatory Purpose .............................................6

    B.    The Rational-Basis Test Is Flexible for
Defendants, Demanding for Most Plaintiffs, and
Impossible for these Plaintiffs to Satisfy....................................8

    C.    *Windsor* Does Not Support Plaintiffs Here.............................13

        1.    *Windsor* Applied a Truncated Form of
Rational-Basis Review to Conclude that
DOMA §3's Principal Purpose Was to
Demean Same-Sex Marriages............................................13

        2.    Virginia's Marriage Laws Do Not Disparage
or Demean Same-Sex Couples as DOMA §3
Did under *Windsor* ...............................................17

3.  Virginia's Concern for *All* Virginia Children in the Aggregate Is Rational and Suffices to Answer the *Windsor* Majority's Concern for Children Raised in Same-Sex Marriages ........................ 17

D.  *Baker* Remains Controlling ........................................... 19

1.  When Faced with Supreme Court Precedents Having Direct Application, Lower Courts Cannot Reject those Precedents Based on Novel or Even Related Legal Theories ........................................ 20

2.  No Doctrinal Developments Justify Departure from *Baker,* Especially on Plaintiffs' Due-Process Claims ......................... 21

E.  *Loving* Does Not Undermine Virginia's Marriage Laws ....................................................... 23

F.  As Ratified by the States, the Equal Protection Clause Does Not Compel Recognition of Same-Sex Marriage ........................................... 24

II.  Virginia's Marriage Laws Do Not Trigger – But Would Readily Satisfy – Elevated Scrutiny ...................................... 27

A.  Virginia's Marriage Laws Do Not Abridge Fundamental Rights ....................................... 27

B.  Virginia's Marriage Laws Would Survive Elevated Scrutiny, If Elevated Scrutiny Applied .................... 29

Conclusion ......................................................... 29

# TABLE OF AUTHORITIES

## CASES

*Adams v. Howerton,*
    673 F.2d 1036 (9th Cir. 1982) ..........................................................4

*Adar v. Smith,*
    639 F.3d 146 (5th Cir. 2011) (*en banc*)..........................................10

*Agostini v. Felton,*
    521 U.S. 203 (1997) ...............................................................20, 22

*Altria Group, Inc. v. Good,*
    555 U.S. 70 (2008) .............................................................................27

*Baker v. Nelson,*
    291 Minn. 310, 191 N.W.2d 185 (Minn. 1971) ................................4

*Baker v. Nelson,*
    409 U.S. 810 (1972) ..............................................3-5, 19-23, 28-29

*Bd. of Trustees of Univ. of Alabama v. Garrett,*
    531 U.S. 356 (2001) .................................................................... 7-8

*Bolling v. Sharpe,*
    347 U.S. 497 (1954) .........................................................................14

*Bostic v. Rainey,*
    No. 2:13cv395 (E.D. Va. Feb. 13, 2014)..........................................3

*Bostic v. Rainey,*
    2014 U.S. Dist. LEXIS 19110 (E.D. Va. Feb. 14, 2014) ..........1-2, 9-10, 21, 23

*Bowers v. Hardwick,*
    478 U.S. 186 (1986) .........................................................................26

*Citizens for Equal Protection v. Bruning,*
    455 F.3d 859 (8th Cir. 2006) ............................................................4

*City of Boerne v. Flores,*
    521 U.S. 507 (1997) .................................................................. 24-25

*Dandridge v. Williams,*
    397 U.S. 471 (1970) .........................................................................19

*F.C.C. v. Beach Communications, Inc.,*
    508 U.S. 307 (1993) .........................................................................11

*Heckler v. Mathews,*
 465 U.S. 728 (1984) .......................................................................11

*Heller v. Doe,*
 509 U.S. 312 (1993) ...................................................................9, 19

*Hicks v. Miranda,*
 422 U.S. 332 (1975) ................................................................. 20-21

*Hillman v. Maretta,*
 133 S.Ct. 1943 (2013) ...................................................................15

*Jimenez v. Weinberger,*
 417 U.S. 628 (1974) .......................................................................14

*Johnson v. Robison,*
 415 U.S. 361 (1974) .........................................................................7

*Kadrmas v. Dickinson Public Schools,*
 487 U.S. 450 (1988) .................................................................. 9-10

*Lawrence v. Texas,*
 539 U.S. 558 (2003) ............................................................ 21-24, 26

*Lehnhausen v. Lake Shore Auto Parts Co.,*
 410 U.S. 356 (1973) .........................................................................9

*Lofton v. Sec'y of Dept. of Children & Family Services,*
 358 F.3d 804 (11th Cir. 2004) .............................................3, 10, 12

*Loving v. Virginia,*
 388 U.S. 1 (1967) ..........................................................23-24, 28-29

*Mandel v. Bradley,*
 432 U.S. 173 (1977) ..................................................................20, 21

*Massachusetts Bd. of Retirement v. Murgia,*
 427 U.S. 307 (1976) ..............................................................9, 18, 19

*Maynard v. Hill,*
 125 U.S. 190 (1888) .......................................................................11

*Minnesota v. Clover Leaf Creamery Co.,*
 449 U.S. 456 (1981) .......................................................................11

*Moore v. Sims,*
 442 U.S. 415 (1979) .......................................................................26

*Nordlinger v. Hahn,*
 505 U.S. 1 (1992) ......................................................................6, 10

*Oncale v. Sundowner Offshore Services, Inc.,*
    523 U.S. 75 (1998) ........................................24

*Pers. Adm'r v. Feeney,*
    442 U.S. 256 (1979) ............................... 6-7, 18

*Plyler v. Doe,*
    457 U.S. 202 (1982) .................................. 2-3

*Quinn v. Millsap,*
    491 U.S. 95 (1989) ........................................15

*Ray Communs., Inc. v. Clear Channel Communs., Inc.,*
    673 F.3d 294 (4th Cir. 2012) ..............................9

*Reed v. Reed,*
    404 U.S. 71 (1971) ........................................7

*Rice v. Santa Fe Elevator Corp.,*
    331 U.S. 218 (1947) ......................................25

*Romer v. Evans,*
    517 U.S. 620 (1996) .............................. 6, 21-23

*Rostker v. Goldberg,*
    453 U.S. 57 (1981) ........................................7

*Securities Industry Ass'n v. Bd. of Governors of Fed'l Reserve Sys.,*
    468 U.S. 137 (1984) ......................................25

*Skinner v. Oklahoma ex rel. Williamson,*
    316 U.S. 535 (1942) ......................................27

*Soskin v. Reinertson,*
    353 F.3d 1242 (10th Cir. 2004) ...........................15

*Thomasson v. Perry,*
    80 F.3d 915 (4th Cir. 1996) ..............................9

*Traficanti v. U.S.,*
    227 F.3d 170 (4th Cir. 2000) .............................14

*Turner v. Fouche,*
    396 U.S. 346 (1970) ......................................15

*Turner v. Safley,*
    482 U.S. 78 (1987) .......................................27

*U.S. v. Masciandaro,*
    638 F.3d 458 (4th Cir. 2011) .............................29

*U.S. v. Windsor,*
    133 S.Ct. 2675 (2013) .................................................. 2, 4-5, 12-18, 20-24, 26

*Vacco v. Quill,*
    521 U.S. 793 (1997) ........................................................................6

*Vance v. Bradley,*
    440 U.S. 93 (1979) ........................................................................19

*Veney v. Wyche,*
    293 F.3d 726 (4th Cir. 2002) ..........................................................6

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ................................................................25, 28

*Waters v. Churchill,*
    511 U.S. 661 (1994) ......................................................................17

*Wayte v. U.S.,*
    470 U.S. 598 (1985) ........................................................................6

*Wyeth v. Levine,*
    555 U.S. 555 (2009) ................................................................. 25-26

## STATUTES

U.S. CONST. amend. XIV ..............................................................4, 24, 26, 29

U.S. CONST. amend. XIV, §1, cl. 3 .................................19, 21, 25, 27, 28

U.S. CONST. amend. XIV, §1, cl. 4 .................................. 6, 10-11, 13, 18-19, 24-25

1 U.S.C. §7 ............................................................................13, 15, 17

28 U.S.C. §1257(2) (1988) ..............................................................4

Defense of Marriage Act,
    Pub. L. No. 104-199, 110 Stat. 2419 (1996) ......................................4, 16, 23

VA. CONST. art. I, §15-A ...................................... 1, 4, 6-8, 13, 16-17, 22-24, 27, 29

VA. CODE §20-38.1 ............................................. 1, 4, 6-8, 13, 16-17, 22-24, 27, 29

VA. CODE §20-45.1 ............................................. 1, 4, 6-8, 13, 16-17, 22-24, 27, 29

VA. CODE §20-45.2 ............................................. 1, 4, 6-8, 13, 16-17, 22-24, 27, 29

VA. CODE §20-45.3 ............................................. 1, 4, 6-8, 13, 16-17, 22-24, 27, 29

## <u>LEGISLATIVE HISTORY</u>

H.R. Rep. No. 104-664 (1996),
     *reprinted at* 1996 U.S.C.C.A.N. 2905 .....................................................16, 26

## <u>RULES AND REGULATIONS</u>

FED. R. APP. P. 29(c)(5) ...............................................................................1

## <u>OTHER AUTHORITIES</u>

*Baker v. Nelson,* No. 71-1027, Jurisdictional Statement (Oct. Term 1972)............21

WILLIAM BLACKSTONE, COMMENTARIES *215 ........................................................26

Thomas Sowell, Ph.D., *The Vision of the Anointed* (BasicBooks 1995)............... 2-3

## IDENTITY, INTEREST AND AUTHORITY TO FILE

*Amicus curiae* Eagle Forum Education & Legal Defense Fund ("EFELDF"), a nonprofit corporation, files this brief with the consent of the parties.[1] Since its founding in 1981, EFELDF has consistently defended traditional American values, including traditional marriage, defined as the union of husband and wife. For the foregoing reasons, EFELDF has a direct and vital interest in the issues raised here.

## STATEMENT OF THE CASE

Same-sex couples and Virginia's new Governor and Attorney General (collectively, "Plaintiffs") seek to invalidate Virginia's definition of marriage as consisting only of the legal union between a man and a woman. VA. CONST. art. I, §15-A; VA. CODE §§20-38.1, 20-45.1 to 20-45.3 (collectively, "Virginia's Marriage Laws"). Two state circuit-court clerks (collectively, "Virginia") defend Virginia law.

Considering this to be "[o]ne of the judiciary's noblest endeavors," Slip Op. at 2, and analogizing her role to President Lincoln's issuing the Emancipation Proclamation, *id.* at 40, the District Judge ably demonstrates the hunger that Justice Scalia identified as motivating judges who rush to judgment in the service of their personal policy views, divorced from their legitimate role in our legal system:

---

[1]    Pursuant to FED. R. APP. P. 29(c)(5), the undersigned counsel certifies that: counsel for *amicus* authored this brief in whole; no counsel for a party authored this brief in any respect; and no person or entity – other than *amicus*, its members, and its counsel – contributed monetarily to this brief's preparation or submission.

1

> The Court is eager – *hungry* – to tell everyone its view of the legal question at the heart of this case. Standing in the way is an obstacle, a technicality of little interest to anyone but the people of We the People, who created it as a barrier against judges' intrusion into their lives.

*U.S. v. Windsor,* 133 S.Ct. 2675, 2698 (2013) (Scalia, J., dissenting) (emphasis in original). Although Justice Scalia alluded to the obstacle of jurisdiction, the obstacle that should have confronted a lower-court judge here was binding Supreme Court precedent. Nonetheless, the hunger is the same.

And the result is the same, too. Not the as-yet uncertain outcome of the litigation, but the certainty that the judiciary's legitimacy is undermined by the perception that judges are political players, delivering for their constituency, rather than legal players bound by a system that requires that all men follow the law.

The hubris and ease with which the District Court rejects the institution of husband-wife marriage as a fundamental social building block, based on little more than judicial intuition and unexamined prejudice, Slip Op. at 31, is breathtaking. "No one man, however brilliant or well-informed, can come in one lifetime to such fullness of understanding as to safely judge and dismiss the customs or institutions of his society, for those are the wisdom of generations after centuries of experiment in the laboratory of history." Thomas Sowell, Ph.D., *The Vision of the Anointed,* at 112 (BasicBooks 1995). While neither legislatures nor judges are fully competent to tinker with the wisdom of millennia, based on incomplete data, our

system gives legislatures "[t]he initial discretion to determine what is 'different' and what is 'the same.'" *Plyler v. Doe,* 457 U.S. 202, 216 (1982). As Dr. Sowell has explained, whatever marginal advantage (if any) elites have over the general public in understanding these issues is dwarfed by "the total direct knowledge brought to bear though social processes (the competition of the marketplace, social sorting, etc.), involving millions of people" over millennia. Sowell, *Vision of the Anointed,* at 114. At its best, the judiciary recognizes these limitations:

> Although social theorists ... have proposed alternative child-rearing arrangements, none has proven as enduring as the marital family structure, nor has the accumulated wisdom of several millennia of human experience discovered a superior model.

*Lofton v. Sec'y of Dept. of Children & Family Services,* 358 F.3d 804, 820 (11th Cir. 2004) (citations omitted). Judges would lack the training to evaluate the social-science data on the effects of shifting away from a paradigm of husband-wife marriage, even if the required longitudinal studies – as yet, at least a generation away, *see* Section I.B, *infra* – existed today.

Nonetheless, marching to a misconstrued conception of equality – "Our *Constitution* declares that 'all men' are created equal," Slip Op. at 2 (Feb. 13, 2014) (emphasis added) – the District Court simply imposes its own views and invents its own laws, without regard for the precedent that forecloses that path. Specifically, in *Baker v. Nelson,* 409 U.S. 810 (1972), the Supreme Court faced

essentially the same questions presented here: whether the Constitution provides a right to same-sex marriage. The Court answered that question in the negative, dismissing "for want of a substantial federal question," *id.,* a mandatory appeal under former 28 U.S.C. §1257(2) (1988) from *Baker v. Nelson,* 291 Minn. 310, 191 N.W.2d 185 (Minn. 1971). Last year, in *Windsor,* the Supreme Court held that the federal husband-wife definition of marriage, 1 U.S.C. §7, from the Defense of Marriage Act, Pub. L. No. 104-199, 110 Stat. 2419 (1996) ("DOMA"), violates the Constitution. *See* Section I.C, *infra* (discussing *Windsor*). In the four-decade interval between *Baker* and *Windsor,* federal appeals courts routinely cited *Baker* to dismiss claims seeking to establish a constitutional right to same-sex marriage. *See, e.g., Citizens for Equal Protection v. Bruning,* 455 F.3d 859, 870-71 (8th Cir. 2006); *Adams v. Howerton,* 673 F.2d 1036, 1042 (9th Cir. 1982). Nothing in *Windsor* or any other Supreme Court decision changed that result.

## STATEMENT OF FACTS

Plaintiffs are Virginia residents who either wish to enter same-sex marriages in Virginia or to compel Virginia to recognize their purportedly valid same-sex marriages from another jurisdiction.[2] Plaintiffs have not introduced evidence

---

[2]    Because it invalidated Virginia's Marriage Laws entirely, the District Court did not separately address whether the Fourteenth Amendment would compel recognition of same-sex marriages from other jurisdictions, assuming that the Constitution did not compel Virginia to perform same-sex marriages in Virginia.

adequate to negative all theoretical connections between husband-wife marriage and responsible procreation and childrearing.

## SUMMARY OF ARGUMENT

Plaintiffs cannot state an equal-protection claim because they are not similarly situated with opposite-sex married couples; Plaintiffs cannot parent and raise children as biological mother-father families (Section I.A). Virginia's preference for that family arrangement satisfies the rational-basis test because Plaintiffs have not met their burden of producing evidence (which cannot yet and may never exist) to negative any *theoretical* connection between biological mother-father families and parenting and childrearing outcomes (Section I.B).

*Windsor* cannot help Plaintiffs because the majority decision held that Congress acting irrationally to impose an across-the-board federal definition over state-created relationships that Congress lacked a basis to reject (Section I.C). Instead, *Baker* controls in this area of traditional, and near-exclusive, state authority (Section I.D). Elevated scrutiny does not apply because the fundamental right to marry has always meant opposite-sex marriage (Section II.A). In any event, preserving the social fabric, as well as ensuring and optimizing the procreation of future generations, would be compelling governmental interests, if elevated scrutiny applied (Section II.B).

## ARGUMENT

## I.  VIRGINIA'S MARRIAGE LAWS SATISFY THE RATIONAL-BASIS TEST

Under the Equal Protection Clause, courts evaluate differential treatment based on sexual orientation under the rational-basis test. *Romer v. Evans,* 517 U.S. 620, 631-32 (1996); *Veney v. Wyche,* 293 F.3d 726, 732 (4th Cir. 2002). As explained in this section, Virginia's Marriage Laws readily meet that test, as recognized in *Baker* and not changed by *Windsor.*

### A.  Plaintiffs Are Not Similarly Situated with Married Opposite-Sex Couples, and Virginia Has No Discriminatory Purpose

The Equal Protection Clause "embodies a general rule that States must treat like cases alike but may treat unlike cases accordingly." *Vacco v. Quill,* 521 U.S. 793, 799 (1997). For a class to raise an equal-protection claim vis-à-vis the government's treatment of a similarly situated class, the two classes must be "in all relevant respects alike." *Nordlinger v. Hahn,* 505 U.S. 1, 10 (1992). Further, "ordinary equal protection standards" require a plaintiff to "show both that the [challenged action] had a discriminatory effect and that it was motivated by a discriminatory purpose." *Wayte v. U.S.,* 470 U.S. 598, 608 (1985). The required "discriminatory purpose" means "more than intent as volition or intent as aware of consequences. It implies that the decisionmaker ... selected or reaffirmed a course of action at least in part *'because of,'* not merely *'in spite of'* its adverse effects upon an identifiable group." *Pers. Adm'r v. Feeney,* 442 U.S. 256, 279 (1979)

6

(emphasis added). Plaintiffs cannot either establish that they are similarly situated with opposite-sex married couples or show an impermissibly discriminatory purpose in Virginia's Marriage Laws.

First, same-sex couples and opposite-sex couples are not "similarly situated" with respect to procreation: "an individual's right to equal protection of the laws does not deny … the power to treat different classes of persons in different ways." *Johnson v. Robison,* 415 U.S. 361, 374-75 (1974) (interior quotations omitted, alteration in original). A classification is clearly "reasonable, not arbitrary" if it "rest[s] upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Reed v. Reed,* 404 U.S. 71, 75-76 (1971) (*quoting Royster Guano Co. v. Virginia,* 253 U.S. 412, 415 (1920)); *Rostker v. Goldberg,* 453 U.S. 57, 67 (1981) (Equal Protection allows Navy to base actions on uncontested differences between male and female officers). Provided that Virginia rationally may prefer married biological parents' raising their children in a family, *see* Section I.B, *infra,* Plaintiffs are not similarly situated with opposite-sex married couples.

Second, any "foreseeable" or even "volitional" impact on the non-favored class does not qualify as a "[d]iscriminatory purpose" if the state lawfully may benefit the favored class. *Feeney,* 442 U.S. at 278-79. Put another way, "where a group possesses distinguishing characteristics relevant to interests the State has the

authority to implement, a State's decision to act on the basis of those differences does not give rise to a constitutional violation." *Bd. of Trustees of Univ. of Alabama v. Garrett,* 531 U.S. 356, 366-67 (2001) (interior quotations omitted). While it may not be Plaintiffs' fault that their union cannot engage in procreation as mother and father, it certainly is not Virginia's fault. Provided that Virginia rationally may prefer married biological parents' raising their children in a family, *see* Section I.B, *infra,* Virginia's Marriage Laws' impact on Plaintiffs or their families does not qualify as a "discriminatory purpose."

If Plaintiffs are not similarly situated with opposite-sex married couples and Virginia lacks an impermissible "discriminatory purpose," Plaintiffs cannot state an Equal Protection claim on which relief can be granted. As indicated, the question then becomes whether Virginia has a rational basis for preferring that biological mothers and fathers raise their children.

**B.     The Rational-Basis Test Is Flexible for Defendants, Demanding for Most Plaintiffs, and Impossible for these Plaintiffs to Satisfy**

Assuming *arguendo* that Plaintiffs' complaint states a potential claim under the rational-basis test, Plaintiffs must offer far more evidence than they have – indeed, evidence that will not even exist for *at least* a generation – before they could ever dislodge Virginia's preference that married biological parents raise their

children in a family.[3]

Specifically, rational-basis plaintiffs must "negative every conceivable basis which might support [the challenged statute]," including those bases on which the state plausibly *may have* acted. *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 364 (1973) (internal quotations omitted); *Kadrmas v. Dickinson Public Schools,* 487 U.S. 450, 462-63 (1988).[4] Further, it is enough that a plausible policy *may have guided* the decisionmaker and that "the relationship of the classification

---

[3]    Summary judgment for Virginia is appropriate "where the movant fails to fulfill its initial burden of providing admissible evidence of the material facts entitling it to summary judgment, … *even if no opposing evidentiary matter is presented.*" *Ray Communs., Inc. v. Clear Channel Communs., Inc.,* 673 F.3d 294, 299 (4th Cir. 2012) (internal quotations omitted); *cf. Heller v. Doe,* 509 U.S. 312, 320 (1993) ("State … has no obligation to produce evidence to sustain the rationality of a statutory classification"). Because Plaintiffs failed to support their claim, summary judgment for Virginia is required.

[4]    Because rational-basis review considers any rationales on which the Virginia electorate *plausibly may have acted,* rational-basis review forbids the District Court's rejection of the procreation-and-childrearing rationale. *See* Slip Op. at 35. Similarly unavailing is the straw-man argument that Virginia allows marriage for infertile opposite-sex couples. *Id.* at 32. First, unlike strict scrutiny, rational-basis review does not require narrowly tailoring marriage to legitimate purposes (*e.g.,* procreation or childrearing): "[r]ational basis review … is not a license for courts to judge the wisdom, fairness, or logic of legislative choices," and "[a] statute does not fail rational-basis review because it is not made with mathematical nicety or because *in practice it results in some inequality.*" *Thomasson v. Perry,* 80 F.3d 915, 928, 930-31 (4th Cir. 1996) (interior quotations omitted, emphasis added); *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 316 (1976). Second, some couples marry with the intent not to have children or with the mistaken belief they are infertile, yet later do have children. Third, by reinforcing the optimal family unit, husband-wife marriage at least reinforces marriage's procreation and childrearing function even when particular marriages are childless.

to its goal is not so attenuated as to render the distinction arbitrary or irrational." *Nordlinger,* 505 U.S. at 11-12 (citations omitted, emphasis added). Under the rational-basis test, government action need only "further[] a legitimate state interest," which requires only "a plausible policy reason for the classification." *Id.* Moreover, courts give economic and social legislation a presumption of rationality, and "the Equal Protection Clause is offended only if the statute's classification rests on grounds wholly irrelevant to the achievement of the State's objective." *Kadrmas,* 487 U.S. at 462-63 (interior quotations omitted). Virginia's Marriage Laws easily meet this test.

With respect to husband-wife marriage, it is enough, for example, that Virginia "rationally may have … considered [it] to be true" that marriage has benefits for responsible procreation and childrearing. *Nordlinger,* 505 U.S. at 11-12; *Adar v. Smith,* 639 F.3d 146, 162 (5th Cir. 2011) (*en banc*); *Lofton,* 358 F.3d at 818-20. Numerous courts and social scientists have recognized the rationality of states' interests in limiting marriage to opposite-sex couples. *See* McQuigg Opening Br. at 53-60. Against these authorities, and with no credible data authority but the echo chamber of similarly minded judges, the District Court claims that opposite-sex marriage will continue, unaffected, by the wholesale changes ordered by the opinion below. Slip Op. at 31. If Virginia wants more children raised in husband-wife families, Virginia's police power gives her the right to privilege that

relationship over all others. *Maynard v. Hill,* 125 U.S. 190, 205 (1888). Insofar as Plaintiffs seek to privilege same-sex marriages via the Equal Protection Clause, they necessarily concede that marriage is a valuable benefit that Virginia bestows on couples eligible to marry:

> [W]hen the right invoked is that to equal treatment, the appropriate remedy is a *mandate* of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class

*Heckler v. Mathews,* 465 U.S. 728, 740 (1984) (emphasis in original, interior quotations omitted). Both purely as a matter of equal-protection law and also as a matter of the applied economics of government subsidies, elevating same-sex couples into eligibility for marriage's benefits lowers the value of the benefit, relatively, for those who already enjoy it.

In any event, "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *F.C.C. v. Beach Communications, Inc.,* 508 U.S. 307, 315 (1993). Accordingly, Plaintiffs cannot prevail by marshaling "impressive supporting evidence … [on] the probable consequences of the [statute]" vis-à-vis the legislative purpose, but must instead negate "the *theoretical* connection" between the two. *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 463-64 (1981) (emphasis in original). Although the typical rational-basis plaintiff has a difficult

evidentiary burden, Plaintiffs here face an *impossible* burden.

Unfortunately for Plaintiffs, the data simply do not exist to *negative* the procreation and childrearing rationale for traditional husband-wife marriage. And yet those data are Plaintiffs' burden to produce. Nothing that Plaintiffs have produced or could produce undermines the rationality of believing that children raised in a marriage by their biological mother and father may have advantages over children raised under other arrangements:

> At present, no one – including social scientists, philosophers, and historians – can predict with any certainty what the long-term ramifications of widespread acceptance of same-sex marriage will be.

*Windsor,* 133 S.Ct. at 2716 (Alito, J., dissenting); *Lofton,* 358 F.3d at 820. Society is *at least* a generation away from the most minimal longitudinal data that could even purport to compare the relative contributions of same-sex versus opposite-sex marriages to the welfare of society. Quite simply, these living arrangements are new, and the few children that have grown up in them cannot present a sufficiently large sample size to provide any basis for meaningful study. Further, the children need to be studied from their own childhood into adulthood and parenthood. While EFELDF submits that Plaintiffs *never* will be able to negative the value of traditional husband-wife families for childrearing, Plaintiffs cannot prevail when

the data *required by their theory of the case* do not (and cannot) yet exist.[5]

### C.    *Windsor* Does Not Support Plaintiffs Here

Because *Windsor* neither follows nor overrules the rational-basis outline described in Section I.B, *supra,* the impact of that decision here is unclear from the face of the majority decision. As explained in this section, *Windsor* can only be read as a holding that the federal government lacked any rational basis to prefer opposite-sex marriage over same-sex marriage, when doing so required the federal government to reject state-authorized same-sex marriages that it lacked any authority to change. As Chief Justice Roberts signaled in his dissent, that deference to the states as the entities with the authority to define marital relationships in *Windsor* translates to deference to the states when courts are presented with state legislation like Virginia's Marriage Laws. *See Windsor,* 133 S.Ct. at 2697 (Roberts, C.J., dissenting). As shown in this section, nothing in *Windsor* or the Equal Protection Clause requires sovereign states to recognize same-sex marriage.

### 1.    *Windsor* Applied a Truncated Form of Rational-Basis Review to Conclude that DOMA §3's Principal Purpose Was to Demean Same-Sex Marriages

*Windsor* plainly held that Congress lacked a "legitimate purpose" for DOMA §3's "principal purpose and … necessary effect" that the majority

---

[5]    Although this litigation does not present the question, *amicus* EFELDF respectfully submits that states could establish rational bases (*e.g.,* procreation and childrearing) for favoring opposite-sex couples over same-sex couples even outside of the question of marriage.

perceived (namely "to demean those persons who are in a lawful same-sex marriage"). *Windsor,* 133 S.Ct. at 2695-96. As the *Windsor* dissents explain, however, the surface of the opinion does not reveal what rationale – exactly – led the *Windsor* majority to that holding:

> The sum of all the Court's nonspecific hand-waving is that this law is invalid (maybe on equal-protection grounds, maybe on substantive-due-process grounds, and perhaps with some amorphous federalism component playing a role) because it is motivated by a "'bare … desire to harm'" couples in same-sex marriages.

*Id.* at 2705 (Scalia, J., dissenting). Reading below the surface, three factors make clear that *Windsor* was decided under equal-protection principles via the rational-basis test, premised on the irrationality perceived by the *Windsor* majority of federal legislation imposing an across-the-board federal definition of "marriage," when states – not the federal government – have the authority to define lawful marriages within their respective jurisdictions.[6]

First, *Windsor* does not rely on elevated scrutiny of any sort, holding only

---

[6]     Although *Windsor* discusses due process and equal protection, the Fifth Amendment's equal-protection component falls within the Due Process Clause's liberty interest. *Jimenez v. Weinberger,* 417 U.S. 628, 637 (1974) (referencing "the equal protection of the laws guaranteed by the due process provision of the Fifth Amendment"); *Bolling v. Sharpe,* 347 U.S. 497, 499-500 (1954). Thus, for federal defendants, equal-protection rights *are* due-process issues. In any event, assuming *arguendo* that no fundamental rights apply, *see* Section II.A, *infra,* substantive due process collapses into essentially the same question that arises under the equal-protection analysis under the rational-basis test. *Traficanti v. U.S.,* 227 F.3d 170, 176 (4th Cir. 2000).

14

that DOMA §3 lacks any "legitimate purpose" whatsoever. *Windsor,* 133 S.Ct. at 2696. In equal-protection cases that present thorny merits issues – even issues that might implicate elevated scrutiny if proved – courts sometimes can sidestep the difficult merits questions by rejecting a law's underlying distinctions as wholly arbitrary. For example, as-applied, race-based challenges to *facially neutral* limits on voting or holding office could proceed *facially* against freeholder requirements on the theory that restricting those privileges to freeholders (*i.e.,* property owners) was arbitrary, even without proving that the as-applied, race-based impact constituted racial discrimination. *Turner v. Fouche,* 396 U.S. 346, 362 (1970); *Quinn v. Millsap,* 491 U.S. 95, 103 n.8 (1989). As in *Turner* and *Quinn,* the *Windsor* majority found DOMA §3 void under the rational-basis test, without needing to resort to elevated scrutiny under other theories pressed by the parties.[7]

　　　Second, DOMA §3's "discrimination of an unusual character" lacked any

---

[7]　　　Even if *Windsor* applied elevated scrutiny to federal intrusions into state marriage law, that would not compel the conclusion that courts should apply the same level of scrutiny to state laws: "family and family-property law must do major damage to clear and substantial federal interests before the Supremacy Clause will demand that state law will be overridden." *Hillman v. Maretta,* 133 S.Ct. 1943, 1950 (2013) (interior quotations omitted); *see also Windsor,* 133 S.Ct. at 2675 (*citing Hillman*). It is no more unusual for states to have a freer hand in family law (where their interests predominate) than for the federal government to have a freer hand in, say, immigration (where its interests predominate): "states on their own cannot treat aliens differently from citizens without a compelling justification," whereas "the federal government can treat aliens differently from citizens so long as the difference in treatment has a rational basis." *Soskin v. Reinertson,* 353 F.3d 1242, 1254 (10th Cir. 2004).

perceived legitimate purpose, evidencing the animus that established an equal-protection violation. *Windsor,* 133 S.Ct. at 2693. As such, the majority did not need even to consider the bases – such as responsible parenting and childrearing – proffered by the House interveners or the enacting Congress in defense of DOMA. *See* H.R. Rep. No. 104-664, at 12 (1996), *reprinted at* 1996 U.S.C.C.A.N. 2905, 2916. Typically, a rational basis excuses even discriminatory purposes; in *Windsor,* the majority found only the purpose "to injure the very class New York seeks to protect," based on the perceived "unusual deviation from the usual tradition of recognizing and accepting state definitions of marriage." *Windsor,* 133 S.Ct. at 2693. Under that unusual posture, *Windsor* did not even need to evaluate the rational bases on which Congress claimed to have acted.

Third, federalism is essential to the *Windsor* holding. Federalism not only defines "the very class … protect[ed]" (*i.e.,* state-approved same-sex marriages), but also makes the *federal* action unusual. *Id.* Because Virginia's Marriage Laws are entirely "usual" and fall within the "virtually exclusive province of the States." *Id.* at 2691 (interior quotations omitted), *Windsor* has no bearing here.

These three interrelated factors establish that *Windsor* cannot help Plaintiffs here. All three are absent when states regulate marriage under their own sovereign authority.

### 2. Virginia's Marriage Laws Do Not Disparage or Demean Same-Sex Couples as DOMA §3 Did under *Windsor*

Although the *Windsor* majority found DOMA §3's primary purpose was to demean certain same-sex couples, *id.* at 2693, that holding does not translate to this litigation for the reasons identified in the prior section. Unlike DOMA §3 in *Windsor,* Virginia's Marriage Laws fit within Virginia's authority and is entirely "usual" as an exercise of that authority. Unlike Virginia's Marriage Laws – which govern the marriage-related facts on the ground in Virginia – DOMA §3 did not undo the fact of Ms. Windsor's New York marriage. Thus, unlike the "unusual" *Windsor* case, this "usual" case requires this Court to evaluate the rational bases for adopting Virginia's Marriage Laws, which *Windsor* did not even consider: "cases cannot be read as foreclosing an argument that they never dealt with." *Waters v. Churchill,* 511 U.S. 661, 678 (1994). Only if Virginia's Marriage Laws fail there, *see* Section I.B, *supra,* can Plaintiffs prevail.

### 3. Virginia's Concern for *All* Virginia Children in the Aggregate Is Rational and Suffices to Answer the *Windsor* Majority's Concern for Children Raised in Same-Sex Marriages

The *Windsor* majority also considered it relevant that DOMA §3 "humiliates tens of thousands of children now being raised" nationally in state-authorized, same-sex marriages. *Windsor,* 133 S.Ct. at 2694. The question of same-sex marriage affects not only the present (and future) children in same-sex marriages,

but also *all future children.* If Virginia and other states with similar marriage laws have permissibly concluded that reserving marriage for opposite-sex couples ensures future children's highest *aggregate* likelihood of optimal upbringings, the *Windsor* concern for thousands of children raised in same-sex marriages cannot trump Virginia's and those states' concern for the best interests of the millions of children for whom the states seek optimized parenting and childrearing outcomes.[8]

Assuming *arguendo* that the *Windsor* opinion's concern for children living in homes headed by same-sex couples could qualify as part of the Court's holding on a childless couple's estate taxation, that holding would go to the arbitrariness of the federal government's rejecting an aspect of New York family law that the federal government had no authority to define, reject, or redefine for federal purposes. *See Windsor,* 133 S.Ct. at 2693-94. The same cannot be said of Virginia because legislation – by an entity with the near-exclusive authority to legislate in this arena – necessarily involves choosing: "the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one." *Murgia,* 427 U.S. at 314. Assuming that it does not involve either fundamental rights or suspect

---

[8]       While any negative impact on children of non-favored relationships is something that a state legislative process may consider in making a legislative judgment, that impact – like the impact on adults in non-favored relationships – is not a judicial concern, *provided that the state law permissibly favors marriage. See* Section I.B, *supra.* Simply put, any "foreseeable" or even "volitional" impact on the non-favored class does not qualify as a "[d]iscriminatory purpose" under the Equal Protection Clause. *Feeney,* 442 U.S. at 278-79.

classes, "[s]uch a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller,* 509 U.S. at 320. Here, Virginia permissibly based its classification on optimizing aggregate parenting and childrearing outcomes.

Classifications do not violate Equal Protection simply because they are "not made with mathematical nicety or because in practice it results in some inequality." *Dandridge v. Williams,* 397 U.S. 471, 485 (1970). "Even if the classification involved here is to some extent both underinclusive and overinclusive, and hence the line drawn by [the legislature] imperfect, it is nevertheless the rule that in a case like this perfection is by no means required." *Vance v. Bradley,* 440 U.S. 93, 108 (1979) (interior quotations omitted); *Murgia,* 427 U.S. at 315-317 (rational-basis test does not require narrow tailoring). As the entity vested with authority over family relationships, Virginia can make choices to ensure the best aggregate outcomes, without violating the Equal Protection Clause.

### D.    *Baker* Remains Controlling

In *Baker,* the Supreme Court considered and rejected the concept that the Fourteenth Amendment's Due Process and Equal Protection Clauses include a federal right to same-sex marriage. The *Baker* plaintiffs sought the same rights and benefits that Minnesota conveyed to husband-wife marriage, and the Supreme

Court dismissed the case for want of a substantial federal question. *Baker,* 409 U.S. at 810. That holding requires this Court to rule for Virginia here.

> **1.    When Faced with Supreme Court Precedents Having Direct Application, Lower Courts Cannot Reject those Precedents Based on Novel or Even Related Legal Theories**

Because it resolved *Baker* summarily and dismissed for want of a substantial federal question, the issues "presented and necessarily decided" in *Baker* are binding on both the District Court and this Court. *Mandel v. Bradley,* 432 U.S. 173, 176 (1977). Given that *Baker* remains on point for same-sex marriages, the lower federal courts have an obligation to follow that authority and leave it to the Supreme Court to reverse *Baker:*

> "[I]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."

*Agostini v. Felton,* 521 U.S. 203, 237 (1997) (interior quotation omitted). Accordingly, "lower courts are bound by summary decision by [the Supreme] Court 'until such time as the Court informs [them] that [they] are not.'" *Hicks v. Miranda,* 422 U.S. 332, 344-45 (1975) (*quoting Doe v. Hodgson,* 478 F.2d 537, 539 (2d Cir. 1973)). Of course, *Windsor* presented an obvious opportunity for the Supreme Court to have done so, if the Supreme Court believed that its *Windsor* reasoning applied to state marriage laws. The Court's failure to reject *Baker* speaks

volumes and forecloses the conclusion that *Baker* is no longer controlling.[9]

### 2.    No Doctrinal Developments Justify Departure from *Baker,* Especially on Plaintiffs' Due-Process Claims

The District Court makes two mistakes in rejecting *Baker* based on doctrinal developments since 1972: "summary dispositions may lose their precedential value" and become "no longer binding 'when doctrinal developments indicate otherwise.'" Slip Op. at 17 (*quoting Hicks,* 422 U.S. at 344). First, with respect to substantive due process, the District Court does not cite *any* pertinent doctrinal developments. *See* Section II.A, *infra* (marriage already was a fundamental right in 1972 when the Supreme Court summary rejected same-sex marriage as *any* type of federal right). Second, with respect to equal protection, the District Court misreads the impact of *Lawrence, Romer,* and *Windsor* on *Baker.*[10]

With respect to *Lawrence,* there is an obvious difference between

---

[9]    The *Baker* jurisdictional statement plainly presented the question whether denying same-sex marriage violates the Constitution's equal-protection and due-process rights that Plaintiffs here assert. *Baker v. Nelson,* No. 71-1027, Jurisdictional Statement at 3 (Oct. Term 1972). Under *Mandel* and *Hicks* then, *Baker* necessarily decided that there is no basis under federal equal-protection or due-process analysis to support the claim that same-sex relationships deserve the same recognition, rights, or benefits as husband-wife marriage.

[10]    The Supreme Court cabined its doctrinal-development exception with the above-quoted proviso "that the lower courts are bound by summary decisions by this Court until such time as the Court informs [them] that [they] are not." *Hicks,* 422 U.S. at 344-45 (interior quotations omitted, alteration in original). It is not clear, therefore, whether lower courts can cite "doctrinal developments" to displace an on-point Supreme Court decision without the Supreme Court's first saying so.

criminalizing consensual and private adult behavior in *Lawrence* and requiring

public and societal recognition, including monetary benefits, in *Baker.* In any

event, *Lawrence* expressly disavows any suggestion of undermining *Baker:*

> The present case … does not involve whether the
> government must give formal recognition to any
> relationship that homosexual persons seek to enter.

*Lawrence v. Texas,* 539 U.S. 558, 578 (2003). As such, the suggestion that

*Lawrence* undermines *Baker* cannot be squared with *Lawrence* itself, much less

*Baker* and *Agostini.*

Similarly, *Romer* held Colorado's Amendment 2 to be unconstitutional for

broadly limiting the *political* rights to seek or obtain various forms of government

redress that homosexuals theretofore had shared with all citizens under the federal

and state constitutions. *Romer,* 517 U.S. at 632-33. Guaranteeing universal

political rights under *Romer* does not undermine allowing husband-wife definitions

of marriage under *Baker.* Unlike the targeted and common definition of "marriage"

at issue here, the *Romer* law was held to be sufficiently overbroad and unusual to

allow the *Romer* majority to infer animus. *Romer,* 517 U.S. at 633. Virginia's

Marriage Laws do not present that situation.

Finally, in *Windsor,* the Supreme Court rejected what the majority perceived

as an overbroad federal intrusion into an area of state dominance, with the resulting

"discrimination" so unusual as to provide evidence of animus as the law's principal

purpose. 133 S.Ct. at 2693-95. By contrast, here Virginia acts within that primary area of dominance to enact a law that is hardly unusual. Indeed, as the Chief Justice explained, that state "power will come into play on the other side of the board in future cases about the constitutionality of state marriage definitions." *Id.* at 2697 (Roberts, C.J., dissenting). Because none of the features relevant to the *Windsor* majority apply here, *see* Sections I.A.1-I.A.3, *supra, Windsor* does not undermine *Baker.*[11]

In summary, *Lawrence, Romer,* and *Windsor* did not undermine *Baker.* As such, *Baker* remains binding precedent that the District Court and this Court have an obligation to follow.

### E.    *Loving* Does Not Undermine Virginia's Marriage Laws

In addition to framing the decision with the latter-day views of Mildred Loving from *Loving v. Virginia,* 388 U.S. 1 (1967), the District Court on several occasions analogizes Virginia's current marriage laws to the anti-miscegenation statutes struck down in *Loving.* Slip Op. at 26. In *Loving,* the Supreme Court

---

[11]    Justice Scalia's *Windsor* dissent – quoted approvingly by the District Court, Slip Op. at 28 – on the ease of transferring the *Windsor* reasoning on DOMA to states' same-sex marriage laws was not (and, as a dissent, could not be) an invitation that lower courts make that leap, contrary to both otherwise-controlling precedent and limitations in the *Windsor* holding itself. Justice Scalia was clearly speaking to the *Supreme Court's* "sense of what it can get away with," not what the lower courts can get away with. *See Windsor,* 133 S.Ct. at 2709 (Scalia, J., dissenting). Lower courts lack the requisite legal flexibility.

rightly rejected Virginia's claim that its miscegenation statute applied neutrally, treating whites and blacks equally. *Loving,* 388 U.S. at 8-9. That statute *did not* apply equally to whites and non-whites, had a race-based purpose, and indeed was held to be "designed to maintain White Supremacy." *Id.* at 11-12. Accordingly, the Court correctly applied heightened scrutiny. *Lawrence,* 539 U.S. at 600 (Scalia, J., dissenting). By contrast, Virginia's Marriage Laws do not discriminate on the basis of any protected status whatsoever.[12]

### F. As Ratified by the States, the Equal Protection Clause Does Not Compel Recognition of Same-Sex Marriage

The *Windsor* majority very carefully tied its rationale and limited its holding to state-recognized same-sex marriages that the federal government declined to recognize for all purposes, notwithstanding that the general authority over family relationships lies with the states. *Windsor,* 133 S.Ct. at 2691. That is an entirely different question from the question presented here: whether the Fourteenth Amendment *requires states* to recognize same-sex marriages in the first place.

While the "power to interpret the Constitution … remains in the Judiciary,"

---

[12]    For example, discrimination based on sex means that "members of one sex are exposed to disadvantageous terms or conditions … to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 81 (1998). Here, Virginia's Marriage Laws treat male and female same-sex couples the same, but treats those same-sex couples differently from opposite-sex couples. Even if that constituted differential treatment under the Equal Protection Clause, it would not be differential treatment *because of sex.*

24

*City of Boerne v. Flores,* 521 U.S. 507, 524 (1997), the Constitution is not a blank check that the federal judiciary can wield to remake this Nation wholly apart from the states' and the People's intent in ratifying the Constitution's generally worded provisions. The Supreme Court already has recognized the limits posed on using the Due Process Clause to legislate beyond "fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." *Washington v. Glucksberg,* 521 U.S. 702, 720-21 (1997). The obvious intent of the states that ratified the Equal Protection Clause should limit the judiciary's hand in imposing judicial preferences in the guise of interpreting the Constitution.

With statutory text, the Supreme Court readily recognizes the judiciary's role as arbiter, not author, of our laws:

> Had Congress intended so fundamental a distinction, it would have expressed that intent clearly in the statutory language or the legislative history. It did not do so, however, and it is not this Court's function to sit as a super-legislature and create statutory distinctions where none were intended.

*Securities Industry Ass'n v. Bd. of Governors of Fed'l Reserve Sys.,* 468 U.S. 137, 153 (1984) (interior quotations omitted). Similarly, when refereeing disputes between the Federal Government and the sovereign states, federal courts do not presume federal preemption "unless that was the *clear and manifest purpose* of Congress." *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947) (emphasis added), "because respect for the States as independent sovereigns in our federal

25

system leads [federal courts] to assume that Congress does not cavalierly pre-empt [state law]." *Wyeth v. Levine,* 555 U.S. 555, 565 n.3 (2009) (internal quotations omitted); *cf.* H.R. Rep. No. 104-664, at 16 (1996), *reprinted at* 1996 U.S.C.C.A.N. 2905, 2920 ("what is most troubling in a representative democracy is the tendency of the courts to involve themselves far beyond any plausible constitutionally-assigned or authorized role"). *Amicus* EFELDF respectfully submits that the same respect for the states – as well as respect for the People – requires restraint in interpreting the Constitution.

Sodomy was a criminal offense in the original thirteen states that ratified the Bill of Rights and all but five of the thirty-seven states that ratified the Fourteenth Amendment. *Bowers v. Hardwick,* 478 U.S. 186, 192-94 & nn.5-6 (1986), *rev'd on other grounds, Lawrence v. Texas,* 539 U.S. 558 (2003); *see also* 4 WILLIAM BLACKSTONE, COMMENTARIES *215 (describing the common-law crime). It is simply inconceivable that those states understood Equal Protection to *require* the states to recognize same-sex marriage.

Given states' "virtually exclusive" authority over marriage, *Windsor,* 133 S.Ct. at 2691, as "a traditional area of state concern," *Moore v. Sims,* 442 U.S. 415, 435 (1979), *amicus* EFELDF respectfully submits that courts should interpret the Constitution to allow states to retain their definitions of marriage: "When the text … is susceptible of more than one plausible reading," federal courts "ordinarily

accept the reading that disfavors" overturning the intent of those who enacted that text. *Altria Group, Inc. v. Good,* 555 U.S. 70, 77 (2008) (interior quotations omitted). Mandating same-sex marriage cannot be compelled by anything that the states or the People ever intentionally ratified.

## II.    VIRGINIA'S MARRIAGE LAWS DO NOT TRIGGER – BUT WOULD READILY SATISFY – ELEVATED SCRUTINY

Although it respectfully submits that the Court must decide this case under the rational-basis test, *see* Section I, *supra, amicus* EFELDF here addresses Plaintiffs' arguments that Virginia's Marriage Laws warrant elevated scrutiny for denying the fundamental right to marry. Although these arguments provide no basis for this Court to apply elevated scrutiny, *amicus* EFELDF respectfully submits that Virginia's Marriage Laws readily would meet elevated scrutiny.

### A.    Virginia's Marriage Laws Do Not Abridge Fundamental Rights

Same-sex marriage is not a fundamental right under the Due Process Clause. Although husband-wife marriage unquestionably is a fundamental right, *Turner v. Safley,* 482 U.S. 78, 95 (1987) ("decision to marry is a fundamental right"); *Skinner v. Oklahoma ex rel. Williamson,* 316 U.S. 535, 541 (1942) ("Marriage and procreation are fundamental"), the federal Constitution has never required an unrestricted right to marry *anyone.*

Instead, the fundamental right recognized by the Supreme Court applies only to marriages between one man and one woman: "Marriage is one of the basic civil

27

rights of man, fundamental to our very existence and survival." *Loving,* 388 U.S. at 12. Unlike opposite-sex marriage, same-sex relationships are not fundamental to the existence and survival of the human race. Indeed, the Supreme Court already has held that same-sex couples have *no right* to marry, much less a fundamental right do so. *Baker,* 409 U.S. at 810; Section I.D, *supra.* Since *Loving* was extant in 1972 when the Supreme Court decided *Baker, Loving* obviously does not relate to this litigation. In that respect, nothing has changed materially since 1972.

Given "[t]he tendency of a principle to expand itself to the limit of its logic," *Glucksberg,* 521 U.S. at 733 n.23 (interior quotations omitted), the Supreme Court has recognized that federal courts must tread cautiously when expounding substantive due-process rights outside the "fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." *Id.* at 720-21. "[E]xtending constitutional protection to an asserted right or liberty interest" thus requires "the utmost care … lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the [federal judiciary]." *Id.* at 720. Accordingly, to qualify as "fundamental," a right must be both "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty" (*i.e.,* "neither liberty nor justice would exist if [the right] were sacrificed"). *Id.* at 720-21. Even those who fervently believe that same-sex marriage meets the second prong must admit that it cannot meet the first. Leaving aside what the states

that ratified the Fourteenth Amendment believed *in the 1860s,* same-sex marriage (which *Baker* easily rejected in 1972) is not "deeply rooted" even *today.*

### B. Virginia's Marriage Laws Would Survive Elevated Scrutiny, If Elevated Scrutiny Applied

Although elevated scrutiny does not apply, *amicus* EFELDF respectfully submits that Virginia's Marriage Laws readily meet elevated scrutiny. Altering something "fundamental to our very existence and survival," *Loving,* 388 U.S. at 12, implicates the most compelling governmental interests, and Virginia has every right to resist Plaintiffs' proposed radical change to the social fabric. *U.S. v. Masciandaro,* 638 F.3d 458, 473 (4th Cir. 2011) (government has interest in public safety). Even under elevated scrutiny, this Court should decline Plaintiffs' invitation to impose their brave new world on Virginia.

### <u>CONCLUSION</u>

This Court should direct the entry of summary judgment for Virginia.

Dated: April 4, 2014                   Respectfully submitted,


                                       ___/s/ Lawrence J. Joseph_____
                                       Lawrence J. Joseph
                                       1250 Connecticut Ave., NW, Suite 200
                                       Washington, DC 20036
                                       Tel: 202-355-9452
                                       Fax: 202-318-2254
                                       Email: ljoseph@larryjoseph.com

                                       *Counsel for Amicus Curiae Eagle Forum*
                                       *Education & Legal Defense Fund*

## CERTIFICATE OF COMPLIANCE WITH RULE 32

1.    The foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 7,000 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32.2.

2.    The foregoing brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in Century Schoolbook 14-point font.

Dated: April 4, 2014                    Respectfully submitted,

_/s/ Lawrence J. Joseph_

Lawrence J. Joseph, D.C. Bar #464777
1250 Connecticut Ave, NW, Suite 200
Washington, DC 20036
Tel: 202-355-9452
Fax: 202-318-2254
Email: ljoseph@larryjoseph.com

*Counsel for Amicus Curiae Eagle Forum Education & Legal Defense Fund*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on April 4, 2014, I electronically filed the foregoing document with the Clerk of the Court for the U.S. Court of Appeals for the Fourth Circuit using the CM/ECF system, which will send notification of such filing to the counsel for the parties who participate in the CM/ECF system. In addition, I served one copy of the foregoing document on the following counsel who does not participate in the CM/ECF system:

David A. Robinson
P. O. Box 780
North Haven, CT 06473

Dated: April 4, 2014                   Respectfully submitted,

/s/ Lawrence J. Joseph
_____
Lawrence J. Joseph, D.C. Bar #464777
1250 Connecticut Ave, NW, Suite 200
Washington, DC 20036
Tel: 202-355-9452
Fax: 202-318-2254
Email: ljoseph@larryjoseph.com

*Counsel for Amicus Curiae Eagle Forum
Education & Legal Defense Fund*