Nos. 14-1167(L), 14-1169, 14-1173
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
_____

TIMOTHY B. BOSTIC, et al., PLAINTIFFS-APPELLEES; and

CHRISTY BERGHOFF, et al., on behalf of themselves and all others similarly situated, INTERVENORS,

v.

GEORGE E. SCHAEFER, III, in his official capacity as the Clerk of Court for Norfolk Circuit Court, DEFENDANT-APPELLANT; and

JANET M. RAINEY, in her official capacity as State Registrar of Vital Records; ROBERT F. MCDONNELL, in his official capacity as Governor of Virginia; KENNETH T. CUCCINELLI, II, in his official capacity as Attorney General of Virginia; DEFENDANTS-APPELLANTS: and

MICHÈLE MCQUIGG, INTERVENOR/DEFENDANT-APPELLANT.
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT NORFOLK
_____

**BRIEF OF AMICUS CURIAE DAVID BOYLE SUPPORTING
DEFENDANT-APPELLANT SCHAEFER, AND FOR REVERSAL**
_____

David Boyle
P.O. Box 15143
Long Beach, CA 90815
(734) 904-6132
dbo@boyleslaw.org
*Pro se* Counsel for Amicus Curiae David Boyle

## TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………....iv

STATEMENT OF INTEREST OF AMICUS CURIAE…….…………….........1

SUMMARY OF ARGUMENT……………………………………………….1

ARGUMENT……………………………. ……….…………………..…….3

I.   CLARENCE THOMAS VERSUS MILDRED LOVING ON INTERRACIAL MARRIAGE *VIS-À-VIS* GAY MARRIAGE.....................3

II.  BISEXUAL AND SEXUAL-ORIENTATION-FLUID PERSONS MAY CHOOSE TO MARRY OPPOSITE-SEX PARTNERS, AND HAVE OFTEN HISTORICALLY DONE SO, WHEN GAY MARRIAGE IS UNAVAILABLE; THEREFORE, GAY-MARRIAGE BANS ARE RATIONAL, AND MEANINGFULLY PRODUCTIVE OF DIVERSE-GENDER MARRIAGES…………………………………………………...5

    A. Human Sexual Fluidity Comprises Many Bisexual or Sexual-Orientation-Fluid Americans Who Could Choose either Sex-Segregated or Diverse-Gender Marriage…………….........................5

    B. A Revelatory Law-Review Article Admitting Gay-Marriage Bans' Channeling of People into Diverse-Gender Marriages……...................8

    C. The Successful Heterosexual Marriages of Some Gay Mormons: Further Proof that Gay-Marriage Bans Are Effective……………...11

i

D. The Defeat of the Lower Court's Argument for the Ineffectiveness of a Gay-Marriage Ban, by the Arguments Above……………………..13

III.   THE FAILURE OF THE "UNDERINCLUSIVENESS RE FERTILITY" ARGUMENT AGAINST THE BAN.………………...………………..14

IV.   *GRUTTER* AND CHILDREN'S BENEFIT FROM THE DIVERSE-GENDER PARENTAGE INTO WHICH THE BAN USHERS SEXUALLY-FLUID PEOPLE; AND THE BAN'S SOCIALLY-BENEFICIAL, LIFE-AFFIRMING EXPRESSIVE CONTENT RE *CASEY* AND *CARHART*……………………………………………………..16

V.   VIRGINIANS MAY WEIGH THE BALANCE OF COST AND BENEFIT FROM GAY MARRIAGE; AND, "FINANCIAL OR STATUS HARM" TO CHILDREN OR THE PUBLIC……………………………………19

VI.   A SEX-DISCRIMINATION CLAIM IS NOT VIABLE..........................22

VII.   A SEXUAL-ORIENTATION-DISCRIMINATION CLAIM IS NOT VIABLE; AND, UPHOLDING THE BAN WOULD NOT PRECLUDE COURT INTERVENTION IN ALLEGED EMPLOYMENT, OR OTHER, DISCRIMINATION AGAINST GAYS....................................................23

VIII.   NOT ALL THOSE RAISED BY SAME-SEX PARTNERS BELIEVE SAME-SEX MARRIAGE IS GOOD FOR CHILDREN…………...…...25

IX.   SODOMY AS CANCER, AIDS, AND INJURY VECTOR…..................26

ii

X.    MANY ARGUMENTS FOR MANDATORY GAY MARRIAGE

WOULD ALSO APPLY TO LEGALIZING POLYGAMY………......…28

XI.   RATIONAL BASIS IS THE RIGHT LEVEL OF SCRUTINY, THOUGH

THE BAN PASSES HIGHER LEVELS; AND THE REASONS

ADDUCED HERE COMPRISE A VERY COMPELLING STATE

INTEREST…………..................................................................................31

(ANTECONCLUSION)……………………………………………………..32

CONCLUSION……………………………….…………………………...…33

CERTIFICATE OF COMPLIANCE AND WORD COUNT……………………34

CERTIFICATE OF SERVICE…………………………………………………35

iii

# TABLE OF AUTHORITIES

## CASES

*Ballard v. United States*, 329 U.S. 187 (1946)…………………………………………17

*Bishop et al. v. Smith et al.*, Nos. 14-5003 and 14-5006 (No. 04-CV-848-TCK-
TLW, 2014 U.S. Dist. LEXIS 4374 (N.D. Okla. Jan. 17, 2014))….…………..1

*Bostic v. McQuigg*, No 14-1173 (No. 2:13-cv-395, 2014 U.S. Dist. LEXIS 19110
(E.D. Va. Feb. 13, 2014))……………………….….…………………………1

*Bostic v. Rainey*, No. 14-1169 (No. 2:13-cv-395, 2014 U.S. Dist. LEXIS 19110
(E.D. Va. Feb. 13, 2014))……………………….………….…………………1

*Bostic v. Schaefer*, No. 14-1167 (No. 2:13-cv-395, 2014 U.S. Dist. LEXIS 19110
(E.D. Va.  13, 2014))…………… ….………….…………………….*passim*

*Brown v. Bd. of Educ.*, 347 U.S. 483 (1954)………………………….………...22

*Cabell v. Chavez-Salido*, 454 U.S. 432 (1982)……………………………………24

*Gonzales v. Carhart*, 550 U.S. 124 (2007)………………………….16, 18, 25

*Grutter v. Bollinger*, 539 U.S. 306 (2003)………………………….....16, 19, 25

*Kitchen et al. v. Herbert et al.*, No. 13-4178 (No. 2:13-cv-217, 2013 U.S. Dist.
LEXIS 179331 (D. Utah Dec. 20, 2013))……………………….…........1

*Lawrence v. Texas*, 539 U.S. 558 (2003)……………………….2, 18, 27, 31

*Loving v. Virginia*, 388 U.S. 1 (1967)……………………….…..1, 3, 4, 5

*Maynard v. Hill*, 125 U.S. 190 (1888)………………………………………28

iv

*Olmstead v. United States*, 277 U.S. 438 (1928)……………………………24-25

*Planned Parenthood of Se. Pa. v. Casey*, 505 U.S 833 (2003)…………........16, 18

*United States v. Windsor*, 133 S. Ct. 2675 (2013)………………...……….5, 21

**BILLS, STATUTES, OR BALLOT PROPOSITIONS**

Ariz. S. B. 1062 ("SB 1062") (2014)…......……..………...………………..23

Cal. Proposition 6 ("Briggs Initiative") (1978)………………...………………19

Hyde Amend., Pub. L. 94-439, tit. II, § 209, 90 Stat. 1434 (1976; amended

2009)……………………………………………………………...19 & n.7

Va. Marshall/Newman Amend. (2006) and similar Va. legislation…..3, and *passim*

**RULES**

Fed. R. App. P. 29…………………………………………………...1 n.1

**OTHER AUTHORITIES**

Michael Boucai, *Sexual Liberty and Same-Sex Marriage: An Argument from

Bisexuality*, 49 San Diego L. Rev. 415 (2012)………………………….*passim*

Br. of Amicus Curiae David Boyle Supporting Appellants and Supporting Reversal

(Feb. 10, 2014) in *Kitchen et al. v. Herbert et al.*, No. 13-4178 (No. 2:13-cv-

217, 2013 U.S. Dist. LEXIS 179331 (D. Utah Dec. 20, 2013))………….…...16

Br. of Pls.-Appellees Derek Kitchen, *et al.* (Feb. 25, 2014) in *Kitchen et al. v. Herbert et al.*, No. 13-4178 (No. 2:13-cv-217, 2013 U.S. Dist. LEXIS 179331 (D. Utah Dec. 20, 2013))…………………………………………………….….10

Dan Chmielewski, *Ronald Reagan on Gay Rights*, Liberal OC, June 9, 2008, http://www.theliberaloc.com/2008/06/09/ronald-reagan-on-gay-rights/ (last visited April 4, 2014, as with all other Internet links herein)…..............................................................................................24 & n.10

Richard A. Epstein, *Judicial Offensive Against Defense Of Marriage Act*, The Libertarian, Forbes.com, July 12, 2010, 1:28 p.m., http://www.forbes.com/ 2010/07/12/gay-marriage-massachusetts-supreme-court-opinions-columnists-richard-a-epstein.html..…………………………………………………..2 & n.2

Gary J. Gates, *LGBT Parenting in the United States*, The Williams Inst., Feb. 2013, http://williamsinstitute.law.ucla.edu/wp-content/uploads/LGBT-Parenting .pdf……………………………………………………….21 & n.9

Gay Men's Health Crisis, *The Bottom Line on Rectal Microbicide Research* (undated, but concerning a Jan. 23, 2013 presentation), http://www.gmhc. org/news-and-events/events-calendar/the-bottom-line-on-rectal- microbicide-research……………………….…………………………………..27 & n.14, 32

Arin Greenwood, *Who Are 'The Polyamorists Next Door'? Q&A With Author Elisabeth Sheff*, Huffington Post, updated March 5, 2014, 10:59 a.m.,

http://www.huffingtonpost.com/2014/03/05/elisabeth-sheff-polyamory_n_
4898961.html……………………………………………………20 & n.8, 30

Robert Oscar Lopez *, Not all children raised by gay parents support gay marriage:
I should know, I'm one of them*, LifeSiteNews.com, June 3, 2013, 3:35 p.m.,
http://www.lifesitenews.com/news/not-all-children-raised-by-gay-parents-
support-gay-marriage-i-should-know-i/………………………….25 & n.11, 26

Carrie A. Moore, *Gay LDS men detail challenges: 3 who are married give some
insights to therapist group*, Deseret News, Mar. 30, 2007, 12:22 a.m., http://
www.deseretnews.com/article/660207378/Gay-LDS-men-detail-challenges
.html…………………………………………………………….11& n.5, 12, 13

Nat'l Ctr. for Biotech. Info., U.S. Nat'l Libr. of Med., Nat'l Insts. of Health,
*Vaginal "fisting" as a cause of death.*, PubMed.gov (undated), http://www.
ncbi.nlm.nih.gov/pubmed/2929548………………………...…...27 & n.15

Patricia, *Our America with Lisa Ling – "Modern Polygamy" a New Perspective on
an Old Taboo*, The Daily OWN, Oct. 24, 2011, http://www.thedailyown.com/
our-america-with-lisa-ling-modern-polygamy-a-new-perspective-on-an-old-
taboo.................................................................................................29 & n.16

*Numbers* 12:1…………………………………………………….............................4

Martha Nussbaum, *A Right to Marry? Same-sex Marriage and Constitutional Law*,
Dissent, Summer 2009, http://www.dissentmagazine.org/article/a-right-to-

marry-same-sex-marriage-and-constitutional-law………………..29-30 & n.17

Matt Sloane, *Fewer teens having oral sex*, The Chart, CNN, Aug. 17, 2012, 10:41
10:41 a.m., http://thechart.blogs.cnn.com/2012/08/17/fewer-teens- having-oral
-sex/……………..…………........................................................26 & n.13, 27

Hilary White, *Group marriage is next, admits Dutch 'father' of gay 'marriage'*,
LifeSiteNews, Mar. 12, 2013, 4:58 p.m., http://www.lifesitenews.com/news/
group-marriage-is-next-admits-dutch-father-of-gay-marriage.............30 & n.18

Wikipedia, *Anal sex*, http://en.wikipedia.org/wiki/Anal_sex (as of Apr. 3, 2014, at
14:57 GMT)……………………………..…………………………26 & n.12

Wikipedia, *Bisexuality*, http://en.wikipedia.org/wiki/Bisexuality (as of Mar. 26,
2014, at 18:09 GMT)…………………………………………….........*passim*

Wikipedia, *Mixed-orientation marriage*, http://en.wikipedia.org/wiki/Mixed-
orientation_marriage (as of Mar. 3, 2014, at 21:17 GMT)………..…...13 & n.6

Wiktionary, *yestergay*, http://en.wiktionary.org/wiki/yestergay (as of June 17,
2013, at 18:59 GMT)…………………………………………………..11 & n.4

## STATEMENT OF INTEREST OF AMICUS CURIAE

The present amicus curiae, David Boyle (hereinafter, "Amicus"),[1] is respectfully filing this Brief in Support of Defendant-Appellant, George Schaefer, in *Bostic v. Schaefer*, No. 14-1167 (No. 2:13-cv-395, 2014 U.S. Dist. LEXIS 19110 (E.D. Va. Feb. 13, 2014)), and by extension in Nos. 14-1169 and 14-1173. Amicus has multiple interests in this case, including his submission of amicus briefs in "sister cases" *Kitchen et al. v. Herbert et al.*, No. 13-4178 (No. 2:13-cv-217, 2013 U.S. Dist. LEXIS 179331 (D. Utah Dec. 20, 2013)) and *Bishop et al. v. Smith et al.*, Nos. 14-5003 and 14-5006 (No. 04-CV-848-TCK-TLW, 2014 U.S. Dist. LEXIS 4374 (N.D. Okla. Jan. 17, 2014)).

## SUMMARY OF ARGUMENT

*Loving v. Virginia* (388 U.S. 1 (1967)) does not mandate same-sex ("gay") marriage, as Clarence Thomas may agree.

If a court seeks a rational nexus between gay-marriage bans and the promotion of diverse-gender marriage that benefits children: one such nexus is that very many Americans are bisexual or sexually fluid. Thus, many Americans who might choose homosexual marriage, would choose heterosexual marriage instead, if gay marriage is unavailable. This is not mere speculation but has a long history.

---

[1] No party or its counsel wrote or helped write this brief, or gave money to its writing or submission, *see* Fed. R. App. P. 29. All parties have filed blanket permission with the Court for amicae/i to write briefs.

1

A gay-marriage ban is not "underinclusive", even if it does not prohibit other sterile people from marrying.

Even if it were underinclusive re fertility, a ban still steers people into gender-diverse marriages, letting any children, including adopted ones, thus benefit. Also, it serves as an expressive message affirming gender diversity and procreation.

Virginian voters can legitimately weigh the costs and benefits of any alleged damage to children and society from banning gay marriage, versus the benefits to children and society, from a gay-marriage ban, of more children being born and being in diverse-gender-parent families.

It is problematic to claim that banning gay marriage is sex discrimination, when gay marriage establishes a sex-segregated environment.

Also, there is no sexual-orientation discrimination problem, since issues like alleged employment discrimination against gays are different from gay marriage.

Some children of same-sex parents found their experience badly damaging, despite what some social scientists claim.

Sodomy (not gay people themselves) is a comparative vector of injury and disease, not requiring state support and valorization. *Lawrence v. Texas*, 539 U.S. 558 (2003), offers gays "negative liberty" from being arrested; but this does not

imply any "positive liberty" of receiving State approbation and financial entitlement.

The reasons used to justify mandatory legalized gay marriage are difficult to distinguish from those used to justify legalizing polygamy.

The Marshall/Newman Amendment (2006) and similar Virginia legislation (together, "the ban") pass not only rational-basis review, but also strict scrutiny, due to the compelling reasons adduced here. Therefore, the Court should ratify the People of Virginia's votes on the ban.

## ARGUMENT

## I. CLARENCE THOMAS VERSUS MILDRED LOVING ON INTERRACIAL MARRIAGE *VIS-À-VIS* GAY MARRIAGE

The lower-court opinion in *Bostic*, *supra* at 1, begins, *see* 2014 U.S. Dist. LEXIS 19110 at *3, with a quote from Mildred Loving of *Loving v. Virginia* fame. Loving, who, as per her name, seemed a goodhearted soul, equated the struggle for gay marriage with her own struggle for interracial marriage. The judge in *Bostic* uses this idea, *see id. passim*, to justify mandating gay marriage in the Old Dominion.

However, this well-intentioned idea lacks logical foundation. Interracial marriages date at least as far back as Moses marrying an Ethiopian wife, *see*

*Numbers* 12:1. Thus, it was the hateful bans on interracial marriage that were themselves "innovations", thankfully overturned by *Loving*. By contrast, gay marriage as an institution has essentially never existed anywhere until recently, even if informal gay relationships existed since ancient Greece or before. It is a new creation, and one which Virginians' votes do not support.

Moreover, every same-sex marriage, by the very title "same-sex", establishes a *sex-segregated environment*; thus denying a sex-diverse upbringing for any children. This is obvious, even if few have pointed it out. Since the point of *Loving* was largely to *de*-segregate, *see id.*, it is very strange for the State or courts to bless a segregated, zero-gender-diversity arrangement like gay marriage, without the people of Virginia being allowed to weigh in by vote. (Gay-marriage proponents may claim a gay-marriage ban is itself a kind of "segregation"; but a polygamist, or other sexual minority, could argue the exact same thing for his own way of life. *See, e.g.*, Richard A. Epstein, *Judicial Offensive Against Defense Of Marriage Act*, The Libertarian, Forbes.com, July 12, 2010, 1:28 p.m.[2] (saying marriage licenses must be extended to both polygamists and gays).

Additionally, does everyone in inter-racial marriages support Loving's ideas on non-inter-sexual, i.e., same-sex, marriage? For example, Justice Clarence Thomas

---

[2] http://www.forbes.com/2010/07/12/gay-marriage-massachusetts-supreme-court-opinions-columnists-richard-a-epstein.html.

of the U.S. Supreme Court is in an interracial marriage and presumably supports *Loving*; *but see, e.g.*, *United States v. Windsor*, 133 S. Ct. 2675, 2697 (2013), where he joins the dissent. And Clarence Thomas may know the law even more thoroughly than Mildred Loving did.

## II. BISEXUAL AND SEXUAL-ORIENTATION-FLUID PERSONS MAY CHOOSE OPPOSITE-SEX SPOUSES, AND HAVE HISTORICALLY DONE SO, WHEN GAY MARRIAGE IS UNAVAILABLE; THEREFORE, GAY-MARRIAGE BANS ARE RATIONAL, AND MEANINGFULLY PRODUCTIVE OF DIVERSE-GENDER MARRIAGES

### A. Human Sexual Fluidity Comprises Many Bisexual or Sexual-Orientation-Fluid Americans Who Could Choose either Sex-Segregated or Diverse-Gender Marriage

One of the intellectual tragedies of the gay-marriage debate, perhaps worse than misconstruing *Loving* to mandate gay marriage, is that gay-marriage proponents have been largely silent about issues they should know well: e.g., widespread sexual fluidity in human beings. As gay-marriage proponents tend to present things, there are basically only two groups: heterosexuals and homosexuals.

According to this false dichotomy, a gay-marriage ban might not rationally have any beneficial effect, since it would not affect heterosexuals, nor would homosexuals suddenly develop desires to enter heterosexual marriages. Thus, the

5

argument goes, a gay-marriage ban is not only meaningless but mean: an illegal instantiation of "animus".

However, the narrow binary model *supra* is outdated and reductive. Indeed, there is a "rainbow" of human sexual preference: traditional two-person heterosexual relationships; multi-person heterosexual relationships (polygamy or polyandry); homosexuality; asexuality; and bisexuality, among others. The last of those, bisexuality, shows that a gay-marriage ban has a beneficial effect, if two-person gender-diverse marriages are beneficial. (Few religions or social traditions do not see them as beneficial.) And there are many bisexuals in America.

According to the Wikipedia article *Bisexuality*,[3] studies show figures ranging from 1.5 to 5 percent of Americans being bisexuals, *see id.* There may be even more bisexuals than homosexuals: "*The Janus Report on Sexual Behavior*, published in 1993, showed that 5 percent of men and 3 percent of women considered themselves bisexual and 4 percent of men and 2 percent of women considered themselves homosexual." *Id.* (footnote omitted) If proponents of mandatory legalized gay marriage know that statistic, on bisexuals outnumbering homosexuals, they have committed a gross material omission by not telling the courts about it. E.g., there are so many people who, as the name "bisexual"

---

[3] http://en.wikipedia.org/wiki/Bisexuality (as of Mar. 26, 2014, at 18:09 GMT ) (last visited April 4, 2014, as with all other Internet links herein).

implies, could be attracted to either sex, that the myth of "total immutability of sexual preference" goes out the window.

In fact, the number may be far larger than 5%: "Alfred Kinsey's 1948 work *Sexual Behavior in the Human Male* found that '46% of the male population had engaged in both heterosexual and homosexual activities[.]" *Id.* (footnote omitted)

*See also, e.g.*, "A 2002 survey in the United States by National Center for Health Statistics found that . . . . 2.8 percent of women ages 18–44 considered themselves bisexual, 1.3 percent homosexual, and 3.8 percent as 'something else'", *id.* (footnote omitted); therefore, 6.6 percent of women 18-44 who were either *per se* bisexual, or "sexually flexible". (Moreover, note that lesbians are outnumbered by over 5 to 1 by bisexual or "something else" people, *see id.*)

So, if we conservatively assume that not even 5%, but only 4%, of the population is bisexual, either *per se* (self-described) or *de facto*; and if there are c. 315 million Americans right now, then c. 12.6 million Americans are bisexual. If even half of those marry, that is 6.3 million people, with roughly 3.15 million of them marrying opposite-sex partners, and 3.15 million marrying same-sex partners, if gay marriage were available.

But if gay marriage were unavailable, then, at least c. 3.15 million more people, if they marry, would marry opposite-sex partners. Over three million people moved into diverse-gender marriage provides far more than a scant *de minimis* number, or

7

a mere "rational basis" for laws banning gay marriage; numbers of that proportion provide an extremely compelling state interest.

If the real-life numbers are anywhere close to those hypothetical figures, they make the case that opponents of gay-marriage bans have long claimed cannot be made. I.e., instead of there being no nexus between gay-marriage bans and the channeling of people into heterosexual marriages, there is actually a direct and very strong nexus. Thus, the test of "rational basis" (or higher scrutiny) is definitively passed by the gay-marriage ban.

## B. A Revelatory Law-Review Article Admitting Gay-Marriage Bans' Channeling of People into Diverse-Gender Marriages

Even some proponents of gay marriage admit, and lament, that laws like the Virginia ban "channel" bisexuals into heterosexual marriages. *See* Michael Boucai, *Sexual Liberty and Same-Sex Marriage: An Argument from Bisexuality*, 49 San Diego L. Rev. 415 (2012), "This Article proposes that same-sex marriage bans channel individuals, particularly bisexuals, into heterosexual relations and relationships[.]" *Id.* at 416. Boucai believes (wrongly) that gay-marriage bans violate fundamental rights, *see id. passim*. So he is admitting against interest, so to speak, when he acknowledges the channeling effect.

Some mechanisms by which laws channel the sexually-flexible into traditional marriages include "proscription of competing institutions[,] vast material support,

8

and symbolic valorization", *id.* at 418 (footnote omitted). (Polygamy is one "proscribed competing institution", so gay marriage is not alone in that respect.)

The article has other insightful observations. Bisexuals are a "class of individuals, amorphous yet numerous", *id.* at 438; "72.8% of all homosexually active men identify as heterosexual", *id.* at 440; certain "trends describe only self-identified bisexuals. It would be startling if bisexuals' true rates of heterosexual coupling and marriage were not significantly higher." *Id.* at 450; bisexuals are "by some estimates an 'invisible majority' of LGBT people", *id.* at 483-84 (footnote omitted); and, "With regard to procreation, this Article's argument implicitly concedes one way in which same-sex marriage bans advance the state's interest: by increasing the number of bisexuals who pursue same-sex relationships, legalization presumably will decrease these individuals' chances of reproducing." *Id.* at 482. All these observations reinforce that bans on same-gender marriage indeed move the huge class of bisexual persons into diverse-gender marriages.

And the article is not only for gay marriage, but also shows far more extreme views. For example: "[What if the] impressionable psychosexual development of children is a basis for widening, not limiting, the range of 'lifestyle choices' to which they are exposed[?]", with a citation "urging advocates to affirm that nonheterosexual parents 'create an environment in which it is safer for children to openly express their own sexual orientations'". *Id.* at 484 & n.456. I.e., Boucai

9

posits nonheterosexual parenting as *better than* heterosexual parenting, *see id.* "Or imagine a claim in disputes over gender-segregated space that heterosexist conditioning must not be legally installed into the very architecture of our lives", with a citation "suggesting that rules of urinary sex-segregation support heterosexuality", *id.* at 484, 485 n.457. (A "State/Straight Urinal Conspiracy"?) The article is so far to the left that it criticizes typical defenses of gay marriage as being too conservative, *see id. passim.* Thus, the article has an "insider's credibility" which rings true when Boucai criticizes gay-marriage-supporting litigants.

And the criticism is extensive. "Bisexuality is 'virtually invisible' in same-sex marriage litigation." *Id.* at 452. This is correct: e.g., in *Kitchen v. Herbert*, *supra* at 1, the February 25, 2014 reply brief by Kitchen et al., while using the words "gay" or "lesbian" innumerable times, mentions the word "bisexual" only three times, *see id.*, as a sort of "token appearance", and makes virtually no comment about bisexual-particular issues.

In fact: "Bisexual invisibility in same-sex marriage litigation tends to be a negative phenomenon—erasure by mere omission—but sometimes it happens through affirmative, active deletion." *Id.* at 455 (footnotes omitted). Because gay-marriage proponents in general have not shown the care or candor to deal seriously—or at all—with the existence of a huge mass of bisexuals and their

10

amenability to being influenced towards heterosexual marriage by gay-marriage bans, Amicus does so here. (While Amicus accuses no one of malice or dishonesty: intentional or not, the omission of a discussion of bisexuality's pervasiveness, and its effects, is a gross material omission in any gay-marriage case.

And, by the way, the LGBT community privately acknowledges sexual flexibility, using terms like "yestergay", *see* Wiktionary, *yestergay*,[4] "1. (slang, GBLT) A former gay male who is now in a heterosexual relationship", *id.*; "hasbian"; and "lesbians until graduation". Our courts should publicly acknowledge what gays privately acknowledge.)

## C. The Successful Heterosexual Marriages of Some Gay Mormons: Further Proof that Gay-Marriage Bans Are Effective

Theory aside, there are multifarious real-life examples of how channeling people into diverse-gender marriages works. *See, e.g.*, Carrie A. Moore, *Gay LDS men detail challenges: 3 who are married give some insights to therapist group*, Deseret News, Mar. 30, 2007, 12:22 a.m.,[5]

> Speaking to a standing-room-only audience, three LDS couples described their experiences with their heterosexual marriages, despite the fact that each of the husbands experience what they call same-sex attraction, or SSA. They said while they are basically happy,

---

[4] http://en.wiktionary.org/wiki/yestergay (as of June 17, 2013, at 18:59 GMT).
[5] http://www.deseretnews.com/article/660207378/Gay-LDS-men-detail-challenges.html.

11

navigating the emotional and physical aspects of their relationships requires constant hard work.
. . . .
Because of the nature of the discussion, none of the participants wanted their identities publicized. Their names have been changed[.]
. . . .
"[M]arriage and family . . . . was always the goal, even when I [one husband] was in the wilderness."
. . . .
[I]t took years for them to be able to discuss [one husband's] attraction to men. He said he "made a lot of mistakes" and the two of them talked about divorce, but he praised his wife for "hanging in there with me."
The wives said they see their husbands as much more than their same-sex attraction. Despite the challenges and public perception to the contrary, one said, "there are people who are married and dealing with this."

*Id.* This revelatory story of courage and persistence teaches us much. It shows, *see id.*, that sexually-fluid or *de facto* bisexual people (whether they call themselves "gay", "bisexual", or "heteroflexible") can be channeled into successful diverse-gender relationships. It also shows, *see id.*, the fear and anonymity that such people go through, perhaps obscuring their true, massive numbers. (*See* again Boucai, re "trends [which] describe only self-identified bisexuals. It would be startling if bisexuals' true rates of heterosexual coupling and marriage were not significantly higher." *Id.* at 450. *See also Bisexuality*, *supra* at 6, on the reductive notion that people are gay, straight or lying, *see id.*; "[B]isexuals must frequently contend with discrimination from gays, lesbians, and straight society around the word *bisexual* and bisexual identity itself." *Id.* (footnotes omitted)

12

### D. The Defeat of the Lower Court's Argument for the Ineffectiveness of a Gay-Marriage Ban, by the Facts Above

At this point, the lower court's argument, "[R]ecognizing a gay individual's fundamental right to marry can in no way influence whether other individuals will marry, or how other individuals will raise families", *Bostic*, *supra* at 1, at *54 (Allen, J.), is destroyed.

If same-sex couples are not allowed State-recognized marriage, then huge numbers of people, e.g., the gay or bisexual Mormon men noted *supra* at 11-12, *will* be, and *have* been, incentivized, massively so, to enter gender-diverse marriages. And any argument that those already in gay relationships will not change course may also be false. For example, Ellen DeGeneres' former lesbian lover Anne Heche went on to marry a man named Coleman Laffoon, *see, e.g.*, Wikipedia, *Mixed-orientation marriage*.[6]

Again, an intellectual tragedy of the gay-marriage debate is the pretense that gay-marriage prohibitions are ineffective at reaching their goals. They are, and have long been, very effective; and if we can stipulate that they are, we can avoid the further tragedy of wasting time, and move onto "step 2", which is whether the prohibitions are constitutional.

---

[6] http://en.wikipedia.org/wiki/Mixed-orientation_marriage (as of Mar. 3, 2014, at 21:17 GMT).

## III. THE FAILURE OF THE "UNDERINCLUSIVENESS RE FERTILITY" ARGUMENT AGAINST THE BAN

And, proceeding to "step 2" noted *supra*: the prohibitions are quite constitutional, despite weakly-reasoned arguments like "underinclusiveness". The lower court claims, "The 'for-the-children' rationale also fails because it would threaten the legitimacy of marriages involving post-menopausal women, infertile individuals, and individuals who choose to refrain from procreating[; and] 'natural' procreation . . . . was effectively disavowed by the legislation itself, which declared that marriage should be limited to opposite-sex couples 'whether or not they are reproductive in effect or motivation.'" *Bostic* at *55, *61 (citations omitted). First off, the categories the lower court mentions, *see id.*, are very difficult to police. What constitutes "infertility", especially when advancing medical technology may cure infertility previously thought incurable? (Some people sterilize themselves; but that doesn't always work; and they may have new surgery and become fertile again. Should a "Fertility Police" give everyone frequent examinations before and during marriage?)

Too, as for elderly people, what age is that, precisely? Again, medicine may assist fertility at later ages than previously possible. As well, men often tend to be fertile longer than women, so that any "Senior-Citizen Fertility Police" would run

14

into equal-protection problems, in that old men might be allowed to marry, while old women would not: an outrage.

As for "individuals who choose to refrain from procreating", *id.* at \*55: millennia of ribald literature, plus common sense, confirm that even sincere desire to remain celibate—or consistently use birth control—, between two romantic partners, may last as long as a dandelion blown into pieces by a warm summer wind. (That takes care of the objection re "'whether or not [heterosexual marriages] are reproductive in effect or motivation'", *id.* at \*61: "motivation" may mean nothing. As for "effect": is a "Birth Police" going to make sure there is issue, progeny, born from a marriage?) "Accidental pregnancies" are frequent and no joke: and to have children born into the protections of a stable, dual-gender marriage is highly desirable.

By contrast, gender is very easy to understand and police. You may not know your racial background, age, subconscious desires, or fertility: but unless you have *very* poor eyesight, you need only undress and you'll quickly discover your gender. This may be too common-sense an observation for some people; but Amicus is, *inter alia*, trying to bring some badly-needed Virginia-style common sense to the debate.

So, "underinclusion" re fertility fails as an objection.

15

**IV.** ***GRUTTER*** **AND CHILDREN'S BENEFIT FROM THE DIVERSE-GENDER PARENTAGE INTO WHICH THE BAN USHERS SEXUALLY-FLUID PEOPLE; AND THE BAN'S SOCIALLY-BENEFICIAL, LIFE-AFFIRMING EXPRESSIVE CONTENT RE** ***CASEY*** **AND** ***CARHART***

But even if, *arguendo*, the "underinclusion" argument about fertility and procreation were correct, a gay-marriage ban would be socially positive on other grounds. *Grutter v. Bollinger* (539 U.S. 306 (2003)) upholds gender diversity as a compelling state interest, *see id.* Since it would be ludicrous to say diversity is compelling in formal education but cannot even be rationally relevant in 18 years of child-nurture, then a gender-diverse parentage is worthy of special favor by the State. (Amicus' 2/10/2014 *Kitchen* amicus brief, *see id. passim*, has many more details about *Grutter* re gay marriage.)

The lower court says, "[C]ounsel also argued [the State's] legitimate interest in celebrating the 'diversity of the sexes,' but failed to establish how [the ban] is related rationally to such a celebration[; and t]he 'for-the-children' rationale rests upon an unconstitutional, hurtful and unfounded presumption that same-sex couples cannot be good parents." *Bostic* at *51-*52, *55 (citation omitted). But *Grutter*, *supra*, shows how gender diversity matters; and part of the rationale States may adopt per *Grutter* is, *see id. passim*,

1) a bonus for diversity

16

2) that allows exclusion of others.

Thus, a diversity bonus in university admissions to members of some groups, may exclude certain others (e.g., white males). But this of course does not mean white males cannot be good students; similarly, even though the gay-marriage ban excludes gays from gay marriage, it does not at all mean "same-sex couples cannot be good parents", *Bostic* at *55, so that the lower court is wrong. (*See also*, "The truth is that the two sexes are not fungible; a community made up exclusively of one is different from a community composed of both[.]" *Ballard v. United States*, 329 U.S. 187, 193 (1946) (Douglas, J.).)

Therefore, even if every single person moved by the gay-marriage ban to choose a diverse-gender marriage were totally sterile: it would still matter that it was a diverse-gender marriage, not a one-sex marriage. This is because the family could adopt children, or one partner may already have children.

In addition, although the State may not employ animus or false information against gays or gay marriage, e.g., claiming that "All gay parents abuse children", the State may still uphold the value of life: and gay parents simply cannot have children with each other, ever. (Artificial insemination and such may let some gays have someone else's child—at least, half someone else's—and employ the social fiction of calling it their own.)

17

*See, e.g.*, *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S 833 (2003):

"Regulations . . . by which the State . . . . may express profound respect for the life

of the unborn are permitted", *id.* at 877; *Gonzales v. Carhart*, 550 U.S. 124 (2007):

"The [Partial-Birth Abortion Ban] Act expresses respect for the dignity of human

life. . . . The government may use its voice and its regulatory authority to show its

profound respect for the life within the woman", *id.* at 157. The instant case is not

about abortion, but it does involve procreation and human life. So, Virginia may

"show its profound respect for . . . life", *id.*, by passing the ban, which honors only

those types of marriages, dual-gender ones, which create life between two partners.

Some may rejoin that *Casey* and *Carhart*, *supra*, still permit some abortions,

while the ban prohibits all gay marriages. However, this analogy is not apt. Gays

are still permitted to live their private sexual and relational lives any way they

want, following *Lawrence*, *supra* at 2. They are just not automatically given a State

blessing and funding for doing so. This is similar to how abortion is treated:

Americans are usually allowed to perform that physical act, but without

government endorsement, *see Casey* and *Carhart* (allowing government to take

actions and send messages favoring children's lives instead of endorsing abortion),

18

and without government funding, *see, e.g.*, the Hyde Amendment[7] (massively limiting federal abortion funding).

Thus, the ban promotes new life, gender equity and desegregation, and diversity. And, including its expressive elements, it does so constitutionally.

## V. VIRGINIANS MAY WEIGH THE BALANCE OF COST AND BENEFIT FROM GAY MARRIAGE; AND, "FINANCIAL OR STATUS HARM" TO CHILDREN OR THE PUBLIC

The court below has said, "[C]hildren being raised by same-sex couples [are] needlessly deprived[, by the ban,] of the protection [etc.] that marriage conveys", *Bostic* at *53. However: the question is of the *kind* of marital relationship a child will be born into, or have to endure.

Polygamous families, too, produce children outside a legal marriage relationship; yet a polygamy ban is legal, and those children are "deprived", despite Virginia's *overall* desire to promote children being born into marriage. Even if gay couples somehow have children, e.g., from a previous relationship: a child should have an optimal environment, which a State may determine is provided by a two-gender marital relationship, *cf., e.g.*, *Grutter*, *supra*.

---

[7] Pub. L. 94-439, tit. II, § 209, 90 Stat. 1434 (1976; amended 2009).

If children raised by gays allegedly suffer some financial or other harm from a gay-marriage ban: any financial harm has been strongly alleviated by federal activism, since *Windsor*, in extending tax breaks and other benefits to gay couples, even if their State does not recognize gay marriage.

And speaking of fiscal harm: if something honored as "marriage" can never naturally produce posterity, that "marriage" may spend public social capital and money on a non-productive relationship that the People consider wasteful. How could it be irrational for, say, a poor, minority, heterosexual mother of five to decide that draining the public fisc to give gay couples (many of whom may be white and wealthy) an additional tax break is not right?

As for "humiliation of children": if any, it is probably no worse than polygamists' children may suffer; *see, e.g.*, Arin Greenwood, *Who Are 'The Polyamorists Next Door'? Q&A With Author Elisabeth Sheff* ("Sheff Article"), Huffington Post, updated Mar. 5, 2014, 10:59 a.m.,[8] "[K]ids in poly families [must] deal[ ] with stigma from society", *id.* Yet few people cry that polygamy must be legalized. As well: what about those children who feel stigmatized or horrified *by being children of a same-sex relationship*; who despise that sex-segregated upbringing? Those children may fear physical or emotional abuse if

---

[8] http://www.huffingtonpost.com/2014/03/05/elisabeth-sheff-polyamory_n_4898961.html.

20

they speak out; but *see infra* Section VIII, where one man who suffered from same-sex parents speaks out.

Moreover, in America, as of 2010, "[T]here are approximately 125,000 same-sex couples raising nearly 220,000 children."[9] 220,000 may be far less than the number of *new* children born of the c. 3.15 million people moved into fruitful marriage by gay-marriage bans, *see supra* at 7. If those 3.15 million had an average of one child each, that would be over three million children, far more than the 220,000 children raised by same-sex couples. (Of course, the 3-million-some new children would be spread out over a number of years.)

Thus, if gay marriage is banned, so that gay couples lack State financial or status benefits, many sexually-fluid people, even some currently in gay relationships, will likely move into heterosexual marriages instead. Not only will this let some children who despise a nontraditional upbringing, have a traditional two-gender upbringing instead: it will let more children be born, period, as noted *supra* at 9 (Boucai on gay-marriage bans' raising the fertility rate). Not a court, but Virginians, should weigh the comparative cost of not letting some gays' children receive certain financial or societal entitlements, with the benefit of having many

---

[9] Gary J. Gates, *LGBT Parenting in the United States*, The Williams Inst., Feb. 2013, http://williamsinstitute.law.ucla.edu/wp-content/uploads/LGBT-Parenting .pdf, at 3.

more children born at all, and many of them moved under a diverse-gender parentage.

## VI. A SEX-DISCRIMINATION CLAIM IS NOT VIABLE

Speaking of gender: a sex-discrimination claim is invalid. —If Amicus said there are public facilities that utterly exclude women: this would sound horrible, except when Amicus explains that the "facilities" are men's bathrooms. Context is key here, as with gay marriage. (Incidentally, speaking of out-of-context commentary: the lower court says, "Gay and lesbian individuals share the same capacity as heterosexual individuals to form . . . . lasting relationships", *Bostic* at *38. But this is basically irrelevant, because any number of people can form committed, long-term relationships, whether polygamists, underage couples, adult incestuous couples, etc.)

*Inter alia*, how does it constitute sex discrimination for the ban to *prohibit* a sex-segregated environment for children? To claim otherwise turns the idea of "sex discrimination" on its head. Actually, one is tempted to say that instead, the *children* of a same-sex couple might have a sex-discrimination or sex-segregation claim, at least if those children were unhappy with that sex-segregated environment. *See, e.g.*, *Brown v. Bd. of Educ.* (347 U.S. 483 (1954)) (condemning segregated learning environments for children); and *see infra* Section VIII.

22

# VII. A SEXUAL-ORIENTATION-DISCRIMINATION CLAIM IS NOT VIABLE; AND, UPHOLDING THE BAN WOULD NOT PRECLUDE COURT INTERVENTION IN ALLEGED EMPLOYMENT, OR OTHER, DISCRIMINATION AGAINST GAYS

And upholding Virginia's chosen gay-marriage ban would not estop this Court from finding that gays suffer illegal discrimination in employment or other fields unrelated to marriage, if this Court wanted to. For example, since a gay person can presumably flip a hamburger as well as a heterosexual, it might be considered irrational for a restaurateur to fire the burger-flipper for being gay. (This spirit of this common-sense observation may be behind Arizona governor Jan Brewer's recent vetoing of "SB 1062". But Arizona still bans gay marriage, showing gay marriage is distinguishable from business-related laws or private decisions.)

Also: regardless of whether a female bisexual athlete were a champion at her sport; if she were in a lesbian relationship, she could have no natural children—or if she and her partner adopted children, those children would not have the advantages of a gender-diverse parentage. Similarly, gay athletes Michael Sam and Jason Collins of the NFL and NBA might be superb at their sports, but that does not mean they can get pregnant, breast-feed, or serve as female role models. And those things may be more important than being a champion athlete.

The Court could even, if desired, adopt heightened scrutiny re homosexuality vis-à-vis employment or other issues besides marriage. (Amicus is not recommending the Court adopt higher scrutiny, only saying that rational-basis scrutiny re gay marriage does not rule out higher scrutiny elsewhere.) This kind of bifurcated scrutiny has been done before, *see, e.g.*, *Cabell v. Chavez-Salido*, 454 U.S. 432, 439 (1982) (applying strict scrutiny to alienage, but a lower level of scrutiny re political classifications).

*See also, e.g.*, Dan Chmielewski, *Ronald Reagan on Gay Rights*, Liberal OC, June 9, 2008,[10] on the Briggs Initiative, a 1978 California ballot measure banning gay teachers from public schools,

> Reagan met with initiative opponents[,] and, ultimately, at the risk of offending his anti-gay supporters in the coming presidential election, wrote in his newspaper column: "I don't approve of teaching a so-called gay life style in our schools, but there is already adequate legal machinery to deal with such problems if and when they arise."

*Id.* However, Reagan was only protecting some employment for gays, and said explicitly, "I don't approve of teaching a so-called gay life style[.]" *Id.* And when a State declares that a gay union deserves the honor of marriage, that teaches children and others that, *inter alia*, the sexual lifestyle which is the physical base of gay marriage is just as healthy as a heterosexual lifestyle. *See Olmstead v. United States*, 277 U.S. 438, 485 (1928): "Our government is the potent, the omnipresent

---

[10] http://www.theliberaloc.com/2008/06/09/ronald-reagan-on-gay-rights/.

teacher." (Brandeis, J., dissenting from the judgment); and *see infra* Section IX, on the dangers of sodomy.

## VIII. NOT ALL THOSE RAISED BY SAME-SEX PARTNERS BELIEVE SAME-SEX MARRIAGE IS GOOD FOR CHILDREN

Both sides in this case have submitted copious social-science evidence saying that gay marriage is either great, or non-optimal, for children. So the People should decide between this contending evidence, and also consider common-sense wisdom encapsulated in sources like *Grutter. See, e.g.*, *Carhart*, *supra* at 18 (Court disregards medical professionals' opinions and upholds Congress on partial-birth-abortion ban). And one voice, bisexual author and Ph.D. Robert Oscar Lopez, *Not all children raised by gay parents support gay marriage: I should know, I'm one of them*, LifeSiteNews.com, June 3, 2013, 3:35 p.m.,[11] is worth hearing:

> [F]rom ages 2-19, I was raised by a lesbian mother with the help of her partner[.]
> . . . [C]hildren deeply feel the loss of a father or mother, no matter how much we love our gay parents or how much they love us. . . .
> Over the last year I've been in frequent contact with adults who were raised by parents in same-sex partnerships. They are terrified of speaking publicly about their feelings, so several have asked me (since I am already out of the closet, so to speak) to give voice to their concerns.
> . . . .

---

[11] http://www.lifesitenews.com/news/not-all-children-raised-by-gay-parents-support-gay-marriage-i-should-know-i/.

> I have heard of the supposed "consensus" on the soundness of same-sex parenting from pediatricians and psychologists, but that consensus is frankly bogus.
>    . . . .
> . . . I love her [his mother] because I know she did everything possible to give me a good life. Still, what was best in our specific circumstances was a state of deprivation that it is unconscionable to force on innocent children if it's not absolutely necessary. . . .

*Id.* This one eyewitness account, *see id.*, may be worth innumerable formal studies.

## IX. SODOMY AS CANCER, AIDS, AND INJURY VECTOR

Another reason to disallow gay marriage, one that demands detached consideration, is that to subsidize relations based on sodomy may increase their number, or at least show *de facto* government endorsement of such practices (as noted *supra* at 24), although they are a risk factor for disease, injury, or death. E.g.,

> [A]nal sex is considered a high-risk sexual practice because of the vulnerability of the anus and rectum[, which] can easily tear and permit disease transmission[;] and the risk of transmission of HIV is higher for anal intercourse than for vaginal intercourse.

Wikipedia, *Anal sex*[12] (citations, including internal, omitted).

There are other deadly problems with sodomy besides HIV/AIDS, such as cancer. *See, e.g.*, Matt Sloane, *Fewer teens having oral sex*, The Chart, CNN, Aug. 17, 2012, 10:41 a.m.,[13] "It's widely accepted that there is an increased number of head and neck cancers today due to changes in sexual practices in the '60s, '70s

---

[12] http://en.wikipedia.org/wiki/Anal_sex (as of Apr. 3, 2014, at 14:57 GMT).

[13] http://thechart.blogs.cnn.com/2012/08/17/fewer-teens-having-oral-sex/.

26

and '80s," -- specifically, an increase in oral sex, said Dr. Otis Brawley, the chief

medical officer of the American Cancer Society." *Id.*

*See also* Gay Men's Health Crisis ("GMHC"), *The Bottom Line on Rectal*

*Microbicide Research* (undated, but concerning a Jan. 23, 2013 presentation),[14]

"Unprotected anal intercourse is 10 to 20 times more likely to result in HIV

infection compared to unprotected vaginal intercourse[, and] is a significant driver

in the global HIV epidemic among gay men and transgender women[.]" *Id.*

Disease-transmission aside, sodomy also causes physical injury, since it

includes practices like "fisting", i.e., putting a fist—or two—, into the birth canal,

since women lack certain anatomy males have that would substitute for a fist. *See,*

*e.g.*, Nat'l Ctr. for Biotech. Info., U.S. Nat'l Libr. of Med., Nat'l Insts. of Health,

*Vaginal "fisting" as a cause of death.*, PubMed.gov (undated)[15] (young woman

dies from vaginal fisting) (citation omitted).

This all proves exactly what Amicus said, *supra* at 2, that "sodomy is a

comparative vector of injury and disease". (And because of science, not relying on

moralistic or Biblical reasons.)

Thus, while under the "negative liberty" of *Lawrence*, a State cannot outlaw

consensual adult sodomy, *see id.*, it is not obliged to *endorse or subsidize* an

---

[14] http://www.gmhc.org/news-and-events/events-calendar/the-bottom-line-on-rectal-microbicide-research.

[15] http://www.ncbi.nlm.nih.gov/pubmed/2929548.

activity, gay marriage, whose physical base is sodomy. While the lower court notes that marriage is not only about sex, *see Bostic* at \*58, it is still *substantially* about sex. Traditional marriage implicitly valorizes heterosexual sex, *see, e.g.*, "[M]arriage . . . . is the foundation of the family", *Maynard v. Hill*, 125 U.S. 190, 211 (1888). Thus, State-blessed gay marriage implicitly valorizes homosexual sex, i.e., sodomy, the only type of sex anatomically possible given the synergy of two women or two men in a sexual relationship. The People have a right to withhold such valorization. (*Cf.* the continuing U.S. ban on gay men's blood donations.)

A State has compelling reason for not raising to the status of marriage a form of life based in inherently risky or deadly behaviors. (Policing, for disease, heterosexuals who want to get married, would be impractical for essentially the reasons *supra* at 14 on policing fertility.) Virginians' health is a very compelling matter.

## X. MANY ARGUMENTS FOR MANDATORY GAY MARRIAGE WOULD ALSO APPLY TO LEGALIZING POLYGAMY

And there are few arguments for gay marriage that could not be made for polygamy. Again, some say that children may feel humiliated, and receive fewer government financial benefits, when their gay parents cannot marry. But why could polygamists' children (and polygamists may have *many* children) not make the same argument?

28

*See, e.g.*, Patricia, *Our America with Lisa Ling – "Modern Polygamy" a New Perspective on an Old Taboo*, The Daily OWN, Oct. 24, 2011,[16] "Lisa [Ling] introduced a group of all women who were meeting with a gay activist for training. They were determined to fight for their rights and lifestyle[, and] claim to want the ability to have their children not feel like second class citizens." *Id.* So, polygamists are actually training with gay activists, *see id.*, and using "rights" or "protecting our children from animus" arguments to legalize polygamy. Sauce for the goose may cover the gander too.

Some may claim that polygamy is inherently dangerous and unequal in a way that a pair of married gay people is not. However, what if, say, there were an isogamous multipair marriage ("IMM"), "iso" ("equal") plus "gamous" ("marriage"), which had an even, sex-balanced number of partners? E.g., a tetrad of two men marrying two women in group marriage: an "intimate quadrilateral". A State could set an upper bound, e.g., ten people (five pairs) would be too many. But "equality" would reign, and gender balance. How, then, could someone who believes in the fallacious "fundamental right to non-traditional marriage" the lower court proffers, complain about an "IMM"? *See, e.g.*, Martha Nussbaum, *A Right to*

---

[16] http://www.thedailyown.com/our-america-with-lisa-ling-modern-polygamy-a-new-perspective-on-an-old-taboo.

29

*Marry? Same-sex Marriage and Constitutional Law*, Dissent, Summer 2009[17] (not only supporting gay marriage but also claiming "legal restriction . . . . would not tell against a regime of sex-equal polygamy").

   *See also, e.g.*, Sheff Article, *supra* at 20, where academic Scheff, having researched polyamorous families for 15 years, concludes, "The kids who participated in my research were in amazingly good shape", *id.* (Though many polyamorous families were white and wealthy, many were far from wealthy, *see id.*) So if, *see id.*, some social science shows polyamory is not harmful to children: then, logically, polygamists' "fundamental right to marry" should not be impeded, especially since their children might be "harmed and humiliated" by banning polygamy. And *see* Hilary White, *Group marriage is next, admits Dutch 'father' of gay 'marriage'*, LifeSiteNews, Mar. 12, 2013, 4:58 p.m.: "Boris Dittrich, the homosexual activist called the 'father' of . . . Dutch gay 'marriage', has admitted that group marriages of three or more people, is the next, inevitable logical step[.]"[18] *Id.* The Court should avoid the slippery slope presented.

---

[17] http://www.dissentmagazine.org/article/a-right-to-marry-same-sex-marriage-and-constitutional-law.

[18] http://www.lifesitenews.com/news/group-marriage-is-next-admits-dutch-father-of-gay-marriage.

## XI. RATIONAL BASIS IS THE RIGHT LEVEL OF SCRUTINY, THOUGH THE BAN PASSES HIGHER LEVELS; AND THE REASONS ADDUCED HERE COMPRISE A VERY COMPELLING STATE INTEREST

But even if heightened scrutiny were somehow necessary instead of rational basis "with a bite" (disallowing animus as a sole reason for legislation), the various bases adduced *supra*, either singly or added together, form a very compelling government interest.

Even strict scrutiny is met. E.g., the interest in gender diversity of parents seems at least compelling as racial or gender diversity at colleges, and is met in a narrowly-tailored manner. People aren't arrested for *not* entering opposite-sex marriages, or harassed by State billboards or mandatory "get married" classes; rather, people are just not actively subsidized and lionized by government for entering another type of marriage, same-sex marriage.

The reasonably-least-restrictive means are used as well. For example, re diverse-gender role models, would it really be less restrictive to have the Government provide gay male married couples a visiting female breast-feeder and role model for children? or give lesbian couples a "rent-a-man" as a male role model? Probably not.

Similarly, with the disease- and injury-risking practice of nonreproductive sex—and reduction of AIDS and cancer seems a compelling interest—, *Lawrence*

31

prohibits punishing sodomy, so how can sodomy be not encouraged? By…being not *encouraged*: since no State "merit badge" or financial benefit, no bonus, is given to gay marriage, which is physically centered on nonreproductive sex, since other kinds of sex are biologically impossible. (People are legally free to engage in nonreproductive sex in private all they want, or marry at any church or synagogue which marries gays.)

Also, a law mandating that gay couples use rubber prophylactics or "dental dams" might seem intrusive and insulting. By contrast, the lack of gay marriage doesn't even mention or do anything; it is just a gap, a lack of State approval and reward.

\* \* \*

Reverend Fred Phelps of the Westboro Baptist Church recently died, and his hateful animus toward gays is missed by no decent person. However, when Boucai admits that gay-marriage bans do channel bisexuals to heterosexual marriages, that admission is not "animus". Nor is it "animus" for GMHC to note that sodomy is far more dangerous than regular sex. When gays themselves have admitted these facts, it is hardly irrational, much less "animus", to cite those true admissions, and let the People weigh the evidence.

In capsule form: gay-marriage bans steer the sexually-fluid to heterosexual marriage, which increases the number of children, gives the spouses safe and

32

procreative sexual opportunities instead of sodomy, and gives diverse-gender parents to children. All that, plus the expressive pro-life, pro-gender-diversity message of an exclusively-heterosexual marriage institution, should let the bans pass the strictest level of scrutiny.

Thus, the People of the Commonwealth have shown plausible common sense by denying a novel right to State-sanctified gay marriage, and should no longer be denied their voters' rights in doing so.

## CONCLUSION

Amicus respectfully asks the Court to reverse the judgment of the court below; and humbly thanks the Court for its time and consideration.

April 4, 2014          Respectfully submitted,

s/David Boyle
P.O. Box 15143
Long Beach, CA 90815
(734) 904-6132
dbo@boyleslaw.org
*Pro se* Counsel for Amicus Curiae David Boyle

## CERTIFICATE OF COMPLIANCE AND WORD COUNT

The undersigned certifies that the accompanying Brief of Amicus Curiae David Boyle Supporting Defendant-Appellant Schaefer, and for Reversal, in No. 14-1167, and by extension in Nos. 14-1169 and 14-1173, is in 14-point, proportionately-spaced Times New Roman font; and that its length, exclusive of "exempt" sections including the table of contents and table of authorities/citations, etc., is 7000 words, since his Microsoft Word 2010 word-processing program states the word count is 7000 words.

Thank you for your time,


April 4, 2014        Respectfully submitted,

s/David Boyle
P.O. Box 15143
Long Beach, CA 90815
(734) 904-6132
dbo@boyleslaw.org
*Pro se* Counsel for Amicus Curiae David Boyle

34

## CERTIFICATE OF SERVICE

The undersigned certifies that he electronically filed the foregoing with the

Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by

using the appellate CM/ECF system on April 4, 2014.

He also certifies that all parties or their counsel of record were served through

the CM/ECF system if they are registered CM/ECF users.

April 4, 2014           Respectfully submitted,

> s/David Boyle
> P.O. Box 15143
> Long Beach, CA 90815
> (734) 904-6132
> dbo@boyleslaw.org
> *Pro se* Counsel for Amicus Curiae David Boyle