No. 14-1167 (L)

---

## In the United States Court of Appeals for the Fourth Circuit

---

TIMOTHY B. BOSTIC, individually, et al., *Plaintiffs-Appellees,*
v. GEORGE SCHAEFER III, in his official capacity as the Clerk of Court for Norfolk Circuit Court, et al.,
*Defendants-Appellants*.

---

Appeal from the United States District Court for the Eastern District of Virginia, Civil Case No. 2:13-CV-395-AWA-LRL (Honorable Arenda L. Wright Allen)

---

**BRIEF OF CONSTITUTIONAL LAW SCHOLARS ASH BHAGWAT, LEE BOLLINGER, ERWIN CHEMERINSKY, WALTER DELLINGER, MICHAEL C. DORF, LEE EPSTEIN, DANIEL FARBER, BARRY FRIEDMAN, MICHAEL J. GERHARDT, DEBORAH HELLMAN, JOHN C. JEFFRIES, JR., LAWRENCE LESSIG, WILLIAM MARSHALL, FRANK MICHELMAN, JANE S. SCHACTER, CHRISTOPHER H. SCHROEDER, SUZANNA SHERRY, GEOFFREY R. STONE, DAVID STRAUSS, LAURENCE TRIBE, AND WILLIAM VAN ALSTYNE AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

---

GEOFFREY R. STONE
THE UNIVERSITY OF
   CHICAGO LAW SCHOOL
1111 E. 60th Street
Chicago, IL  60637
(773) 702-4907
gstone@uchicago.edu

LORI ALVINO MCGILL
*Counsel of Record*
LATHAM & WATKINS LLP
555 11th Street, NW
Suite 1000
Washington, DC  20004
(202) 637-2319
lori.alvino.mcgill@lw.com

*Counsel for Amici Constitutional Law Scholars*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

INTEREST OF *AMICI CURIAE* ........................................................1

SUMMARY OF ARGUMENT ...........................................................4

ARGUMENT ......................................................................................7

I.    THE CONSTITUTION REQUIRES HEIGHTENED JUDICIAL SCRUTINY OF LAWS THAT DISCRIMINATE AGAINST GAY AND LESBIAN PERSONS ..................................................................7

    A.    Gay Men And Lesbians Have Faced A Long History Of Discrimination ...............................................................10

    B.    Sexual Orientation Is Irrelevant To An Individual's Ability To "Contribute To Society" .....................................................15

    C.    Gay Men And Lesbians Lack Sufficient Political Power To Protect Themselves Against Invidious Discrimination......................17

    D.    Sexual Orientation Is An "Immutable" Or "Defining" Characteristic ...............................................................24

    E.    Doctrinal Developments Culminating In Windsor v. United States Require Application Of Heightened Scrutiny .........................27

CONCLUSION ................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adarand Constructors, Inc. v. Pena,*
    515 U.S. 200 (1995)......................................................................8, 9, 19

*Baker v. Wade,*
    769 F.2d 289 (5th Cir. 1985) ...................................................14

*Ben-Shalom v. Marsh,*
    881 F.2d 454 (7th Cir. 1989) ...................................................29

*Bolling v. Sharpe,*
    347 U.S. 497 (1954)....................................................................28

*Bostic v. Rainey,*
    No. 2:13cv395, 2014 WL 561978 (E.D. Va. Feb. 13, 2014) .............6, 11, 13

*Bowen v. Gilliard,*
    483 U.S. 587 (1987)....................................................................8, 24

*Bowers v. Hardwick,*
    478 U.S. 186 (1986), *overruled by Lawrence v. Texas*, 539 U.S. 558,
    578 (2003)....................................................................................13

*Christian Legal Society Chapter of the University of California, Hastings*
    *College of the Law v. Martinez,*
    130 S. Ct. 2971 (2010)..............................................................26

*City of Cleburne v. Cleburne Living Center, Inc.,*
    473 U.S. 432 (1985)....................................................7, 8, 9, 15, 16

*City of Richmond v. J.A. Croson Co.,*
    488 U.S. 469 (1989)....................................................................19, 30

*Clark v. Jeter,*
    486 U.S. 456 (1988)....................................................................8

**Page(s)**

*Conaway v. Deane*,
 932 A.2d 571 (Md. 2007) ...........................................................16

*Cook v. Gates*,
 528 F.3d 42 (1st Cir. 2008)........................................................29

*Craig v. Boren*,
 429 U.S. 190 (1976).............................................................18, 19

*Equality Foundation of Greater Cincinnati, Inc. v. City of Cincinnati*,
 860 F. Supp. 417 (S.D. Ohio 1994), *rev'd on other grounds*, 54 F.3d
 261 (6th Cir. 1995), *vacated and remanded*, 518 U.S. 1001 (1996)............16

*Fatin v. INS*,
 12 F.3d 1233 (3d Cir. 1993) .......................................................24

*Frontiero v. Richardson*,
 411 U.S. 677 (1973).............................................9, 15, 18, 21, 24

*Golinski v. United States Office of Personnel Management*,
 824 F. Supp. 2d 968 (N.D. Cal. 2012), *cert. denied*, 133 S. Ct. 2887
 (2013)...........................................................................26

*Graham v. Richardson*,
 403 U.S. 365 (1971)................................................................8

*Gregory v. Ashcroft*,
 501 U.S. 452 (1991)...............................................................15

*Hernandez v. Robles*,
 855 N.E.2d 1 (N.Y. 2006) .........................................................16

*High Tech Gays v. Defense Industrial Security Clearance Office*,
 895 F.2d 563 (9th Cir. 1990) .................................................27, 29

*Howard v. Child Welfare Agency Review Board*,
 No. CV 1999-9881, 2004 WL 3154530 (Ark. Cir. Dec. 29, 2004),
 *aff'd*, 238 S.W.3d 1 (Ark. 2006)..................................................13

iii

**Page(s)**

*In re Marriage Cases*,
183 P.3d 384 (Cal. 2008) ...............................................................25

*Jantz v. Muci*,
759 F. Supp. 1543 (D. Kan. 1991), *rev'd on other grounds*, 976 F.2d
623 (10th Cir. 1992) .....................................................................15

*Johnson v. Johnson*,
385 F.3d 503 (5th Cir. 2004) .........................................................29

*Kerrigan v. Commissioner of Public Health*,
957 A.2d 407 (Conn. 2008) .....................................................22, 26

*Lalli v. Lalli*,
439 U.S. 259 (1978) .......................................................................14

*Lawrence v. Texas*,
539 U.S. 558 (2003) .............................................6, 14, 25, 26, 28, 30

*Lofton v. Secretary of the Department of Children & Family Services*,
358 F.3d 804 (11th Cir. 2004) ........................................................29

*Loving v. Virginia*,
388 U.S. 1 (1967) .........................................................5, 8, 18, 23

*Lyng v. Castillo*,
477 U.S. 635 (1986) ...................................................................9, 24

*Massachusetts Board of Retirement v. Murgia*,
427 U.S. 307 (1976) ....................................................................8, 15

*Mathews v. Lucas*,
427 U.S. 495 (1976) .......................................................................25

*Mississippi University for Women v. Hogan*,
458 U.S. 718 (1982) .........................................................................8

*Nyquist v. Mauclet*,
432 U.S. 1 (1977) .......................................................................9, 25

**Page(s)**

*Padula v. Webster,*
    822 F.2d 97 (D.C. Cir. 1987)...................................................27, 29

*Pedersen v. Office of Personnel Management,*
    881 F. Supp. 2d 294 (D. Conn. 2012) .................................11, 20

*Perry v. Brown,*
    671 F.3d 1052 (9th Cir. 2012) ...............................................29

*Perry v. Schwarzenegger,*
    704 F. Supp. 2d 921 (N.D. Cal. 2010), *aff'd*, 671 F.3d 1052 (9th Cir. 2012), *vacated sub nom. Hollingsworth v. Perry*, 133 S. Ct. 2652 (2013)...........................................................................11

*Plyler v. Doe,*
    457 U.S. 202 (1982)...........................................................8, 25

*Price-Cornelison v. Brooks,*
    524 F.3d 1103 (10th Cir. 2008) .............................................29

*Romer v. Evans,*
    517 U.S. 620 (1996)...............................................................7

*Rowland v. Mad River Local School District,*
    730 F.2d 444 (6th Cir. 1984), *cert. denied*, 470 U.S. 1009, 1014 (1985)...................................................................................11

*Rowland v. Mad River Local School District,*
    470 U.S. 1009 (1985)...........................................................22

*SmithKline Beecham Corp. v. Abbott Laboratories,*
    740 F.3d 471 (9th Cir. 2014) ..............................................6, 29

*Steffan v. Perry,*
    41 F.3d 677 (D.C. Cir. 1994)................................................25

*Thomasson v. Perry,*
    80 F.3d 915 (4th Cir. 1996) ..............................................10, 27

v

**Page(s)**

*United States Department of Agriculture v. Moreno*,
413 U.S. 528 (1973)................................................................22

*United States v. Windsor*,
133 S. Ct. 2675 (2013).............................................6, 22, 27, 28

*Veney v. Wyche*,
293 F.3d 726 (4th Cir. 2002) ...............................................10, 27

*Walmer v. United States Department of Defense*,
52 F.3d 851 (10th Cir. 1995) ......................................................29

*Watkins v. United States Army*,
875 F.2d 699 (9th Cir. 1989) ...............................................16, 25

*Windsor v. United States*,
699 F.3d 169 (2d Cir. 2012), *aff'd on other grounds*, 133 S. Ct. 2675 ,
*cert. denied*, 133 S. Ct. 2885 *and* 133 S. Ct. 2884 (2013) ...........................28

*Woodward v. United States*,
871 F.2d 1068 (Fed. Cir. 1989) ...................................................29

## CONSTITUTIONAL PROVISIONS AND STATUTES

U.S. Const. amend. XIV, § 1 ...................................................................7

8 U.S.C. § 1182(a)(4) (1982) ..................................................................12

10 U.S.C. § 654(b) (2006), *repealed by* Pub. L. No. 111-321, § 2(f)(1)(A),
124 Stat. 3515, 3516 (2010) ........................................................12

Pub. L. No. 64-301, § 3, 39 Stat. 874, 875 (1917)....................................12

Pub. L. No. 89-236, § 15(b), 79 Stat. 911, 919 (1965)............................12

Pub. L. No. 101-649, § 601, 104 Stat. 4978, 5067-77 (1990) ................13

**Page(s)**

Fla. Stat. § 63.042(3) (2003) ........................................................13

Miss. Code Ann. § 93-17-3(2) (2000) ...................................13

Va. Code Ann. § 63.2-1201 (2014)..........................................13

Va. Code Ann. § 63.2-1202 (2014) .........................................13

Va. Code Ann. § 63.2-1709.3(A) (2014) ................................13

## OTHER AUTHORITY

Bruce A. Ackerman, *Beyond Carolene Products,* 98 Harv. L. Rev. 713
(1985)..................................................................................23

Am. Psychiatric Ass'n, *Position Statement On Homosexuality and Civil
Rights*, 131 Am. J. Psychiatry 436 (1974).....................................16

George Chauncey, *Why Marriage? The History Shaping Today's Debate
Over Gay Equality* (2004) ..........................................12

153 Cong. Rec. S12,202 (daily ed. Sept. 27, 2007)................................21

John Hart Ely, *Democracy and Distrust: A Theory of Judicial Review* 150
(1980).................................................................................9, 23

Exec. Order No. 13,087 of May 28, 1998, 63 Fed. Reg. 30,097 (June 2,
1998) ....................................................................................12

Nathaniel Frank, *Unfriendly Fire: How the Gay Ban Undermines the
Military and Weakens America* (2009).........................................11

Gary J. Gates & Frank Newport, Gallup Politics, *Special Report: 3.4% of
U.S. Adults Identify as LGBT* (Oct. 18, 2012), http://www.gallup.com/
poll/158066/special-report-adults-identify-lgbt.aspx ...................22

**Page(s)**

Evan Gerstmann, *The Constitutional Underclass: Gays, Lesbians, and the Failure of Class-Based Equal Protection* (1999) ..........................................10

Gregory M. Herek et al., *Demographic, Psychological, and Social Characteristics of Self-Identified Lesbian, Gay, and Bisexual Adults*, 7 Sex Res. Soc. Policy 176 (2010) ...............................................26

House Press Gallery, *Demographics*, http://pressgallery.house.gov/member-data/demographics (last visited Mar. 25, 2014) .....................................17, 18

Human Rights Campaign, *Statewide Employment Laws and Policies* (Jan. 15, 2014), *available at* http://s3.amazonaws.com/hrc-assets//files/assets/resources/employment_laws_1-2014.pdf.......................19

Letter from United States GAO to Hon. Tom Harkin et al., *Sexual Orientation and Gender Identity Employment Discrimination: Overview of State Statutes and Complaint Data* (Oct. 1, 2009), *available at* http://www.gao.gov/new.items/d10135r.pdf...........................19

Oral Argument Tr. at 108-09, *Windsor v. United States*, 133 S. Ct. 2675 (2013) (No. 12-307), *available at* http://www.supremecourt.gov/oral_arguments/argument_transcripts/12-307 _jnt1.pdf ..............................24

Richard A. Posner, *Sex and Reason* (1992)............................................................10

David R. Sands, *113th Congress Mirrors Increasingly Diverse U.S.*, Wash. Times, Jan. 7, 2013, *available at* http://www.washingtontimes.com/news/2013/jan/7/113th-congress-mirrors-increasingly-diverse-us/#ixzz2KHEmHzJj ...........21

Jane S. Schacter*, Ely at the Altar: Political Process Theory Through the Lens of the Marriage Debate,* 109 Mich. L. Rev. 1363 (2011) .............20, 21

Brad Sears et al., Williams Institute, *Documenting Discrimination on the Basis of Sexual Orientation and Gender Identity in State Employment* 13-2 (2009), *available at* http://williamsinstitute.law.ucla.edu/research/workplace/documenting-discrimination-on-the-basis-of-sexual-orientation-and-gender-identity-in-state-employment/.....................20

viii

**Page(s)**

Laurence H. Tribe, *American Constitutional Law* (2d ed. 1988) ............................16

United States Senate, *Ethnic Diversity in the Senate*,
     http://www.senate.gov/artandhistory/history/common/briefing/
     minority_senators.htm (last visited Mar. 25, 2014) ......................................17

United States Senate, *Women in the Senate*,
     http://www.senate.gov/artandhistory/history/common/briefing/
     women_senators.htm (last visited Mar. 25, 2014) .........................................18

## INTEREST OF *AMICI CURIAE*

Amici are constitutional law scholars who teach and write in the field. Amici have studied, written scholarly commentary on, and have a common professional interest in one of the issues presented in these cases: Whether a classification based on sexual orientation triggers heightened scrutiny under current equal protection jurisprudence.

*Amici* are the following scholars[1]:

**Ashutosh Bhagwat**, Professor of Law, University of California at Davis School of Law;

**Lee Bollinger**, President, Columbia University;

**Erwin Chemerinsky**, Founding Dean, Distinguished Professor of Law, Professor of Political Science, University of California, Irvine School of Law;

**Walter Dellinger**, Douglas B. Maggs Professor Emeritus, Duke University School of Law;

**Michael C. Dorf**, Robert S. Stevens Professor of Law, Cornell University Law School;

---

[1] *Amici* appear in their individual capacities; institutional affiliations are listed here for identification purposes only. All parties consent to the filing of this brief. No counsel for a party authored this brief in whole or in part or made a monetary contribution intended to fund the preparation or submission of this brief, nor has any other person or persons made a monetary contribution intended to fund preparing or submitting this brief.

1

**Lee Epstein**, Provost Professor of Law and Political Science, Rader Family Trustee Chair in Law, University of Southern California Gould School of Law;

**Daniel Farber**, Sho Sato Professor of Law, University of California, Berkeley;

**Barry Friedman**, Jacob D. Fuchsberg Professor of Law, New York University School of Law;

**Michael J. Gerhardt**, Samuel Ashe Distinguished Professor of Constitutional Law and Director, Center for Law and Government, University of North Carolina School of Law;

**Deborah Hellman**, F. D. G. Ribble Professor of Law, University of Virginia School of Law;

**John C. Jeffries, Jr.**, David and Mary Harrison Distinguished Professor of Law, University of Virginia School of Law;

**Lawrence Lessig**, Roy L. Furman Professor of Law and Leadership, Harvard Law School;

**William Marshall**, William Rand Kenan, Jr. Distinguished Professor of Law, University of North Carolina School of Law;

**Frank Michelman**, Robert Walmsley University Professor, Emeritus, Harvard Law School;

**Jane S. Schacter**, William Nelson Cromwell Professor of Law, Stanford Law School;

**Christopher H. Schroeder**, Charles S. Murphy Professor of Law, Duke University School of Law;

**Suzanna Sherry**, Herman O. Loewenstein Professor of Law, Harvie Branscomb Distinguished University Professor, Vanderbilt Law School;

**Geoffrey R. Stone**, Edward H. Levi Distinguished Service Professor, University of Chicago Law School;

**David Strauss**, Gerald Ratner Distinguished Service Professor of Law, University of Chicago Law School;

**Laurence Tribe**, Carl M. Loeb University Professor, Harvard University; Professor of Constitutional Law, Harvard Law School;

**William Van Alstyne**, William R. and Thomas L. Perkins Professor Law, Emeritus, Duke University School of Law.

## SUMMARY OF ARGUMENT

For decades, the Supreme Court and this Court have considered four factors in determining whether a law that discriminates against any particular group should be tested by heightened judicial scrutiny:  (1) whether the group has experienced a history of invidious discrimination; (2) whether the defining characteristic of the group is relevant to one's ability to contribute to society; (3) whether the group can effectively protect itself against discrimination through the political process; and (4) whether an individual can, without sacrificing a core aspect of her identity, effectively opt-out of the group.  Applying those factors, classifications based on sexual orientation clearly warrant heightened scrutiny, as the Ninth Circuit has held, and the Supreme Court has strongly implied.

1.    It is beyond question that gay men and lesbians have suffered a history of purposeful discrimination, both private and legal.  They have been ostracized, humiliated, prosecuted, denied private and government employment, and denied even the right to form a family.  Few groups in American history have experienced such persistent and pervasive discrimination.

2.    A person's sexual orientation is irrelevant to her ability to contribute to society.  Sexual orientation is not in any way a disability that renders an individual less capable of being a lawyer, doctor, policeman, parent, teacher, or

4

judge.  It is a classic example of a personal characteristic that has no legitimate bearing on one's competence, skill, or value as a human being.

3.    Gay and lesbian individuals have limited ability to protect themselves through the political process against continued public and private discrimination. As an initial matter, relative political power is not a particularly weighty factor in the analysis.  In any event, the limited political power of gay and lesbian persons weighs in favor of applying heightened scrutiny here.  Although there have been some recent successes in a few jurisdictions in the struggle for equal rights for gay and lesbian individuals, attempts to secure federal and state antidiscrimination legislation often have failed, and many recent strides toward equality have been swiftly rolled back by aggressive ballot initiatives.  The barriers to gay and lesbian persons achieving equal respect, equal dignity, and equal rights through the political process remain daunting, and private discrimination and hostility are still often both widespread and fierce.

Against the backdrop of the nation's history of discrimination against gay and lesbian persons, the Supreme Court's decisions teach that the limited and recent progress achieved by this group does not preclude heightened scrutiny of laws that discriminate on the basis of sexual orientation.  In *Loving v. Virginia*, the Supreme Court unanimously applied strict scrutiny to a law that prohibited interracial marriage, after observing that fourteen states had repealed their anti-

miscegenation statutes in the fifteen years leading up to that decision. 388 U.S. 1, 6 n.5 (1967). The Court also extended heightened scrutiny to sex-based classifications at a time when Congress had recently enacted several statutory prohibitions on sex-based discrimination. In the same vein, a few scattered victories in a handful of states do not preclude heightened scrutiny for laws that discriminate against gay and lesbian individuals today.

4. Gay and lesbian individuals share a common "immutable" characteristic, both because sexual orientation is fundamental to their identity, *Lawrence v. Texas*, 539 U.S. 558, 576-77 (2003), and because one's sexual orientation is not changeable through conscious decision, therapeutic intervention, or any other method.

Finally, the clear thrust of recent decisions recognizes that laws discriminating against gay and lesbian individuals are either irrational or fail to satisfy the demands of heightened scrutiny, as the District Court recognized. *Bostic v. Rainey*, No. 2:13cv395, 2014 WL 561978, at *22 & n.16 (E.D. Va. Feb. 13, 2014) (noting the Court "would be inclined" to apply heightened scrutiny had it not found rational basis scrutiny sufficient to dispose of the claim). Indeed, as the Ninth Circuit recently held, *SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471, 481-82 (9th Cir. 2014), the Supreme Court's decision in *United States v. Windsor*, 133 S. Ct. 2675, 2693 (2013), effectively applied a heightened standard

6

of scrutiny for claims of discrimination on the basis of sexual orientation, and the Court's earlier decisions in *Lawrence* and *Romer v. Evans*, 517 U.S. 620 (1996), support this doctrinal development.

This Court should apply the traditional four-factor test and hold that laws that discriminate on the basis of sexual orientation are subject to heightened scrutiny.

## ARGUMENT

## I. THE CONSTITUTION REQUIRES HEIGHTENED JUDICIAL SCRUTINY OF LAWS THAT DISCRIMINATE AGAINST GAY AND LESBIAN PERSONS

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

Laws that distinguish among individuals in the distribution of benefits or burdens generally are presumed to be valid, and will be sustained, if they are "rationally related to a legitimate [government] interest." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985). But that "general rule gives way" when the law in question classifies based on factors that "reflect prejudice and antipathy—a view that those in the burdened class are not as worthy or deserving as others." *Id.* "Legislation predicated on such prejudice is . . . incompatible with the constitutional understanding that each person is to be judged

7

individually and is entitled to equal justice under the law." *Plyler v. Doe*, 457 U.S. 202, 216 n.14 (1982). Accordingly, the Supreme Court has held that any law that classifies on the basis of such a characteristic must be tested by heightened judicial scrutiny to pass constitutional muster. *See, e.g.*, *Loving v. Virginia*, 388 U.S. 1 (1967) (race); *Graham v. Richardson*, 403 U.S. 365 (1971) (alienage); *Clark v. Jeter*, 486 U.S. 456 (1988) (legitimacy); *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718 (1982) (sex/gender).[2]

In determining whether heightened scrutiny is appropriate, courts generally consider four factors: (1) whether the group has experienced a history of invidious discrimination, *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 313 (1976) (per curiam); (2) whether the discrimination is based on "'stereotyped characteristics not truly indicative'" of the group's abilities, *Cleburne*, 473 U.S. at 441 (quoting *Murgia*, 427 U.S. at 313); (3) whether members of the group have "'obvious, immutable, or distinguishing characteristics that define them as a discrete group,'" *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987); and (4) whether the group lacks the

---

[2] A law that singles out such a class for disparate treatment must be narrowly tailored to serve a compelling government interest. *See, e.g.*, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 235 (1995). Laws that discriminate on the basis of sex are considered quasi-suspect and must be "substantially related to an important governmental objective." *Mississippi Univ. for Women*, 458 U.S. at 721-22.

8

capacity adequately to protect itself in the political process, *Lyng v. Castillo*, 477 U.S. 635, 638 (1986).

The Supreme Court has not insisted that all four factors be present in every instance. For example, in some cases the Court has applied heightened scrutiny despite a group's substantial political power or the ability of individuals to opt out of the class. *See, e.g.*, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 235 (1995) (holding that *all* racial classifications are inherently suspect); *Nyquist v. Mauclet*, 432 U.S. 1, 9 n.11 (1977) (resident aliens are a suspect class notwithstanding their ability to opt out of the class).[3] In general, however, the Supreme Court considers these four factors in deciding whether heightened scrutiny is appropriate.

Consideration of these factors establishes that laws that discriminate against gay men and lesbians must be subjected to heightened judicial scrutiny, and this

---

[3] *See also Cleburne*, 473 U.S. at 442 n.10 ("'[T]here's not much left of the immutability theory, is there?'" (quoting John Hart Ely, *Democracy and Distrust: A Theory of Judicial Review* 150 (1980))); *id.* at 472 n.24 (Marshall, J., concurring in judgment in part and dissenting in part) ("The 'political powerlessness' of a group may be relevant, but that factor is neither necessary, as the gender cases demonstrate, nor sufficient, as the example of minors illustrates."); *Frontiero v. Richardson*, 411 U.S. 677, 686 & n.17 (1973) (plurality op.) (applying intermediate scrutiny to women while finding that they "do not constitute a small and powerless minority").

9

Court should revisit its pre-*Windsor* decisions that once suggested the contrary.[4] Gay men and lesbians have long suffered a history of discrimination across all facets of life; sexual orientation has no bearing on an individual's ability to contribute to society; gay and lesbian individuals have historically faced significant obstacles to protecting themselves from discrimination through the democratic process; and sexual orientation is immutable or, at a minimum, is a defining characteristic that an individual ought not be compelled by law to change in order to avoid discrimination.

### A. Gay Men And Lesbians Have Faced A Long History Of Discrimination

There can be no doubt that homosexuals historically have been, and continue to be, the target of purposeful and often grievously harmful discrimination because of their sexual orientation. For centuries, the prevailing attitude toward gay persons has been "one of strong disapproval, frequent ostracism, social and legal discrimination, and at times ferocious punishment." Richard A. Posner, *Sex and Reason* 291 (1992); *see also* Evan Gerstmann, *The Constitutional Underclass: Gays, Lesbians, and the Failure of Class-Based Equal Protection* 62 (1999) (cataloguing the "numerous legal disadvantages" suffered by gay men and lesbians "in twentieth-century America"). Gay men and lesbians have been denied

---

[4] *See, e.g.*, *Veney v. Wyche*, 293 F.3d 726, 731-32 & n.4 (4th Cir. 2002) (citing *Thomasson v. Perry*, 80 F.3d 915, 929 (4th Cir. 1996)) (applying rational basis scrutiny to homosexual prisoner's discrimination claim).

10

employment, targeted for violence, publicly humiliated, and treated as perverts, sinners, and criminals.[5]

The long history of discrimination against gay men and lesbians in this country, including in Virginia, has been recounted at length by numerous courts. *See, e.g., Bostic*, 2014 WL 561978, at *14-15; *Pedersen v. Office of Pers. Mgmt.*, 881 F. Supp. 2d 294, 314-16 (D. Conn. 2012); *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 981-91 (N.D. Cal. 2010), *aff'd*, 671 F.3d 1052 (9th Cir. 2012), *vacated sub nom. Hollingsworth v. Perry*, 133 S. Ct. 2652 (2013). It therefore suffices for present purposes to provide only a few of many examples of the historical discrimination against this group in almost every facet of American life.

The United States government's own practices provide ample evidence of the widespread, government-sanctioned discrimination suffered by gay and lesbian persons. During World War II, for example, the military systematically attempted to screen out lesbians and gay men from the armed forces and—adding insult to injury—denied benefits to those who had served their nation. Nathaniel Frank, *Unfriendly Fire: How the Gay Ban Undermines the Military and Weakens America* 9-11 (2009). During the 1950s, President Eisenhower issued an executive order

---

[5]  *See also Rowland v. Mad River Local Sch. Dist.*, 730 F.2d 444 (6th Cir. 1984), *cert. denied*, 470 U.S. 1009, 1014 (1985) (Brennan, J., dissenting) ("[H]omosexuals have historically been the object of pernicious and sustained hostility.").

requiring the discharge of homosexual employees from all federal employment and mandating that defense contractors and other private corporations with federal contracts ferret out and fire all homosexual employees.[6]  The federal government's employment discrimination against gay men and lesbians continued until the late 1990s.  *See* Exec. Order No. 13,087 of May 28, 1998, 63 Fed. Reg. 30,097 (June 2, 1998).  As recently as 1993, the federal government enacted the "Don't Ask, Don't Tell" policy, which forced service members to choose between concealing their sexual orientation and being discharged.  That policy remained in effect until late 2010.  10 U.S.C. § 654(b) (2006), *repealed by* Pub. L. No. 111-321, § 2(f)(1)(A), 124 Stat. 3515, 3516 (2010).

In the realm of immigration, from 1917 to 1990 Congress prohibited gay men and women from entering the country.  *See* Immigration Act of 1917, Pub. L. No. 64-301, § 3, 39 Stat. 874, 875 (1917) (requiring exclusion of "persons of constitutional psychopathic inferiority"); Immigration and Nationality Act, amended October 3, 1965, Pub. L. No. 89-236, § 15(b), 79 Stat. 911, 919 (adding "sexual deviation" as ground for denying entry into the United States); 8 U.S.C.

---

[6]  "At the height of the McCarthy witch-hunt, the U.S. State Department fired more homosexuals than communists.  In the 1950s and 1960s literally thousands of men and women were discharged or forced to resign from civilian positions in the federal government because they were suspected of being gay or lesbian."  George Chauncey, *Why Marriage? The History Shaping Today's Debate Over Gay Equality* 6 (2004).

§ 1182(a)(4) (1982) (prohibiting individuals who acknowledged their homosexuality from entering this country); Immigration Act of 1990, Pub. L. No. 101-649, § 601, 104 Stat. 4978, 5067-77 (1990) (finally eliminating "sexual deviants" from the list of excludable aliens).

Gay and lesbian individuals have also faced legal discrimination in the domestic sphere. For example, state laws historically prohibited (and some still prohibit) gay men and lesbians (and same-sex couples) from serving as foster or adoptive parents. *See, e.g.*, Fla. Stat. § 63.042(3) (2003); Miss. Code Ann. § 93-17-3(2) (2000); *Howard v. Child Welfare Agency Review Bd.*, No. CV 1999-9881, 2004 WL 3154530, at *10-12 (Ark. Cir. Dec. 29, 2004) (upholding law that forbids the placement of children in the foster care of homosexuals), *aff'd*, 238 S.W.3d 1 (Ark. 2006). *Cf. Bostic*, 2014 WL 561978, at *3 (noting that second-parent adoption is not allowed unless the parents are married) (citing Va. Code Ann. §§ 63.2-1201 and -1202 (2014)); Va. Code Ann. § 63.2-1709.3(A) (2014) (allowing child-placing agencies to refuse placement when doing so "would violate the agency's written religious or moral convictions or policies").

Perhaps the most telling evidence of the animus and discrimination against gay men and lesbians is the legacy of widespread criminalization of sexual conduct between consenting adults of the same sex. *See Bowers v. Hardwick*, 478 U.S. 186, 192 (1986), *overruled by Lawrence v. Texas*, 539 U.S. 558, 578 (2003); *see*

*also Baker v. Wade*, 769 F.2d 289, 292 (5th Cir. 1985) ("[T]he strong objection to homosexual conduct … has prevailed in Western culture for the past seven centuries …."). Such laws, the Supreme Court ultimately recognized, unlawfully "demean [the] existence" of gay and lesbian individuals. *Lawrence*, 539 U.S. at 578.

In a society in which homosexuality was excoriated as a heinous sin, the law branded it a serious crime, and the medical profession treated gay persons as diseased freaks of nature, individuals who suspected themselves of harboring homosexual desires were made to feel inferior and reviled. Gay men and lesbians attempted, often desperately, to hide their secret shame from family, friends, neighbors, and associates. The fear of discovery kept the secret lives of most gay men and lesbians invisible, even to one another. In short, gay men and lesbians have endured significant and longstanding discrimination in this country. Every court to have considered that question has come to the same conclusion.[7]

---

[7] That gay men and lesbians have not historically been disenfranchised does not diminish this undeniable history of discrimination; the Supreme Court has never required a history of disenfranchisement to trigger heightened scrutiny. *See, e.g., Lalli v. Lalli*, 439 U.S. 259, 264-66 (1978) (recognizing illegitimacy as a quasi-suspect class).

14

**B.    Sexual Orientation Is Irrelevant To An Individual's Ability To "Contribute To Society"**

Another critical factor in the Court's heightened scrutiny analysis is whether the group in question is distinctively different from other groups in a way that "'frequently bears [a] relation to ability to perform or contribute to society.'" *Cleburne*, 473 U.S. at 440-41; *see also Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality op.) ("[W]hat differentiates sex from such nonsuspect statuses as intelligence or physical disability, and aligns it with the recognized suspect criteria, is that the sex characteristic frequently bears no relation to ability to perform or contribute to society.").

In *Cleburne*, the Court ruled that heightened scrutiny was inappropriate for laws discriminating against people who are "mentally retarded," because such individuals "have a reduced ability to cope with and function in the everyday world." 473 U.S. at 442. Similarly, heightened scrutiny was not considered appropriate in reviewing mandatory retirement laws because "physical ability generally declines with age." *Murgia*, 427 U.S. at 315; *see also Gregory v. Ashcroft*, 501 U.S. 452, 472 (1991).

As numerous courts, scholars, and the American Psychiatric Association have recognized, homosexual orientation "'implies no impairment in judgment, stability, reliability or general social or vocational capabilities.'" *Jantz v. Muci*, 759 F. Supp. 1543, 1548 (D. Kan. 1991) (quoting Resolution of the American

15

Psychological Association (Jan. 1985)), *rev'd on other grounds*, 976 F.2d 623 (10th Cir. 1992); *Watkins v. United States Army*, 875 F.2d 699, 725 (9th Cir. 1989) (Norris, J., concurring in the judgment) ("Sexual orientation plainly has no relevance to a person's 'ability to perform or contribute to society.'"); Laurence H. Tribe, *American Constitutional Law* § 16-33 (2d ed. 1988) ("[H]omosexuality bears no relation at all to [an] individual's ability to contribute fully to society."); Am. Psychiatric Ass'n, *Position Statement On Homosexuality and Civil Rights*, 131 Am. J. Psychiatry 436, 497 (1974).[8]

Indeed, gay men and lesbians can and do perform perfectly well as contributing members of society in every profession and facet of community life—when they are permitted to do so. Thus, the Supreme Court's observation that race, gender, alienage, and national origin "are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy," is equally applicable to gay men and women. *Cleburne*, 473 U.S. at 440.

---

[8] *See also Equality Found. of Greater Cincinnati, Inc. v. City of Cincinnati*, 860 F. Supp. 417, 437 (S.D. Ohio 1994) ("[S]exual orientation .. bears no relation whatsoever to an individual's ability to perform, or to participate in, or contribute to, society."), *rev'd on other grounds*, 54 F.3d 261 (6th Cir. 1995), *vacated and remanded*, 518 U.S. 1001 (1996); *Conaway v. Deane*, 932 A.2d 571, 609 (Md. 2007) ("Gay . . . persons . . . have been subject to unique disabilities not truly indicative of their abilities to contribute meaningfully to society."); *Hernandez v. Robles*, 855 N.E.2d 1, 28 (N.Y. 2006) (Kaye, C.J., dissenting) ("Obviously, sexual orientation is irrelevant to one's ability to perform or contribute.").

### C.  Gay Men And Lesbians Lack Sufficient Political Power To Protect Themselves Against Invidious Discrimination

That gay and lesbian individuals as a group possess limited ability to protect themselves in the political process also weighs in favor of heightened scrutiny of laws that discriminate against such individuals.

1.  Before turning to the substantial body of evidence establishing the political vulnerability of gay men and lesbians, it is useful first to examine the nature and extent of the Supreme Court's consideration of political power in the heightened scrutiny analysis.  As the Court has repeatedly made clear, the fact that a group has some political influence does not in any way foreclose—or even weigh significantly against—the need for heightened scrutiny.  To the contrary, the Court invokes heightened scrutiny to test the constitutionality of laws that discriminate against groups that possess significant political influence.[9]

---

[9] While we recognize that the attainment of high political office by someone belonging to a particular group may have little if any correlation with the degree to which the group *qua* group enjoys political power, it is worth noting that racial minorities have served as President of the United States, Attorney General, Secretary of State, and held numerous other state and federal positions.  The 113th Congress contains 44 African Americans.  *See* House Press Gallery, *Demographics*, http://pressgallery.house.gov/member-data/demographics (last visited Mar. 25, 2014); United States Senate, *Ethnic Diversity in the Senate*, http://www.senate.gov/artandhistory/history/common/briefing/minority_senators.htm (last visited Mar. 25, 2014).

Women have served as Secretary of State, Attorney General, Speaker of the House, Secretary of Health and Human Services, and Secretary of Homeland Security, and have held numerous additional powerful state and federal positions.

African-Americans, for example, had made significant political gains at the time of many of the Court's most important decisions applying strict scrutiny to racial classifications.  In *Loving*, 388 U.S. at 6 n.5, for example, the Court observed that fourteen states had repealed their anti-miscegenation statutes in the fifteen years leading up to that decision. The Court nevertheless unanimously applied strict scrutiny to a law that discriminated against African-Americans.

Women, too, had achieved substantial political successes when heightened scrutiny was first applied to sex-based classifications.  The *Frontiero* plurality observed, for example, that "the position of women in America ha[d] improved markedly in recent decades."  411 U.S. at 685.  Congress had enacted several statutory prohibitions on sex-based discrimination (including Title VII of the Civil Rights Act of 1964 and the Equal Pay Act of 1963), and both houses of Congress had garnered the supermajorities necessary to pass the Equal Rights Amendment. *Id.* at 687.  The plurality nonetheless correctly concluded that heightened scrutiny should apply to laws that discriminate on the basis of sex, citing the "long and unfortunate history of sex discrimination."  *Id.* at 684.[10]

---

The 113th Congress contains 102 women, including 20 senators.  *See* House Press Gallery, *supra*; United States Senate, *Women in the Senate*, http://www.senate.gov/artandhistory/history/common/briefing/women_senators.ht m (last visited Mar. 25, 2014).

[10] Moreover, the Court has applied heightened scrutiny even to classes that have historically been among the most politically powerful in the nation.  *See Craig v.*

2.    There is little doubt that the consideration of limited political power weighs heavily in favor of heightened scrutiny of laws that discriminate against gay men and lesbians.

Gay men and lesbians have often failed in attempts to secure federal or state legislation to limit discrimination against them.  Women and racial minorities, by contrast, have long enjoyed such protections.  For example, to this day, twenty-nine states still have no laws prohibiting discrimination against gays and lesbians in employment, housing, or public accommodations, notwithstanding the history of discrimination discussed above.  *See* Human Rights Campaign, *Statewide Employment Laws and Policies* (Jan. 15, 2014), *available at* http://s3.amazonaws.com/hrc-assets//files/assets/resources/employment_laws_1-2014.pdf; *see also* Letter from United States GAO to Hon. Tom Harkin et al., *Sexual Orientation and Gender Identity Employment Discrimination: Overview of State Statutes and Complaint Data* (Oct. 1, 2009), *available at* http://www.gao.gov/new.items/d10135r.pdf.    Five states still forbid same-sex

---

*Boren*, 429 U.S. 190, 208-10 (1976) (men); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 494 (1989) (whites); *Adarand*, 515 U.S. at 227-31 (same).  The Court in these cases was fully aware of the substantial political power held by those groups.  *See Craig*, 429 U.S. at 219 (Rehnquist, J., dissenting) ("There is no suggestion in the Court's opinion that males in this age group are in any way peculiarly disadvantaged …."); *Croson*, 488 U.S. at 495 ("*Even were we* to accept a reading of the guarantee of equal protection under which the level of scrutiny varies according to the ability of different groups to defend their interests in the representative process, heightened scrutiny would still be appropriate in the circumstances of this case." (emphasis added)).

couples from adopting children, *Pedersen*, 881 F. Supp. 2d at 327-28, and many more prohibit same-sex couples from marrying.  In the last two decades, more than two-thirds of ballot initiatives that proposed to enact (or prevent the repeal of) basic employment antidiscrimination protections for gay and lesbian individuals have failed.  *See* Brad Sears et al., Williams Institute, *Documenting Discrimination on the Basis of Sexual Orientation and Gender Identity in State Employment* 13-2 (2009),      *available      at*      http://williamsinstitute.law.ucla.edu/research /workplace/documenting-discrimination-on-the-basis-of-sexual-orientation-and-gender-identity-in-state-employment/.[11]

Moreover, in some instances hard-fought gains in the battle for equal rights for gay men and lesbians have been rolled back by aggressive ballot initiatives. Voters have used initiatives or referenda to repeal or prohibit equal marriage rights for same-sex couples on thirty-three occasions in recent years.  In short, "more frequently than any other group" gay men and lesbians have had to respond to ballot initiatives "erect[ing] barriers against basic civil rights protections."  *Id.* at 13-1.

---

[11] *See* Jane S. Schacter, *Ely at the Altar:  Political Process Theory Through the Lens of the Marriage Debate*, 109 Mich. L. Rev. 1363, 1393 (2011) ("It hardly follows that a group is politically 'powerful' because it has achieved some success in securing legal remedies against some of the formal and informal discrimination that has long burdened the group.").

The prevalence of violence directed at gay and lesbian individuals is also a strong indicator of relative powerlessness. Anti-gay hate crimes increased dramatically between 2003 and 2008, and hate crimes targeting lesbian and gay individuals represent an increasingly large share of total hate crimes in the United States. *See* 153 Cong. Rec. S12,202 (daily ed. Sept. 27, 2007) (statement by Sen. Dianne Feinstein) (noting that 8 out of 100,000 African Americans report being a victim of a hate crime, as do 13 out of 100,000 LGB people). The threat of private discrimination and violence further undermines the ability of many gay and lesbian people to participate fully in the political process by encouraging them to stay "in the closet." Although recent increased acceptance in some areas of the country has encouraged more gay and lesbian individuals to live openly, many remain personally and politically "invisible."[12]

Gay and lesbian individuals also remain "vastly under-represented in this Nation's decisionmaking councils." *Frontiero*, 411 U.S. at 686 n.17. There are only seven openly gay persons currently serving in the Congress.[13] The Connecticut Supreme Court observed in 2008 that, of the more than half million people who then held political office at the local, state, and national levels in this

---

[12] *See* Schacter, *supra*, at 1384-86 (describing Professor Segura's testimony in *Perry v. Schwarzenegger*).

[13] David R. Sands, *113th Congress Mirrors Increasingly Diverse U.S.*, Wash. Times, Jan. 7, 2013, *available at* http://www.washingtontimes.com/news/2013/jan/7/113th-congress-mirrors-increasingly-diverse-us/#ixzz2KHEmHzJj.

country, only about 300 were openly gay. *See Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407, 446 (Conn. 2008).[14]   And, in marked contrast to the relative successes of members of other groups who have been accorded the protection of heightened scrutiny, no openly gay person has ever served in the United States Cabinet, or on any federal court of appeals.  In light of the very small number of openly gay public officials in the United States today, it is reasonable to conclude that lesbians and gay men have only one-fiftieth the representation they would have in the halls of government if it were not for the past and present discrimination against them.[15]  It is therefore not surprising that the Supreme Court in *Windsor* acknowledged that gay men and lesbians are "'a politically unpopular group.'"  *Windsor*, 133 S. Ct. at 2693 (quoting *United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 534-35 (1973)).

---

[14] The ability to hide one's sexual orientation is a hindrance rather than an aid in securing rights.  As Justice Brennan (joined by Justice Marshall) put it: "homosexuals constitute a significant and insular minority of this country's population.  Because of the immediate and severe opprobrium often manifested against homosexuals once so identified publicly, members of this group are particularly powerless to pursue their rights openly in the political arena." *Rowland v. Mad River Local Sch. Dist.*, 470 U.S. 1009, 1014 (1985) (Brennan, J., dissenting).

[15] Although the exact number of gay men and lesbians in the U.S. is unknown, a 2012 Gallup poll reported that 3.4% of Americans self-identify as lesbian, gay, bisexual, or transgender.  Gary J. Gates & Frank Newport, Gallup Politics, *Special Report: 3.4% of U.S. Adults Identify as LGBT* (Oct. 18, 2012), http://www.gallup.com/poll/158066/special-report-adults-identify-lgbt.aspx.  But only .06% of public officials are openly gay.  *Kerrigan*, 957 A.2d at 446.

22

It is true that there have been some recent political successes. However, a modicum of success in select jurisdictions is insufficient to establish that a historically oppressed and subordinated group can adequately protect itself in the political process more generally. *See Loving*, 388 U.S. at 6 & n.5; *see generally* Bruce A. Ackerman, *Beyond Carolene Products*, 98 Harv. L. Rev. 713, 742 (1985) (arguing that the Court's focus should be on "systematic disadvantages that undermine our system's legitimacy"); John Hart Ely, *Democracy and Distrust: A Theory of Judicial Review* 145-70 (1980) (discussing how deep-seated prejudice can distort the political process). The simple fact is that the barriers to achieving equal respect, equal dignity, and equal rights through the political process remain daunting. This is especially evident at the state level, where a substantial majority of jurisdictions still fervently opposes equal rights for gay men and lesbians, and where private discrimination is still often widespread and fierce. Just as the repeal of anti-miscegenation laws in some states was insufficient to prevent the *Loving* Court from employing heightened scrutiny to invalidate such laws in 1967, and just as laws prohibiting discrimination against women were insufficient to prevent the Court from employing heightened scrutiny to invalidate laws discriminating against women since the 1970s, so too are scattered victories in a handful of states

23

an insufficient basis on which to reject heightened scrutiny for laws that discriminate against gay and lesbian individuals today.[16]

### D. Sexual Orientation Is An "Immutable" Or "Defining" Characteristic

In deciding whether heightened scrutiny is appropriate, the Court has looked with particular suspicion upon laws that discriminate on the basis of "'immutable . . . or distinguishing characteristics that define [persons] as a discrete group.'" *Gilliard*, 483 U.S. at 602 (quoting *Lyng*, 477 U.S. at 638). This consideration derives from the "'basic concept of our system that legal burdens should bear some relationship to individual responsibility.'" *Frontiero*, 411 U.S. at 686; *cf. Fatin v. INS*, 12 F.3d 1233, 1239-40 (3d Cir. 1993) (Alito, J.) (characteristic is "'immutable'" when "'members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences'").

Accordingly, a law is more likely to receive heightened scrutiny if it discriminates against an individual based on a characteristic that she either cannot

---

[16] At oral argument in *Windsor*, Chief Justice Roberts remarked that "political figures are falling over themselves" to support Windsor's side of the case, and implied that this demonstrated "the political effectiveness" of recent advocacy on behalf of gay and lesbian persons. Oral Argument Tr. at 108-09, *Windsor v. United States*, 133 S. Ct. 2675 (2013) (No. 12-307), *available at* http://www.supremecourt.gov/oral_arguments/argument_transcripts/12-307 _jnt1.pdf. But rising political support is not, as past decisions make abundantly clear, a reason to reject heightened scrutiny.

realistically change, or ought not be compelled to change because it is fundamental to her identity. *See, e.g.*, *Plyler*, 457 U.S. at 220 (noting that illegal alien children "have little control" over that status); *Nyquist*, 432 U.S. at 9 n.11 (treating resident aliens as a suspect class despite their ability to opt out of that class); *Steffan v. Perry*, 41 F.3d 677, 689 n.9 (D.C. Cir. 1994) (noting that a "[c]lassification[] based on … religion, of course, would trigger strict scrutiny").[17]

Sexual orientation clearly falls within this category of defining personal characteristics. As the Supreme Court has acknowledged, sexual orientation is so fundamental to a person's identity that one ought not be forced to choose between one's sexual orientation and one's rights as an individual even if such a choice could be made. *See Lawrence*, 539 U.S. at 576-77 (recognizing that individual decisions by consenting adults concerning the intimacies of their physical relationships are "an integral part of human freedom").[18] In any event, there is

---

[17] The Supreme Court has on several occasions applied heightened scrutiny to laws that discriminate against a group whose defining characteristics are capable of alteration. These characteristics need not manifest in the form of an "obvious badge"; they often may be disclosed or suppressed as a matter of preference. *See Mathews v. Lucas*, 427 U.S. 495, 505-06 (1976); *see also Watkins*, 875 F.2d at 726 (Norris, J., concurring in judgment) ("It is clear that by 'immutability' the [Supreme] Court has never meant strict immutability…. At a minimum, … the Supreme Court is willing to treat a trait as effectively immutable if changing it would involve great difficulty, such as requiring a major physical change or a traumatic change of identity.").

[18] *See also, e.g.*, *In re Marriage Cases*, 183 P.3d 384, 442 (Cal. 2008) ("Because … sexual orientation is so integral an aspect of one's identity, it is not appropriate

now broad medical and scientific consensus that sexual orientation *is* an immutable characteristic. *See* Gregory M. Herek et al., *Demographic, Psychological, and Social Characteristics of Self-Identified Lesbian, Gay, and Bisexual Adults*, 7 Sex Res. Soc. Policy 176 (2010).

Nor is there any meaningful distinction between the "status" of being gay—a characteristic that defines a class—and "the propensity to engage in a certain kind of conduct" identified with being gay. The Supreme Court has emphatically rejected attempts to draw a distinction between "status and conduct" in defining the rights of "homosexual persons." *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 130 S. Ct. 2971, 2990 (2010) ("*CLS*"); *Lawrence*, 539 U.S. at 575 ("When homosexual *conduct* is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual *persons* to discrimination …." (emphasis added)); *see also id.* at 567 ("[I]t would demean a married couple were it to be said marriage is simply about the right to have sexual intercourse."); *id.* at 583 (O'Connor, J., concurring in

to require a person to repudiate or change his or her sexual orientation in order to avoid discriminatory treatment."); *Kerrigan*, 957 A.2d at 438 ("In view of the central role that sexual orientation plays in a person's fundamental right to self-determination, we fully agree with the plaintiffs that their sexual orientation represents the kind of distinguishing characteristic that defines them as a discrete group …."); *Golinski v. United States Office of Personnel Management*, 824 F. Supp. 2d 968, 987 (N.D. Cal. 2012) ("[S]exual orientation is so fundamental to one's identity that a person should not be required to abandon it."), *cert. denied*, 133 S. Ct. 2887 (2013).

judgment) ("While it is true that the law applies only to conduct, the conduct targeted by this law is conduct that is closely correlated with being homosexual. Under such circumstances, [the] law is targeted at more than conduct. It is instead directed toward gay persons *as a class*." (emphasis added)). Many earlier decisions were grounded on the now-discredited theory that homosexual *behavior* is changeable and therefore homosexuality is not immutable. Those decisions do not survive *Lawrence*, *CLS*, or *Windsor*.[19] *See Windsor*, 133 S. Ct. at 2690 (concluding that the Defense of Marriage Act was "directed to a class of persons" worthy of protection, *e.g.*, same-sex couples).

### E. Doctrinal Developments Culminating In Windsor v. United States Require Application Of Heightened Scrutiny

Before *Lawrence* was decided, this Court held that sexual orientation is not a suspect classification warranting heightened scrutiny. *Veney v. Wyche*, 293 F.3d 726, 731-32 & n.4 (4th Cir. 2002) (citing *Thomasson v. Perry*, 80 F.3d 915, 929 (4th Cir. 1996)). Doctrinal developments culminating in *Windsor*, however, require this Court to reexamine that conclusion.

---

[19] *E.g.*, *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 573 (9th Cir. 1990). Somewhat ironically, other lower court decisions applying rational basis review *did* recognize the status/conduct problem; they relied on *Bowers* and reasoned that it would be "anomalous … to declare status defined by conduct that states may constitutionally criminalize as deserving of strict scrutiny." *Padula v. Webster*, 822 F.2d 97, 103 (D.C. Cir. 1987); *see infra* at 28-29 & n.20.

The Supreme Court's decisions in *Romer v. Evans* and *Lawrence v. Texas* did not directly address the issue of heightened scrutiny, but they have clearly come to be understood as supporting such an analysis. *See Windsor v. United States*, 699 F.3d 169, 182 (2d Cir. 2012) (holding that *Lawrence* supported a finding of a history of discrimination and ultimately heightened scrutiny), *aff'd on other grounds*, 133 S. Ct. 2675, *cert. denied*, 133 S. Ct. 2885 *and* 133 S. Ct. 2884 (2013).

Moreover, in *Windsor*, the Supreme Court relied expressly on equal protection principles to strike down the Defense of Marriage Act (DOMA). *Windsor*, 133 S. Ct. at 2693-95. As in *Lawrence*, the Court did not explicitly address the standard of review applicable to laws that discriminate on the basis of sexual orientation, but it declared that the actual purpose of the law was impermissible animus: DOMA's purpose was "to impose a disadvantage, a separate status, and so a stigma upon all who enter into same-sex marriages." *Id.* at 2693. Because DOMA's "principal purpose is to impose inequality" and to "demean" same-sex married couples, the law was unconstitutional, in part because the "equal protection guarantee of the Fourteenth Amendment" prohibits exactly such demeaning laws. *Id.* at 2694-95 (citing *Lawrence*, 539 U.S. 558; *Bolling v. Sharpe*, 347 U.S. 497, 499-500 (1954)). That the Court focused as it did on the actual purpose of DOMA, rather than hypothesizing a *conceivably legitimate*

justification, demonstrates that it was implicitly applying a heightened standard of scrutiny. Thus, although most federal courts applied rational basis review in cases contesting the constitutionality of laws discriminating against gay and lesbian individuals before *Lawrence and Windsor*,[20] those decisions clearly changed the legal framework.

As the Ninth Circuit recognized in a recent decision challenging the constitutionality of a peremptory strike against a gay venire person, "[i]n its words and its deed, *Windsor* established a level of scrutiny for classifications based on sexual orientation that is unquestionably higher than rational basis review." *SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471, 481 (9th Cir. 2014). The Ninth Circuit correctly concluded that *Windsor* "reinforces the constitutional urgency of ensuring that individuals are not excluded from our most fundamental institutions because of their sexual orientation, *id.* at 485, and this Court should so hold.

* * * * *

---

[20] *See, e.g.*, *Perry v. Brown*, 671 F.3d 1052, 1080 n.13 (9th Cir. 2012) (citing *High Tech Gays*, 895 F.2d at 574); *Cook v. Gates*, 528 F.3d 42, 51 (1st Cir. 2008); *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1113 n.9 (10th Cir. 2008) (citing *Walmer v. U.S. Dep't of Def.*, 52 F.3d 851, 854 (10th Cir. 1995));; *Johnson v. Johnson*, 385 F.3d 503, 532 (5th Cir. 2004); *Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 818 & n.16 (11th Cir. 2004); *Woodward v. United States*, 871 F.2d 1068, 1076 (Fed. Cir. 1989)); *Ben-Shalom v. Marsh*, 881 F.2d 454, 464 (7th Cir. 1989); *Padula*, 822 F.2d at 103.

"[T]he judiciary's role under the Equal Protection Clause is to protect 'discrete and insular minorities' from majoritarian prejudice or indifference." *Croson*, 488 U.S. at 495. It is not seriously disputed that gay men and lesbians have experienced a history of purposeful discrimination on the basis of a characteristic that bears no relation to their ability to contribute to society. Gay men and lesbians also lack sufficient political power to protect themselves against continued discrimination. Sexual orientation is both fundamental to one's identity, *Lawrence*, 539 U.S. at 576-77, and not changeable through conscious decision, therapeutic intervention, or any other method. Laws that discriminate against gay and lesbian persons should therefore be tested by heightened judicial scrutiny. In line with this conclusion, though not explicitly endorsing it, *Windsor* closely scrutinized a federal law discriminating between same-sex and opposite-sex couples.

## CONCLUSION

For the foregoing reasons, this Court should hold that laws that classify individuals for disparate treatment on the basis of their sexual orientation trigger heightened scrutiny.

Respectfully submitted,

/s/ Lori Alvino McGill

GEOFFREY R. STONE
THE UNIVERSITY OF
    CHICAGO LAW SCHOOL
1111 E. 60th Street
Chicago, IL 60637
(773) 702-4907
gstone@uchicago.edu

LORI ALVINO MCGILL
    *Counsel of Record*
LATHAM & WATKINS LLP
555 11th Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2319
lori.alvino.mcgill@lw.com

April 11, 2014

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(a)

Counsel for *Amici Curiae* hereby certifies that:

1.  This Brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  The Brief contains 6,981 words (as calculated by the word processing system used to prepare this brief), excluding the parts of the Brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.  This Brief complies with the type face requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The Brief has been prepared in proportionally spaced typeface using Microsoft Word in 14 point Times New Roman style font.

Dated: April 11, 2014

Respectfully Submitted,

/s/ Lori Alvino McGill
Lori Alvino McGill
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC  20004
(202) 637-2200

*Attorneys for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of April, 2014, the foregoing document was filed with the clerk's office for the United States Court of Appeals for the Fourth Circuit and served on counsel of record via the Court's ECF system.

/s/ Lori Alvino McGill
Lori Alvino McGill