No. 14-1167 (L)

—————————————

# In the United States Court of Appeals for the Fourth Circuit

—————————————

TIMOTHY B. BOSTIC, individually, et al., *Plaintiffs-Appellees,*
v. GEORGE SCHAEFER III, in his official capacity as the Clerk of Court for Norfolk Circuit Court, et al.,
*Defendants-Appellants.*

—————————————

Appeal from the United States District Court for the Eastern District of Virginia, Civil Case No. 2:13-CV-395-AWA-LRL (Honorable Arenda L. Wright Allen)

—————————————

**BRIEF OF PEOPLE OF FAITH FOR EQUALITY IN VIRGINIA (POFEV), CELEBRATION CENTER FOR SPIRITUAL LIVING, CLARENDON PRESBYTERIAN CHURCH, COMMONWEALTH BAPTIST CHURCH, CONGREGATION OR AMI, HOPE UNITED CHURCH OF CHRIST, LITTLE RIVER UCC, METROPOLITAN COMMUNITY CHURCH OF NORTHERN VIRGINIA, MT. VERNON UNITARIAN CHURCH, ST. JAMES UCC, ST. JOHN'S UCC, NEW LIFE METROPOLITAN COMMUNITY CHURCH, UNITARIAN UNIVERSALIST FELLOWSHIP OF THE PENINSULA, UNITARIAN UNIVERSALIST CONGREGATION OF STERLING, UNITED CHURCH OF CHRIST OF FREDERICKSBURG, UNITARIAN UNIVERSALIST CHURCH OF LOUDOUN,, REV. MARIE HULM ADAM , REV. MARTY ANDERSON, REV. ROBIN ANDERSON, REV. VERNE ARENS, RABBI LIA BASS, REV. JOSEPH G. BEATTIE, REV. MARC BOSWELL, REV. SUE BROWNING, REV. JIM BUNDY, REV. MARK BYRD, REV. STEVEN C. CLUNN, REV. DR. JOHN COPERHAVER, RABBI GARY CREDITOR, REV. DAVID ENSIGN, REV. HENRY FAIRMAN, RABBI JESSE GALLOP, REV. TOM GERSTENLAUER, REV. DR. ROBIN H. GORSLINE, REV. TRISH HALL, REV. WARREN HAMMONDS, REV. JON HEASLET, REV. DOUGLAS HODGES, REV. PHYLLIS HUBBELL, REV. STEPHEN G. HYDE, REV. JANET JAMES, REV. JOHN MANWELL, REV. JAMES W. MCNEAL,**

**ANDREW MERTZ, REV. ANDREW CLIVE MILLARD, REV. DR. MELANIE MILLER, REV. AMBER NEUROTH, REV. JAMES PAPILE, REV. LINDA OLSON PEEBLES, REV. DON PRANGE, RABBI MICHAEL RAGOZIN, RABBI BEN ROMER, REV. JENNIFER RYU, REV. ANYA SAMMLER-MICHAEL, RABBI AMY SCHWARTZMAN, REV. DANNY SPEARS, REV. MARK SURIANO, REV. ROB VAUGHN, REV. DANIEL VELEZ-RIVERA, REV. KATE R. WALKER, REV. TERRYE WILLIAMS, AND REV. DR. KAREN-MARIE YUST AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

_____

JOHN HUMPHREY
*Counsel of Record*
THE HUMPHREY LAW FIRM
107 S. West St., PMB 325
Alexandria, VA 22314
Phone: 703-599-7919
Fax: 703-637-4483
Email: humphrey.law@earthlink.net

*Counsel for Amici People of Faith for Equality Virginia, Virginia Congregations, and Virginia Clergy*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................. iii

INTEREST OF AMICI CURIAE ...................................................... 1

ARGUMENT ................................................................................ 2

I.    THE CONSTITUTION REQUIRES VIRGINIA'S
      MARRIAGE LAWS DISCRIMINATING AGAINST
      LESBIAN AND GAY PERSONS BE SUBJECT TO
      HEIGHTENED JUDICIAL SCRUTINY ................................... 3

      A. Marriage Has Evolved Over Time in Virginia As
         Exclusion Laws Have Been Eliminated, Added, and
         Eliminated Again .......................................................... 4

      B. Virginia's Marriage Discrimination Laws Serve the
         Same Function in an Overall Scheme of Discrimination
         that Earlier Marriage Restrictions Did Against Other
         Disfavored Groups ....................................................... 6

         1. Marriage Discrimination against Servants and Slaves ............. 7

            a. Indentured Servants ....................................... 7

            b. Slaves .......................................................... 10

         2. Marriage Discrimination Based on Race ............................... 13

            a. The Colonial Period Through the Civil War ............... 13

            b. The Post-Civil War Period ............................ 16

         3. Marriage Discrimination Against Religious Minorities ......... 20

         4. Marriage Discrimination Against Persons with Mental
            Illness or Certain Disabilities ................................ 22

i

C.  Virginia's Laws Excluding Gay and Lesbian Couples
from Legal Recognition of Their Marriages Are Rooted
in Discrimination, Not Protecting Marriage................................ 24

CONCLUSION ............................................................................ 27

ii

# TABLE OF AUTHORITIES

## CASES

*City of Cleburne v. Cleburne Living Ctr., Inc.* 473 U.S. 432 (1985) .....................24

*Lawrence v. Texas*, 539 U.S. 558, 578-79 (2003) ...............................................5, 26

*Loving v. Virginia*, 388 U.S. 1 (1967) ...................................................................18


## CONSTITUTIONAL PROVISIONS AND STATUTES

Va. Const. art. I, § 15-A ...........................................................................................4

1 WILLIAM WALTER HENING, STATUTES AT LARGE 146 (1823) ..............................14

1 WILLIAM WALTER HENING, STATUTES AT LARGE 149 (1823) ..............................20

2 WILLIAM WALTER HENING, STATUTES AT LARGE 165-66 (1823).........................21

1 WILLIAM WALTER HENING, STATUTES AT LARGE 191 (1823) ..............................20

1 WILLIAM WALTER HENING, STATUTES AT LARGE 252-53 (1823).........................8

1 WILLIAM WALTER HENING, STATUTES AT LARGE 257 (1823) ...............................7

1 WILLIAM WALTER HENING, STATUTES AT LARGE 441-2 (1823)............................7

1 WILLIAM WALTER HENING, STATUTES AT LARGE 532-33 (1823).........................21

2 WILLIAM WALTER HENING, STATUTES AT LARGE 114 (1823) ...............................8

2 WILLIAM WALTER HENING, STATUTES AT LARGE 116-17 (1823).........................11

3 WILLIAM WALTER HENING, STATUTES AT LARGE 86-87 (1823)....................14, 15

3 WILLIAM WALTER HENING, STATUTES AT LARGE 441 (1823) ...............................8

3 WILLIAM WALTER HENING, STATUTES AT LARGE 447 (1823)...................7, 15, 16

5 WILLIAM WALTER HENING, STATUTES AT LARGE 550 (1823) ..............................16

6 WILLIAM WALTER HENING, STATUTES AT LARGE 359 (1823) ..............................16

12 William Walter Hening, Statutes at Large, 84-86 (1823)...................................21

iii

1865 Va. Acts c. 18, § 1, p. 85 (amending 1860 Code of Virginia, c. 108, § 14) ... 19

1865 Va. Acts c. 18, § 2, p. 85 ................................................................. 12

1867 Va. Acts c. 127, p. 951 .................................................................... 13

Va. Code § 49 (1887) ............................................................................... 17

1910 Va. Acts c. 357, p. 581 .................................................................... 18

1918 Va. Acts c. 300, p. 473 .............................................................. 22, 23

Va. Code § 4493 (1918) .......................................................................... 23

Va. Code § 4494 (1918) .......................................................................... 23

Racial Integrity Act, 1924 Va. Acts c. 371, § 5, p. 535 ................. 17, 18, 19

1924 Va. Acts c. 394, § 2, p. 569 ............................................................ 22

Va. House J. Res. 607 (2001) .................................................................. 22

Va. Code § 20-45.2 ................................................................................... 4

Va. Code § 20-45.3 ................................................................................... 4

## BOOKS AND JOURNALS

GEORGE MACLAREN BRYDON, VIRGINIA'S MOTHER CHURCH AND THE POLITICAL CONDITIONS UNDER WHICH IT GREW, (Virginia Historical Society, 1947) ......................................................... 20, 21

Mark R. Cheathem, *The Domestic Slave Trade and the U.S. Constitution*, 35 REVIEWS IN AM. HISTORY 374 (2007) .................................................. 11

WESLEY FRANK CRAVEN, WHITE, RED, AND BLACK: THE SEVENTEENTH CENTURY VIRGINIAN (1971) .................................................................. 10

K.G. DAVIES AND B.C. SHAFER, THE NORTH ATLANTIC WORLD IN THE SEVENTEENTH CENTURY (University of Minnesota Press, 1974) ......................... 9

iv

Gregory Dorr, *Racial Integrity Laws of the 1920s*, ENCYCLOPEDIA VIRGINIA (Virginia Foundation for the Humanities: 2012)...............................................17

H. J. ECKENRODE, SEPARATION OF CHURCH AND STATE IN VIRGINIA (1910) ..........21

David W. Galenson, *The Rise and Fall of Indentured Servitude in the Americas: An Economic Analysis*, 44 J. of Economic History 1 (1984)..............9

Michael Guasco, *From Servitude to Slavery* in THE ATLANTIC WORLD: 1450-2000, TOYIN FALOLA AND KEVIN D. ROBERTS, EDS. (Bloomington: Indiana University Press, 2008)........................................................................10

National Humanities Center, *On Slaveholders' Sexual Abuse of Slaves – Selections from 19th and 20th Century Slave Narratives* (2009) .........................12

National Park Service, *African Americans at Jamestown* (http://www.nps.gov/jame/historyculture/african-americans-at-jamestown.htm)..........................................................................................11

MICHAEL TADMAN, SPECULATORS AND SLAVES: MASTERS, TRADERS, AND SLAVES IN THE OLD SOUTH 45, 147 (1989).........................................................11

Reginald Washington, *Sealing the Sacred Bonds of Holy Matrimony: Freedmen's Bureau Marriage Records*, 37 NAT'L ARCHIVES & RECORDS ADMIN. PROLOGUE MAGAZINE (Spring 2005).   .................................................10

Peter Wallenstein, *Law and the Boundaries of Place and Race in Interracial Marriage*, 32 Akron L. Rev. 557 (1999) ...........................................................18

Brendan Wolfe and Martha McCartney, *Indentured Servants in Colonial Virginia* in ENCYCLOPEDIA VIRGINIA (Virginia Foundation for the Humanities 2012).........................................................................................8, 10

## NEWS ARTICLES

*Both Convicted*, THE RICHMOND PLANET (Jan. 30, 1909) ..................................17, 18

*Gay Couples Turned Away on Valentine's Day in Virginia* (Fox 5 News, Washington, D.C., Feb. 14, 2014) ...................................................................26

*Gay Marriage Advocates Rally For Equality* (WRIC-TV, ABC News 8, Richmond, Feb. 14, 2014) ...................................................................26

*Interfaith Movement Holds Love Rally in Leesburg* (Leesburg Today, March 20, 2014) ...............................................................................26

*Judge Rules for Gay Marriage: Valentine's Day Protest Turns into Celebration in Manassas* (Prince Williams Times, Manassas, Feb. 19, 2014) .......................................................................................26

*Lesbian Couple Apply for License in Staunton* (Staunton News-Leader, Staunton, Feb. 14, 2014) .................................................................26

*Local Clergy Members Lead Spring Blessing for Same-Sex Couples on Courthouse Grounds* (Washington Post, March 22, 2014) .................................26

*Lynchburg faithful gather to stand on the side of marriage equality* (Augusta Free-Press, April 16, 2014) .................................................................26

*POEFV Rallies On: Virginia Interfaith Group Holds Rescheduled Loudoun Co. Rally for Marriage Equality* (Metro Weekly, Washington, D.C., March 21, 2014) ......................................................................26

*Prince Edward Circuit Court*, FARMVILLE HERALD (Jan. 2, 1909) .........................17

*Rally for same-sex marriage held in Lynchburg* (Lynchburg News-Advance, April 16, 2014) .................................................................26

*Same-Sex Couples Seek Marriage Licenses During Annual March* (CBS News 19, Charlottesville, March 5, 2014) ..........................................26

*Williamsburg Activists Hail Ruling Against Gay Marriage Ban* (Virginia Gazette, Williamsburg, Feb. 14, 2014) .................................................26

## OTHER AUTHORITY

"Application for a Marriage License," Library of Virginia (http://lva.omeka.net/items/show/85) .................................................................23

Catholic Diocese of Richmond, *History of the Diocese and Diocesan Statistics* (http://www.richmonddiocese.org/node/12)......................................................21

*Historical Census Browser*, University of Virginia, Geospatial and Statistical Data Center at http://mapserver.lib.virginia.edu/ ..............................10

Letter to Sen. Bill Frist from GAO Assoc. Gen. Counsel Dayna Shah (Jan. 23, 2004) (http://www.thetaskforce.org/downloads/reports/reports/GAOBenefits.pdf)....25

Letter from Walter Plecker to Mrs. Robert Cheatham, April 30, 1924 (quoted in J. DOUGLAS SMITH, MANAGING WHITE SUPREMACY: RACE, POLITICS, AND CITIZENSHIP IN JIM CROW VIRGINIA 91)......................................19

## INTERESTS OF *AMICI CURIAE*

*Amici* People of Faith for Equality in Virginia (POFEV) is a 501(c)(3) not-for-profit organization working with religious congregations and individuals in local communities to achieve equality under the law for all Virginians regardless of sexuality, gender, and gender expression and identity; to ensure that all families and individuals are honored; and to create and sustain open and welcoming communities of faith.  POFEV's board members who have joined in their individual capacity are each conducting similar work as individuals in their community.

The fifteen *amici* congregations are all Virginia congregations affiliated with many different religious traditions and denominations, including The Alliance of Baptists, Centers for Spiritual Living, Conservative Judaism, the Presbyterian Church (U.S.A.), Union for Reform Judaism, the Unitarian Universalist Association of Congregations, the United Church of Christ, and the Universal Fellowship of Metropolitan Community Churches.  Among the membership of these congregations are individuals who are lesbian or gay and families who have lesbian or gay members.  Many of these congregations' families are headed by a lesbian or gay couple who have been married legally in other jurisdictions or who have had religious marriages or blessings of their relationships in the congregations themselves.  These congregations have experienced and believe that there is no

1

distinction between the love of different-sex and same-sex couples and that all families would be strengthened by the legal recognition of marriages between persons who are of the same sex.

The forty-six *amici* clergy and interns all live in or serve in Virginia. They have been, are, or desire to be licensed in Virginia to perform marriage ceremonies. As part of their religious responsibilities as clergy and pastors, they have counseled many lesbian, gay, and straight couples who are contemplating marriage and many families with lesbian, gay, and straight members about their lives and relationships. Like the *amici* congregations, they have experienced and believe that there is no distinction between the love of different-sex and same-sex couples and that all families would be strengthened by the legal recognition of marriages among couples of the same sex. These clergy have been ordained by or serve congregations or institutions affiliated with The Alliance of Baptists, Centers for Spiritual Living, the Christian Church (Disciples of Christ), the Cooperative Baptist Fellowship, Conservative Judaism, the Episcopal Church, the Presbyterian Church (U.S.A.), Union for Reform Judaism, the Unitarian Universalist Association of Congregations, the United Church of Christ, the Universal Fellowship of Metropolitan Community Churches, and the United Methodist Church.

## ARGUMENT

## II.   THE CONSTITUTION REQUIRES VIRGINIA'S MARRIAGE LAWS DISCRIMINATING AGAINST LESBIAN AND GAY PERSONS BE SUBJECT TO HEIGHTENED JUDICIAL SCRUTINY

Virginia's laws which exclude lesbian and gay persons from legal recognition of their loving, committed relationships must be subject to heightened judicial scrutiny.  *Amici* POFEV, *et al.*, endorse the arguments in favor of heightened scrutiny offered by Defendant-Appellant Rainey ("Rainey Br."), Plaintiff-Appellees ("Bostic Br."), and Intervenors ("Harris Br.") in their briefs on the basis that marriage is a fundamental right (Rainey Br. 19-24; Bostic Br. 26-31; Harris Br. 12-21) and that Virginia's laws excluding gays and lesbians from the right to marry discriminate on the basis of sexual orientation and gender (Rainey Br. 24-39; Bostic Br. 32-40; Harris Br. 21-33).

In addition to the rationales that the parties offer in support of applying heightened scrutiny, *amici* offer two separate arguments showing why laws excluding lesbians and gays as a group from legal marriage meet the test for heightened scrutiny and how they are being deprived of a fundamental right.  First, Virginia's exclusion of lesbians and gays from the right to marry is a continuation of a long-standing pattern in Virginia of using exclusion from marriage to ostracize and suppress disfavored groups in the state.  Looking back at past marriage

3

exclusion laws that now are widely recognized as motivated by animus, but at the time represented deeply and broadly held social beliefs, makes the similar invidious nature in Virginia's current marriage exclusion laws more apparent. Second, the laws challenged in the present case also should be viewed in the context of Virginia's related history of using marriage laws as powerful cogs in much larger engines driving discrimination against disfavored groups.

### A. Marriage Has Evolved Over Time in Virginia As Exclusion Laws Have Been Eliminated, Added, and Eliminated Again

Virginia's marriage laws exclude gay and lesbian Virginians from access to the legal institution of marriage by refusing to recognize any marriage between two persons who are not of the same sex.  Va. Const. art. I, § 15-A; Va. Code § 20-45.2; Va. Code § 20-45.3.  Such a strategy of suppression is sadly not new in Virginia.

Virginia's history regarding what modern courts now understand to be the fundamental right to have one's loving relationship with another legally recognized as a marriage begins with an institution in Virginia that was not widely available to most Virginians, but was instead reserved for the privileged few.  Since nearly Virginia's beginning, restricting disfavored groups' access to legally recognized marriage—and to alternative arrangements in the face of marriage restrictions—has been at the core of efforts in darker moments of Virginia's history to suppress,

control, and ostracize groups who were disfavored. The goal of these marriage laws frequently has been to prevent, not promote, the creation of stable families.

Only over time, after the elimination, and at times addition, and then elimination again, of exclusions of many disfavored groups, did marriage in Virginia become much more expansive and inclusive. Such evolution occurred because the deep animus directed toward disfavored groups gave way sufficiently over time to an understanding that their exclusion from marriage was not rooted in the inability of any two people to love and commit to one another. Instead, it came to be understood, these exclusions were part of the larger machinery in place to advantage privileged groups at the expense of disfavored ones. As Justice Kennedy observed in his conclusion to the Supreme Court's majority opinion in *Lawrence v. Texas*,

> Had those who drew and ratified the Due Process Clauses of the Fifth Amendment or the Fourteenth Amendment known the components of liberty in its manifold possibilities, they might have been more specific. They did not presume to have this insight. They knew times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress. As the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom.

*Lawrence v. Texas*, 539 U.S. 558, 578-79 (2003).

Indeed, throughout Virginia's history the law has been equally prescriptive in refusing to recognize relationships of significant minorities of Virginians, and at times even majorities of Virginians, on the basis of various disfavored

5

characteristics.  Over its history Virginia's law has expressly excluded from legal recognition the relationships of couples because they were servants, or slaves, or African Americans, or of different races from one another, or afflicted with epilepsy, or judged to have a mental illness, or of a different intellectual ability, or were unwilling to marry according to the religious traditions of an established church, or just happened to love someone of the same sex.

### B. Virginia's Marriage Discrimination Laws Serve the Same Function in an Overall Scheme of Discrimination that Earlier Marriage Restrictions Did Against Other Disfavored Groups

The evolution of Virginia's marriage requirements over time demonstrates that refusing to give legal recognition to the committed relationships of lesbian and gay persons also has a critical function within the larger regulatory and statutory schemes designed to discriminate against and suppress their aspirations.  This function is the same one that previous marriage discrimination laws targeted at other groups were designed to do: to destabilize loving relationships of couples, to interfere with their ability to form stable relationships, to discourage their procreation, and to provide a critical part of the legal infrastructure needed to support a discriminatory social, political, and legal apparatus, just as marriage discrimination laws functioned under Jim Crow and the twentieth century eugenics movement.

6

### 1. Marriage Discrimination against Servants and Slaves

### a. Indentured Servants

In the seventeenth century, laws restricting access to marriage were an essential component of Virginia plantation owners' efforts to maintain control over the era's most disfavored group: indentured servants. Virginia tobacco was a labor-intensive industry, and landowning elites were deeply worried about the profitability of their plantations, the reliability of their labor force, and their social standing.

To protect the interests of planters, the legislature developed a system of laws to enable landowners to maintain control over the laborers indentured to them. Essential to this regime were laws that set or extended periods of indenture and laws designed to keep servants focused on work by taking away their right to marry. [1]

In 1642/43, the Virginia legislature, prompted by concern for "the great many abuses and much detriment … both against the law of God and likewise to the service of manye masters" caused by the "secret marriages of servants,"

---

[1] The legislature enacted a variety of laws setting terms of indenture. *See*, *e.g.*, 1 WILLIAM WALTER HENING, STATUTES AT LARGE 257 (Act XXVI of March 2, 1642-3) (1823) (setting terms of indenture of four to seven years for servants arriving without written contracts); 1 WILLIAM WALTER HENING, STATUTES AT LARGE 441-2 (Act XIV of March 13, 1657-8) (1823) (amending term of indenture for servants without written contracts); 3 WILLIAM WALTER HENING, STATUTES AT LARGE 447 (Act XVI) (April 23, 1705 session) (1823) (amending term of indenture for Christian servants without written contracts).

enacted a law requiring servants to have their masters' permission prior to

marrying. 1 WILLIAM WALTER HENING, STATUTES AT LARGE 252-53 (1823). Male

servants who married without permission were forced to serve their masters an

extra year, and female servants who married without permission had their period of

servitude doubled.[2] *Id.* Free persons who married a servant who did not have

permission to marry were required to pay the master the equivalent of two years'

service and a civil fine. *Id.* The 1661/62 legislature took additional steps to reduce

the likelihood that servant couples would marry.[3] It imposed a severe fine on any

minister who publicized a servant's intent to marry or who performed a marriage

without a written certificate from the servant's master. 2 WILLIAM WALTER

HENING, STATUTES AT LARGE 114 (1823).[4] The same law pressed any free person

who married a servant without the master's permission into a year's service with

the master unless he or she could pay a fine of 1500 pounds of tobacco. *Id.*

---

[2] Fifteen years later in 1657/58, the legislature reduced the penalty on female
servants to the same as that on men, only one year of additional service. 2
WILLIAM WALTER HENING, STATUTES AT LARGE 114 (1823).

[3] The law was re-enacted in substantially the same form in 1705. 3 William Walter
Hening, Statutes at Large 441 c. 48 § 6 (Oct. 23, 1705 session) ("An act
concerning Marriages").

[4] The fine to be imposed was 10,000 pounds of tobacco. *Id.* This is approximately
the amount of tobacco harvested by ten servants in an entire season. *See* Brendan
Wolfe and Martha McCartney, *Indentured Servants in Colonial Virginia* in
ENCYCLOPEDIA VIRGINIA (Virginia Foundation for the Humanities 2012) (noting
between 1620 and 1670, "the annual output of tobacco per hand rises from
approximately 710 pounds to around 1,600 pounds.")

8

The servants' loss of legal recognition of their relationships is stunning in several respects. First, it was imposed on many thousands of servants by statute after they had contracted to come to Virginia, and in light of poor communications of the day across the Atlantic and limited literacy among the servant class, even after the initial law was passed, many prospective servants may not have been aware of its existence before accepting an indenture and boarding a ship bound for Virginia.

Second, for much of Virginia's first 100 years, Virginia law deprived one-half of Virginia's population of the right to have their relationships legally recognized on the basis of their servant status. Slavery was not the dominant form of labor in Virginia prior to 1700.[5] Instead, during Virginia's first 100 years, labor was provided primarily by indentured servants. Three-fourths of all immigrants to

---

[5] David W. Galenson, *The Rise and Fall of Indentured Servitude in the Americas: An Economic Analysis*, 44 J. of Economic History 1, 9-10 (1984). By 1700, Virginia had a population of 60,000 including only 6,000 African slaves. K.G. DAVIES AND B.C. SHAFER, THE NORTH ATLANTIC WORLD IN THE SEVENTEENTH CENTURY (University of Minnesota Press, 1974) , p. 72-73.

Virginia were indentured.[6]  At points during this period, one-half or more of Virginia's residents were indentured servants.[7]

### b. Slaves

Virginia, as did all slave-holding states, refused to recognize any legal relationship between slaves, including relationships that slaves themselves intended as, and understood as, marriages.[8]  Thus, by the first U.S. census in 1790, Virginia's laws categorically excluded from marriage 39% of the state's populations – over 290,000 persons.[9]  By the Civil War, the number of slaves Virginia excluded from marriage rights had grown to more than 490,000 out of 1.6 million Virginians.  *Id.*

---

[6] WESLEY FRANK CRAVEN, WHITE, RED, AND BLACK: THE SEVENTEENTH CENTURY VIRGINIAN 5 (1971).  Of 120,000 immigrants to Virginia and Maryland between before 1700, 90,000 were indentured servants.  Michael Guasco, *From Servitude to Slavery* in THE ATLANTIC WORLD: 1450-2000, TOYIN FALOLA AND KEVIN D. ROBERTS, EDS. (Bloomington: Indiana University Press, 2008), p. 74.

[7] Brendan Wolfe and Martha McCartney, *Indentured Servants in Colonial Virginia* in ENCYCLOPEDIA VIRGINIA (Virginia Foundation for the Humanities 2012).

[8] Reginald Washington, *Sealing the Sacred Bonds of Holy Matrimony: Freedmen's Bureau Marriage Records*, 37 NAT'L ARCHIVES & RECORDS ADMIN. PROLOGUE MAGAZINE (Spring 2005).

[9] *Historical Census Browser*, University of Virginia, Geospatial and Statistical Data Center at http://mapserver.lib.virginia.edu/.

From the point that Virginia passed its first law addressing slavery in 1661,[10] it began to build a regulatory regime to protect the property interests of slave owners at the expense of slaves.  The denial of marriage recognition was critical to this emerging legal regime because marriage recognition would have conferred additional rights on slaves and denied certain freedoms to slave owners.  The lack of marriage rights created enormous obstacles to the creation of stable families.  Legal recognition of slave marriages would have made owner decisions to split and sell off family members run up against conflicting legal parental obligations and marital rights.[11]  Respect for existing marital relationships may have reduced

---

[10] 2 WILLIAM WALTER HENING, STATUTES AT LARGE 116-17 (1823) (providing a scheme to return captured runaway slaves and assigning to mulatto children the legal status of their mother, slave or free).  Africans first arrived in Jamestown in 1619 on a Dutch ship and were sold or traded for supplies, but as indentured servants, not slaves; the first evidence of someone in Virginia being a "slave for life" was in 1640.  National Park Service, *African Americans at Jamestown* (http://www.nps.gov/jame/historyculture/african-americans-at-jamestown.htm).

[11] Thirty percent of all child slaves were sold prior to reaching majority age in Virginia, and one half of all slaves sold were spouses or children separated from their families.  MICHAEL TADMAN, SPECULATORS AND SLAVES: MASTERS, TRADERS, AND SLAVES IN THE OLD SOUTH 45, 147 (1989).  The slave owning caste generally had the view that the disruption to slave lives "was minimal and temporary, presuming that blacks were inferior emotionally," a rationale that allowed slave owners "to depict themselves as paternalistic protectors even as slave families were torn apart."  Mark R. Cheathem, *The Domestic Slave Trade and the U.S. Constitution*, 35 REVIEWS IN AM. HISTORY 374 (2007).

sexual abuse of slaves by masters and forced pairings of slaves for purposes of

producing offspring that might bring higher prices at auction.[12]

Emancipation and the termination of the threats of slave owners' actions that

so severely undermined slave families still did not resolve the problem of existing

relationships between slaves being undocumented and unrecognized in the eyes of

the law, and thus without access to the legal benefits of marriage that existed at the

time. To remedy this, the Reconstruction Virginia legislature in 1865 enacted a

sweeping law recognizing all previously prohibited marriages among the half-

million former slaves that Virginia:

> [C]olored persons [who] before the passage of this act shall have
> undertaken and agreed to occupy the relation to each other of husband
> and wife, and shall be cohabiting together as such as the time of its
> passage, whether the rite of marriage shall have been solemnized
> between them or not, they shall be deemed husband and wife and be
> entitled to the rights and privileges, and subject to the duties and
> obligations of that relation in like manner as if they had been duly
> married by law; and all their children shall be deemed legitimate … .

1865 Va. Acts c. 18, § 2, p. 85 (1874 Code of Virginia, c. 103, § 4). The need to

express that the children were legitimated by the statute is a stark reminder of the

presumptions of modern life that did not apply to African Americans living under

slavery and demonstrates the extent to which non-recognition would have

---

[12] "I know these facts will seem too awful to relate," warns former slave William J.
Anderson in his 1857 narrative, ". . . as they are some of the *real* 'dark deeds of
American Slavery.'" National Humanities Center, *On Slaveholders' Sexual Abuse
of Slaves – Selections from 19th and 20th Century Slave Narratives* (2009).

continued to work a disability on the former slaves. Intestate inheritance rights, obligations to support children, and property rights are but a few of the legal benefits the couples and their families would have been denied without legal recognition of their existing relationships.[13]

### 2. Marriage Discrimination Based on Race

Restrictions on access to marriage were from their start a critical component of Virginia's overall scheme to suppress Africans and persons of African descent. As supplies of indentured servants in Virginia dwindled and enslavement of Africans became the dominant form of labor in the early eighteenth century, preventing racial mixing within families by marriage became an important social policy goal to preserve the privileged social position of whites in Virginia society. Racial mixing posed a threat to that order by calling into question the legal distinctions assigning people to the white or colored race, and thus the right of one group to receive certain privileges to the exclusion of another.

### a. The Colonial Period through The Civil War

The roots of Virginia's laws excluding interracial couples from the right to marry can be seen in Virginia's legislative records by 1630, when whippings were

---

[13] Underscoring the importance of this legal recognition and the total disregard that Virginia had previously for marriages among slaves, in 1867, the General Assembly also passed legislation directing the governor to obtain from the United States Government and to provide to county clerks the registers of solemnized marriage of colored persons that federal officers had obtained so that offspring of such marriages could be legitimized under the law. 1867 Va. Acts c. 127, p. 951.

ordered as punishment for one Hugh Davis "for abusing himself to the dishonor of

God and shame of Christians, by defiling his body in lying with a negro."

1 WILLIAM WALTER HENING, STATUTES AT LARGE 146 (1823). It was another

sixty years, in 1691, before the Virginia legislature passed the first law taking away

the right of interracial couples to marry in what would become a legacy of two

hundred and seventy-five years of criminalization of interracial marriage:

> And for the prevention of that abominable mixture and spurious issue
> which hereafter may encrease in this dominion, as well by the
> negroes, mulattoes, and Indians intermarrying with English, or other
> white women, as by their unlawfull accompanying of one another, *Be
> it enacted by the authority aforesaid, and it is hereby enacted*, that for
> the time to come whatsoever English or other white man or woman
> being free shall intermarry with a negroe, mulatto, or Indian man or
> woman bond or free shall within three months after such marriage be
> banished and removed from this dominion forever … .

3 WILLIAM WALTER HENING, STATUTES AT LARGE 86-87 (1823).

The integration of the ban on interracial marriage into the larger complex of

laws oppressing and discriminating against racial minority groups is evident in this

provision being included in a comprehensive 1691 law entitled *An Act to Suppress

Outlying Slaves*, which also included provisions addressing the apprehension of

escaped slaves and rules for setting slaves free.

The same Virginia legislature of 1691, like recent Virginia legislatures that

sought to restrict the access of gay and lesbian Virginians not only to marriage but

also any other "legal status for relationships of unmarried individuals that attempts

to approximate the design, qualities, significance or effects of marriage," Va.

Const. art. I, § 15-A, also was concerned that couples might attempt to create

families outside of legally recognized marriages. To discourage such aspirations,

the 1691 law contained heavy penalties on white women who bore children by

persons of color outside of wedlock. It provided that "if any English woman being

free shal (*sic*) have a bastard child by any negro or mulatto," the child was to be

given to the Church wardens to bind into service until the age of thirty-one, and the

woman herself had to pay a fine or be sold herself into servitude for five years.

3 WILLIAM WALTER HENING, STATUTES AT LARGE 86-87 (1823). Indentured white

women servants bearing interracial children were not given the option of paying

the fine. *Id.* [14]

    Indeed, to ensure that the entire mechanism of marriage was working to

discourage interracial marriage, the legislature enacted laws placing additional

significant economic burdens on people who sought or abetted interracial marriage.

In 1705, the legislature passed a law imposing a substantial fine on any minister

who performed a marriage between a white and colored person. 3 WILLIAM

WALTER HENING, STATUTES AT LARGE, 447, 454 (1823). The same law provided

---

[14] In 1705, the legislature revised the statute to punish any white *person* who
married a negro or mulatto with six months in prison and a substantial fine rather
than banishment. 3 WILLIAM WALTER HENING, STATUTES AT LARGE 447 (1823).
The minister performing the marriage was fined ten thousand pounds of tobacco.
*Id.*

that any white Christian indentured servant serving any white person was set free and acquitted of any service due if the master intermarried with any "negro, mulatto, or Indian, Jew, Moor, Mahometan, or other infidel."  3 WILLIAM WALTER HENING, STATUTES AT LARGE 447, 449-50.[15]

### b.  The Post-Civil War Period

After the emancipation of slaves during The Civil War, categorical exclusions of African-American slaves from marriage ended with the abolition of slavery.  However, Virginia continued to invidiously exclude mixed-race couples as a group from legal marriage recognition as part of a larger scheme to maintain the privileges the law and society gave to whites, and to deny such privileges to people of color, by keeping the races distinct.  In addition, Virginia's marriage laws continued to be a critical cog in Virginia's Jim Crow machinery oppressing African Americans.

The freeing of negro slaves after the Civil War threatened to undo the system of racial hierarchy that afforded whites substantial privileges during slavery, and the Virginia legislature began the process of developing legal schemes to continue to suppress the aspirations of freed slaves.  The process began with a law defining any person as "negro" or "Indian" who had one-fourth or more

---

[15] This statute was re-enacted in 1748 and 1753.  5 WILLIAM WALTER HENING, STATUTES AT LARGE 550 (1823); 6 WILLIAM WALTER HENING, STATUTES AT LARGE 359 (1823).

16

"negro" or "Indian" ancestry. Va. Code § 49 (1887). In 1910 and 1924, the legislature tightened definition of race again, resting by 1924 on a rule that a "single drop of blood" would designate someone as "negro" and one-sixteenth "Indian" ancestry would designate someone as Indian so long as they did also so have "negro" blood. Racial Integrity Act, 1924 Va. Acts c. 371, § 5, p. 535. [16]

The consequences of these definitions of race for couples and families were devastating, especially with regard to their effect of excluding couples from legal recognition for their marriages due to their race. In one case in 1909, for example, a husband Marcus Lindsay and wife Sophia Jones were indicted, tried and sentenced to two years in the state penitentiary for committing the crime of miscegenation. *Prince Edward Circuit Court*, FARMVILLE HERALD (Jan. 2, 1909). Mr. Lindsay, "the son of a white woman," had always believed that he had "colored blood in his veins" and "had associated with Negroes from his infancy, lived with them, and attended their churches and schools." *Both Convicted*, THE RICHMOND PLANET (Jan. 30, 1909). The court pronounced the case a "tragedy" for

---

[16] The reason for the discrepancy in ancestry between the definition of a "negro" and an "Indian" is that a number of prominent "white" families who claimed descent from John Rolfe and Pocahontas suddenly would have been designated "Indian" by the rule. Gregory Dorr, *Racial Integrity Laws of the 1920s*, ENCYCLOPEDIA VIRGINIA (Virginia Foundation for the Humanities: 2012).

17

both defendants, but found itself obligated to declare their marriage null and void and sentence them to the statutory minimum two years.  *Id.*[17]

Beyond the prosecutions of mixed-race couples for violating miscegenation statutes, Virginia's marriage laws played a role in the much larger scheme of race-based discrimination: a critical tool with which to implement segregation policies. In addition to reaffirming Virginia's miscegenation laws that dated back to 1691, the Racial Integrity Act directed the State registrar of vital statistics to "prepare a form whereon the composition of any individual, as Caucasian, Negro, Mongolian, American Indian, Asiatic Indian, Malay, or any mixture thereof, of any other non-Caucasic strains, and if there be any mixture, then, the racial composition of the parents and other ancestors, so as to show in what generations such mixture occurred."  *Id.*  Falsifying a registration certificate carried a punishment of one year in jail, and no marriage license could be issued unless the county clerk had "reasonable assurance that the statements as to color" of the applicants was correct.

---

[17] To demonstrate the vagaries of the animus against persons of color, the following year, in 1910, the legislature expanded the definition of "colored" to include more people.  In doing so it may have made the marriage between Mr. Lindsay and Ms. Jones legal depending upon Mr. Lindsay's ancestry.  The new law provided, "Every person having one-sixteenth or more of negro blood shall be deemed a colored person, and every person not a colored person having one-fourth or more of Indian blood shall be deemed an Indian." 1910 Va. Acts c. 357, p. 581. Other examples of Virginia couples excluded from the right to marry due to miscegenation prosecutions are collected in Peter Wallenstein, *Law and the Boundaries of Place and Race in Interracial Marriage*, 32 Akron L. Rev. 557 (1999).  And, of course, over fifty years later is the prosecution of Mildred and Richard Loving.  *Loving v. Virginia*, 388 U.S. 1 (1967).

*Id.* This rule even more fully engaged the state's marriage licensing apparatus in support of Jim Crow discrimination.[18]

Armed with the power of the office in the State's registrar of vital statistics, the state had the mechanisms required to gather any data it needed to racially classify its citizens for the end of imposing its discriminatory laws. Again, the consequences of this use of the marriage laws for families were real, as evidenced in this letter from Appellant Janet Rainey's predecessor as Director of the Virginia Bureau of Vital Statistics, Walter Plecker, to one mother informing her that he had determined the child's father was a "negro":

> This is to give you warning that this is a mulatto child and you cannot pass it off as white. A new law passed by the last legislature says that if a child has one drop of negro blood in it, it cannot be counted as white. You will have to do something about this matter and see that the child is not allowed to mix with white children, it cannot go to white schools and can never marry a white person in Virginia. It is an awful thing.

Letter from Walter Plecker to Mrs. Robert Cheatham, April 30, 1924 (quoted in J. DOUGLAS SMITH, MANAGING WHITE SUPREMACY: RACE, POLITICS, AND CITIZENSHIP IN JIM CROW VIRGINIA 91.

---

[18] Since 1865, ministers had been required to write in the required records of marriages whether the persons being married were "white" or "colored," but the state previously had not had such a prominent role in maintaining a centralized system of maintaining the records of individual's races. 1865 Va. Acts c. 18, § 1, p. 85 (amending 1860 Code of Virginia, c. 108, § 14).

19

### 3. Marriage Discrimination against Religious Minorities

Laws governing religious affairs in Virginia prior to the enactment of the Virginia Statute for Establishing Religious Freedom in 1786 categorically denied religious minorities the right to marry in their own traditions and were important parts of efforts to suppress these minorities in favor of the established Anglican Church. The establishment of Anglicanism throughout the colonial period posed significant disabilities on adherents of other faiths. During the early days of the colony, Virginians were required to take an oath of allegiance that included they recognize the King of England as the supreme authority in religious as well as civil matters, which forced Catholics and most non-Anglican Protestants to choose between their faith and living in Virginia. 1 WILLIAM WALTER HENING, STATUTES AT LARGE 191 (1823). From 1632, all ministers were required "to conforme themselves in all thinges according to the cannons of the church of England." 1 WILLIAM WALTER HENING, STATUTES AT LARGE 149 (1823).

The legislature was quite hostile to non-Anglicans through much of Virginia's colonial history. The activities of dissenting Protestants came before the legislature from time to time, who for example in 1649 placed specific prohibitions on the importation of Puritan ministers from other colonies,[19] regulated the

---

[19] GEORGE MACLAREN BRYDON, VIRGINIA'S MOTHER CHURCH AND THE POLITICAL CONDITIONS UNDER WHICH IT GREW 119, (Virginia Historical Society, 1947).

gatherings of Quakers in 1658,[20] and in 1662 required fines to be paid by any persons including in particular Anabaptists and Quakers who refused to have their children baptized[21]. In 1699, many these restrictions were eased for adherents of some Protestant traditions in 1699 with the legislature's acceptance of the English Act of Toleration of 1689 to Virginia.[22] Presbyterians, Quakers, and Huguenots who were able to comply with the Act of Toleration's requirements began to settle in Virginia in the wake of this greater tolerance of their beliefs.[23] However, Catholics, Unitarians, and other faiths continued to be unable to meet the act's requirements of professed allegiance to the ecclesiastical authority of the King of England,[24] and it was not until the passage in 1786 of Jefferson's Virginia Statute of Religious Freedom[25] that Virginia stopped excluding from legal recognition the relationships of any person married in a tradition other than the Anglican or Protestant traditions willing to conform to the requirements of the Act of Toleration.

As a result of this legislative hostility throughout the colonial period, until the end of the Revolutionary War, Virginia law excluded any non-Anglican clergy

---

[20] 1 WILLIAM WALTER HENING, STATUTES AT LARGE 532-33 (1823).

[21] 2 WILLIAM WALTER HENING, STATUTES AT LARGE 165-66 (1823).

[22] H. J. ECKENRODE, SEPARATION OF CHURCH AND STATE IN VIRGINIA 32 (1910).

[23] H. J. ECKENRODE, SEPARATION OF CHURCH AND STATE IN VIRGINIA 32 (1910).

[24] BRYDON, VIRGINIA'S MOTHER CHURCH 121, 173. The first Catholic Church in Virginia was not established until 1795. Catholic Diocese of Richmond, *History of the Diocese and Diocesan Statistics* (http://www.richmonddiocese.org/node/12).

[25] 12 William Walter Hening, Statutes at Large, 84-86 (1823).

person from being able to conduct a legally recognized marriage ceremony, and thus prevented all adherents to a tradition other than Anglicanism from being married in their own tradition if they wanted their marriage to be legally recognized.

### 4.  Marriage Discrimination against Persons with Mental Illness or Certain Disabilities

Virginia's law legalizing sterilization of persons in the care of the state who were judged to have mental illnesses, intellectual disabilities, or to have an inherited form of epilepsy are now infamous and relatively well known.  1924 Va. Acts c. 394, § 2, p. 569.  As noted in a resolution passed by Virginia General Assembly in 2001, however, "in practice, the eugenics laws were used to target virtually any human shortcoming or malady, including alcoholism, syphilis and criminal behavior."  Va. House J. Res. 607 (2001).  What is less focused on was that six years earlier, Virginia's had passed a law excluding individuals judged to have these same condition from the right to marry.   1918 Va. Acts c. 300, p. 473.  This legislation formed the "outside" of an "inside-outside" strategy in which persons committed to state hospitals were sterilized and those on the outside were barred from legal marriage.

As with Virginia's restrictions on marriage related to race, the full state apparatus regulating marriage was engaged by the law in the scheme to prevent a couple from marrying if one person in the couple was a woman under the age of 45

22

and if either she or her husband was "a habitual criminal, idiot, imbecile, hereditary epileptic or insane person." 1918 Va. Acts c. 300, p. 473. The Bureau of Vital Statistics was instructed to incorporate into all application forms for marriage licenses questions to obtain the information for the clerk of court to determine whether the applicants met the standards. See "Application for a Marriage License," Library of Virginia (http://lva.omeka.net/items/show/85). The men applying for the license then were required to certify that they and their fiancées were in compliance, and any applicant who making a false statement on the application was guilty of perjury, 1918 Va. Code § 4493, and subject to up to ten years in prison and a one thousand dollar fine, 1918 Va. Code § 4494.

One of the notable elements of the law is the extent to which it was transparent that its purpose was not to promote marriage, but, like the laws being challenged in the present suit, is to restrict access to the right of people to marry. Without the inclusion of the marriage restrictions, the reach of the sterilization laws depended upon decisions by family members, courts, and hospitals to commit persons to the care of the state's mental facilities. However, the engagement of the state's marriage enforcement machinery created a larger dragnet that served to make it more difficult for persons adjudged to have mental illness, intellectual disabilities, or an inherited form of epilepsy to form stable relationships with the person whom they loved and from whom they needed support.

23

## C. VIRGINIA'S LAWS EXCLUDING GAY AND LESBIAN COUPLES FROM LEGAL RECOGNITION OF THEIR MARRIAGES ARE ROOTED IN DISCRIMINATION, NOT PROTECTING MARRIAGE

Virginia's categorical exclusion of significant numbers of its residents from the right to have their marriages legally recognized on the basis of their shared characteristics demonstrates how misleading Appellants' ahistorical view of marriage in Virginia is. The importance of marriage is the one point upon which all the parties in this litigation agree. However, Virginia's history of excluding a wide array of disfavored groups from marriage to control and suppress them puts the mandated exclusion of gay and lesbian couples from marriage in a very different light.

What the painful history of exclusion of disfavored groups makes apparent is the degree to which Virginia frequently has used separation from the benefits and advantages of marriage to individuals as a weapon to suppress those the governing class views as not "as worthy or deserving." *City of Cleburne v. Cleburne Living Ctr., Inc.* 473 U.S. 432, 440 (1985). In view of this history of exclusion of disfavored groups from marriage, any mandated exclusion should be viewed with great skepticism. Appellants' protestations of the important role of marriage, which again few deny, miss the point that it is not marriage that is suspect here, but the exclusion from it. Virginia's marriage discrimination laws that single out

24

lesbian and gay Virginians for discriminatory treatment are no different, and they should be subject to exacting review.

As was true for other couples in other disfavored groups whose relationships the state has refused to recognize, discrimination against gay and lesbian Virginians is both a direct attack on the dignity and humanity of gay and lesbian Virginians and the central cog in the regulatory engine that drives broad-based discrimination against gays and lesbians. The failure of the state to legally recognize the loving, committed relationships of lesbian and gay couples has the effect of preventing them from accessing more than a thousand state and federal legal benefits and protections for them and their families that other couples receive.[26] Not having these benefits and protections makes lesbian and gay couples and their families more vulnerable to the pressures that all families face. This discrimination in marriage recognition therefore is at the hub of enforcing many other forms of discrimination that appear facially neutral but in total create substantial burdens on the families of lesbian and gay couples.

In witnesses around Virginia between February and April, 2014, religious congregations and individuals have poured out in public celebrations to stand with and support gay and lesbian Virginians who are part of their congregations and

---

[26] Letter to Sen. Bill Frist from GAO Assoc. Gen. Counsel Dayna Shah (Jan. 23, 2004) (http://www.thetaskforce.org/downloads/reports/reports/GAOBenefits.pdf).

their larger communities in the hope for marriage equality in Virginia.[27]  From

Alexandria to Leesburg to Lynchburg to Tidewater, religious communities in

Virginia have recognized what the U.S. Supreme Court foretold in *Lawrence v.*

*Texas*, that

> [T]imes can blind us to certain truths and later generations can see that laws
> once thought necessary and proper in fact serve only to oppress. As the
> Constitution endures, persons in every generation can invoke its principles in
> their own search for greater freedom.

*Lawrence v. Texas*, 539 U.S. 558, 578-79 (2003).

The history of marriage in Virginia has been a mixed blessing.  On the one

hand it offers the promise of love, stability, and support for those who are allowed

to access it.  On the other, Virginia has created a painful path for many whom it

---

[27] *See*, *e.g.*, Rally for same-sex marriage held in Lynchburg (Lynchburg News-
Advance, April 16, 2014); Lynchburg faithful gather to stand on the side of
marriage equality (Augusta Free-Press, April 16, 2014); Local Clergy Members
Lead Spring Blessing for Same-Sex Couples on Courthouse Grounds (Washington
Post, March 22, 2014); Interfaith Movement Holds Love Rally in Leesburg
(Leesburg Today, March 20, 2014); POEFV Rallies On: Virginia Interfaith Group
Holds Rescheduled Loudoun Co. Rally for Marriage Equality (Metro Weekly,
Washington, D.C., March 21, 2014); Same-Sex Couples Seek Marriage Licenses
During Annual March (CBS News 19, Charlottesville, March 5, 2014); Judge
Rules for Gay Marriage: Valentine's Day Protest Turns into Celebration in
Manassas (Prince Williams Times, Manassas, Feb. 19, 2014); Lesbian Couple
Apply for License in Staunton (Staunton News-Leader, Staunton, Feb. 14, 2014);
Gay Couples Turned Away on Valentine's Day in Virginia (Fox 5 News,
Washington, D.C., Feb. 14, 2014); Gay Marriage Advocates Rally For
Equality (WRIC-TV, ABC News 8, Richmond, Feb. 14, 2014); Williamsburg
Activists Hail Ruling Against Gay Marriage Ban (Virginia Gazette, Williamsburg,
Feb. 14, 2014).

has excluded for many different reasons—race, servitude, religious belief, intellectual disability, mental illness, physical infirmity, and sexual orientation. Now as later generations with the benefit of the hindsight of past injustices, this Court has the opportunity to right another wrong and ensure greater freedom not only for lesbian and gay Virginians, but for all.

## CONCLUSION

For the foregoing reasons, this Court should review under heightened scrutiny Virginian's discriminatory laws that exclude lesbian and gay Virginians from the right to have their loving, committed relationships recognized, and by doing so affirm in all respects the judgment of the District Court.

Date: April 18, 2014                          Respectfully submitted,

                                              /s/ John Humphrey
                                              John Humphrey
                                              THE HUMPHREY LAW FIRM
                                              107 S. West St., PMB 325
                                              Alexandria, VA 22314
                                              Phone: 703-599-7919
                                              Fax: 703-637-4483
                                              Email: humphrey.law@earthlink.net

## RULE OF APPELLATE PROCEDURE 32(a)

Counsel for *Amici Curiae* hereby certifies that:

    1.    This Brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). The Brief contains 6,999 words (as calculated by the word processing system used to prepare this brief), excluding the parts of the Brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

    2. This Brief complies with the type face requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The Brief has been prepared in proportionally spaced typeface using Microsoft Word in 14 point Times New Roman style font.

Date: April 18, 2014          Respectfully submitted,

                            /s/ John Humphrey
                            John Humphrey
                            THE HUMPHREY LAW FIRM
                            107 S. West St., PMB 325
                            Alexandria, VA 22314
                            Phone: 703-599-7919
                            Fax: 703-637-4483
                            Email: humphrey.law@earthlink.net

28

## STATEMENT OF COMPLIANCE WITH FED. R. APP. PROC. 29(c)(5)

No counsel for a party authored this brief in whole.  No party or counsel to a party made a monetary contribution intended to fund the preparation or submission of this brief.  No person other than an amicus curiae, its members or its counsel contributed money intended to fund preparing or submitting this brief.

Date: April 18, 2014                          Respectfully submitted,


/s/ John Humphrey
John Humphrey
THE HUMPHREY LAW FIRM
107 S. West St., PMB 325
Alexandria, VA 22314
Phone: 703-599-7919
Fax: 703-637-4483
Email: humphrey.law@earthlink.net

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of April, 2014, the foregoing document was filed with the clerk's office for the United States Court of Appeals for the Fourth Circuit and served on counsel of record via the Court's ECF system.


<u>/s/ John Humphrey</u>

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or
mandamus case, except that a disclosure statement is **not** required from the United
States, from an indigent party, or from a state or local government in a pro se case.
In mandamus cases arising from a civil or bankruptcy action, all parties to the
action in the district court are considered parties to the mandamus case. Corporate
defendants in a criminal or post-conviction case and corporate amici curiae are
required to file disclosure statements. If counsel is not a registered ECF filer and
does not intend to file documents other than the required disclosure statement,
counsel may file the disclosure statement in paper rather than electronic form.
Counsel has a continuing duty to update this information.

No. 14-1167          Caption: Bostic et al. v. Rainey et al.

Pursuant to FRAP 26.1 and Local Rule 26.1, each of the *amici curiae* listed below
make the following disclosure:

1. No *amicus* is a publicly held corporation or other public held entity.
2. No *amicus* has a parent corporation.
3. No *amicus* is a stock corporation and no amicus has ten percent or more of its
   stock owned by a publicly held corporation or other publicly held entity.
4. No publicly held corporation or other publicly held entity connected to an
   *amicus* has a direct financial interest in the outcome of the litigation (Rule
   26.1(b)).
5. No *amicus* is a trade association.
6. This case does not arise out of a bankruptcy proceeding.

Amici making the above disclosure:

Organizations: People of Faith for Equality in Virginia (POFEV), Celebration

Center for Spiritual Living, Clarendon Presbyterian Church, Commonwealth

Baptist Church, Congregation Or Ami, Hope United Church of Christ, Little River

UCC, Metropolitan Community Church of Northern Virginia, Mt. Vernon

Unitarian Church, St. James UCC, St. John's UCC, New Life Metropolitan
Community Church, Unitarian Universalist Fellowship of the Peninsula, Unitarian
Universalist Congregation of Sterling, United Church of Christ of Fredericksburg,
Unitarian Universalist Church of Loudoun,

<u>Individuals:</u> Rev. Marie Hulm Adam , Rev. Marty Anderson, Rev. Robin
Anderson, Rev. Verne Arens, Rabbi Lia Bass, Rev. Joseph G. Beattie, Rev. Marc
Boswell, Rev. Sue Browning, Rev. Jim Bundy, Rev. Mark Byrd, Rev. Steven C.
Clunn, Rev. Dr. John Coperhaver, Rabbi Gary Creditor, Rev. David Ensign, Rev.
Henry Fairman, Rabbi Jesse Gallop, Rev. Tom Gerstenlauer, Rev. Dr. Robin H.
Gorsline, Rev. Trish Hall, Rev. Warren Hammonds, Rev. Jon Heaslet, Rev.
Douglas Hodges, Rev. Phyllis Hubbell, Rev. Stephen G. Hyde, Rev. Janet James,
Rev. John Manwell, Rev. James W. McNeal, Andrew Mertz, Rev. Andrew Clive
Millard, Rev. Dr. Melanie Miller, Rev. Amber Neuroth, Rev. James Papile, Rev.
Linda Olson Peebles, Rev. Don Prange, Rabbi Michael Ragozin, Rabbi Ben
Romer, Rev. Jennifer Ryu, Rev. Anya Sammler-Michael, Rabbi Amy
Schwartzman, Rev. Danny Spears, Rev. Mark Suriano, Rev. Rob Vaughn, Rev.
Daniel Velez-Rivera, Rev. Kate R. Walker, Rev. Terrye Williams, and Rev. Dr.
Karen-Marie Yust.

Signature: _____/s/ John Humphrey_____ Date: _____4/18/14_____

Counsel for: _Amici_ listed above

## CERTIFICATE OF SERVICE

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

I certify that on April 21, 2014 the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ John Humphrey